V. 1,1

————— 2:16-cr-00046-GMN-PAL —————

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEVADA

3  UNITED STATES OF AMERICA,      )  Case No. 2:16-cr-46-GMN-PAL
                                  )
4              Plaintiff,         )  Las Vegas, Nevada
                                  )  March 15, 2017
5        vs.                      )  8:38 a.m.
                                  )  Courtroom 7C
6  ERIC J. PARKER (11),           )
   O. SCOTT DREXLER (12),         )  Jury Trial, Day 17
7  RICHARD R. LOVELIEN (13),      )  Volume 1
   STEVEN A. STEWART (14),        )
8  TODD C. ENGEL (15),            )
   GREGORY P. BURLESON (16),      )
9                                 )
              Defendants.         )
10 ———————————————————————————————)

11

12           REPORTER'S TRANSCRIPT OF PROCEEDINGS

13       BEFORE THE HONORABLE GLORIA M. NAVARRO,
            UNITED STATES DISTRICT CHIEF JUDGE

14

15 APPEARANCES:
   For the Plaintiff:

16
          STEVEN W. MYHRE, AUSA
17        NADIA JANJUA AHMED, AUSA
          NICHOLAS D. DICKINSON, AUSA
18        ERIN M. CREEGAN, SAUSA
          United States Attorney's Office
19        501 Las Vegas Boulevard South, Suite 1100
          Las Vegas, Nevada 89101
20        (702) 388-6336
   (continued next page)
21
   Court Reporter:        Patricia L. Ganci, RMR, CRR, CCR 937
22                        United States District Court
                          333 Las Vegas Boulevard South, Room 1334
23                        Las Vegas, Nevada 89101
                          PG@nvd.uscourts.gov
24
   Proceedings reported by machine shorthand.  Transcript produced
25 by computer-aided transcription.

```
─────────────────────── 2:16-cr-00046-GMN-PAL ───────────────────────
```

 1  APPEARANCES CONTINUED:

 2  For Defendant Eric J. Parker:

 3          JESS R. MARCHESE, ESQ.
            Law Office of Jess R. Marchese
 4          601 Las Vegas Boulevard South
            Las Vegas, Nevada 89101
 5          (702) 385-5377

 6  For Defendant O. Scott Drexler:

 7          TODD M. LEVENTHAL, ESQ.
            Leventhal and Associates
 8          626 South Third Street
            Las Vegas, Nevada 89101
 9          (702) 472-8686

10  For Defendant Richard R. Lovelien:

11          SHAWN R. PEREZ, ESQ.
            Law Office of Shawn R. Perez
12          626 South Third Street
            Las Vegas, Nevada 89101
13          (702) 485-3977

14  For Defendant Steven A. Stewart:

15          RICHARD E. TANASI, ESQ.
            Tanasi Law Offices
16          601 South 7th Street, 2nd Floor
            Las Vegas, Nevada 89101
17          (702) 906-2411

18  For Defendant Todd C. Engel:

19          TODD C. ENGEL, PRO SE
            #18427-023
20          Nevada Southern Detention Center
            2190 East Mesquite Avenue
21          Pahrump, Nevada 89060

22          JOHN G. GEORGE, ESQ. (Standby Counsel)
            800 South 8th Street
23          Las Vegas, Nevada 89101
            (702) 561-7855

24

25

```
                          2:16-cr-00046-GMN-PAL
```

1  APPEARANCES CONTINUED:

2  For Defendant Gregory P. Burleson:

3          TERRENCE M. JACKSON, ESQ.
           Law Office of Terrence M. Jackson
4          624 South 9th Street
           Las Vegas, Nevada 89101
5          (702) 386-0001

6  Also Present:

7          Sharon Gavin, Special Agent, FBI
           Joel Willis, Special Agent, FBI
8          Mike Abercrombie, FBI
           Mamie Ott, Legal Assistant

9

10                     INDEX OF EXAMINATIONS

11  TESTIMONY OF MARK SEYLER
      Direct Examination by Ms. Creegan         15
12    Cross-Examination by Mr. Perez            27
      Cross-Examination by Mr. Tanasi          126
13    Cross-Examination by Mr. Marchese        128
      Cross-Examination by Mr. Engel           134
14    Cross-Examination by Mr. Jackson         146
      Cross-Examination by Mr. Leventhal       157
15
    TESTIMONY OF TIMOTHY J. DEPPNER
16    Direct Examination by Ms. Ahmed          168

17  TESTIMONY OF JOSEPH WOOLSTENHULME
      Direct Examination by Ms. Ahmed          174
18    Cross-Examination by Mr. Tanasi          219
      Cross-Examination by Mr. Jackson         224
19    Cross-Examination by Mr. Marchese        233
      Cross-Examination by Mr. Leventhal       237
20    Redirect Examination by Ms. Ahmed        243
      Recross-Examination by Mr. Leventhal     245
21

22

23

24

25

2:16-cr-00046-GMN-PAL

GOVERNMENT'S EXHIBIT INDEX

| Exhibit No. | Admitted |
|---|---|
| 337A | 17 |
| 443 | 21 |
| 458 | 25 |
| 453, pages 3-6 | 171 |
| 143 | 187 |
| 460 | 192 |
| 149 | 195 |

DEFENDANT'S EXHIBIT INDEX

| Exhibit No. | Admitted |
|---|---|
| 5046 | 238 |

LAS VEGAS, NEVADA; MARCH 15, 2017; 8:38 A.M.

--oOo--

P R O C E E D I N G S

THE COURT:  Thank you.  You may be seated.

COURTROOM ADMINISTRATOR:  This is the time set for jury trial day 17 in Case No. 2:16-cr-46-GMN-PAL, United States of America versus Eric Parker, O. Scott Drexler, Ricky Lovelien, Steven Stewart, Todd Engel, and Gregory Burleson.

THE COURT:  All right.  Before I begin, I just want to make a couple of preliminary remarks to remind everyone -- I see the same familiar faces, but every once in a while there's someone new coming in, so I just want to make sure everybody knows that this is a courtroom and not a sporting event. Therefore, no expressions of your opinion, whether verbally or through body language, are permitted.  Also, in addition, any outbursts of any kind are not permitted.  The marshals have been instructed to remove anyone who makes any improper expression.

1           And also, no electronic devices are permitted, so
2   iPhones, iPads, laptops, what have you.  They're not permitted
3   even if they're turned off or in vibrate mode or private mode.
4   So please double-check and make sure that you don't have an
5   electronic device because, again, the marshals will ask you to
6   leave the courtroom if you have one.
7           No recording of any kind is permitted in Federal Court.
8   That means no audio recording, no video recording.  The
9   attorneys do have electronic devices so that they can review
10  discovery and present discovery in court, and they are not
11  permitted to record by audio or video any of the proceedings,
12  either.
13          All right.  So we have microphones for everyone.  The
14  podium has been moved.  So I think we're ready to go.  I did
15  want to double-check.  My notes are that Exhibit 337A has not
16  yet been admitted.  It was only going to be played for the
17  witness, and that's when we took our break.  So I just want to
18  make sure that that's clear, that it hasn't been admitted yet.
19          MS. CREEGAN:  Your Honor, that's correct, 337A has not
20  been admitted yet.  And I believe there's another record matter.
21  I think I may have been unclear about Exhibit 174.  I just want
22  to be clear that the government was withdrawing all but the
23  first page of 174.
24          THE COURT:  Which one was 174?
25          MS. CREEGAN:  174 is an e-mail which attached the

—2:16-cr-00046-GMN-PAL—

1   article to which it referred, and we withdrew the article and

2   left only the e-mail.

3          THE COURT:  Was that through Special Agent Seyler?

4          MS. CREEGAN:  Yes, Your Honor.  Toward the very

5   beginning of his testimony.

6          THE COURT:  Do you have that, Aaron?

7          COURTROOM ADMINISTRATOR:  Your Honor, yes, I do.  We

8   reviewed the transcript last night, and the transcript wasn't

9   overly clear.  It did mention removing the second page, but not

10  the subsequent pages.

11         THE COURT:  This is 174 or 184?

12         COURTROOM ADMINISTRATOR:  174.  The first page was an

13  e-mail and the subsequent pages were an article.  The e-mail

14  contained a link to the article.

15         THE COURT:  What's the numbering?  Where is that?  I've

16  got a lot of them here and I don't see 174.  Do you know in

17  sequence where it was?

18         COURTROOM ADMINISTRATOR:  Your Honor, it was in the

19  morning yesterday prior to our morning break.

20         THE COURT:  I see 194 and then 176, 178, 179, 197, 198.

21         COURTROOM ADMINISTRATOR:  That was after 174 was

22  admitted, so 174 would have been admitted prior to that.

23         THE COURT:  All right.  And so the clarification is

24  that only the first page is redacted?

25         MS. CREEGAN:  Only the first page will be an exhibit.

—————————— 2:16-cr-00046-GMN-PAL ——————————

1   The subsequent pages will be withdrawn.

2          THE COURT:  All right.  So only page 1 is what

3   you're -- what is actually admitted; you're withdrawing the rest

4   of the pages.

5          MS. CREEGAN:  Correct.  I believe I incorrectly said

6   the second page, when there are multiple subsequent pages.

7          THE COURT:  And for this clip that's coming up, I think

8   you said it was one minute.  There's no mention of any of the

9   other codefendants in there, is there?

10          MS. CREEGAN:  There is not and that's part of why we're

11   not able to play a significant portion of it -- of the

12   recording, because of Bruton issues.

13          THE COURT:  Okay.  Because that would be a potential

14   violation of the defendants' rights so that's been properly

15   redacted.

16          All right.  Any other motions that anyone wants to make

17   about this exhibit before we bring in the jury so that we don't

18   have to talk about what portions need to be redacted if there's

19   more that needs to be redacted?  It wouldn't make any sense to

20   have that discussion in front of the jury.  So is there anything

21   else that -- after this video, is there going to be another

22   video that might raise the same issue that we can address now

23   before we bring in the jury?

24          MS. CREEGAN:  This is the last audio recording or video

25   that I have to do with this witness.

1           MR. TANASI:  And, Your Honor, if I may, just -- the

2    clip that we were just talking about, what exhibit number was

3    that again, just so I'm clear?

4           THE COURT:  337A.

5           MR. TANASI:  337.  So we're not talking about 447,

6    right?

7           MS. CREEGAN:  447B, I believe, was already admitted, so

8    we're not admitting any other portion of 447.

9           MR. TANASI:  Okay.  Your Honor, there is, I think, an

10   issue with -- I guess since we're talking about it, there is an

11   issue with 447, the portion that was at least played and

12   admitted.  It was cut off, the portion that was played and

13   admitted, before Mr. Engel hands the microphone back to Cliven

14   Bundy.  Cliven Bundy receives the microphone, and he makes a

15   comment in regards to what Mr. Engel had just said.  And it's

16   something to the effect of, No, not exactly, or -- I don't

17   remember it exactly, but it's kind of in effort to distance

18   himself from Mr. Engel's comment.  And so contextually under the

19   rule of completeness, 106, I think that at least that extra 10

20   seconds should come in to kind of give context to the entire

21   situation.

22          THE COURT:  All right, but Mr. Cliven Bundy is not a

23   defendant in this case.  So there's no prejudice to him in this

24   case.

25          MR. TANASI:  Well, there's prejudice to the -- my

2:16-cr-00046-GMN-PAL

1  client in that Mr. Bundy is distancing himself from Mr. Engel's

2  words.  And with all due respect to Mr. Engel, my client is

3  doing the same thing.

4        THE COURT:  All right.  Well, obviously, I haven't seen

5  the tape.  I need to see it during the break.  In

6  cross-examination would you be asking to play the continuation

7  right after Mr. Engel stops speaking and you said the microphone

8  goes back to Mr. Cliven Bundy and then he disavows the

9  statements of Mr. Engel?

10        MR. TANASI:  That was my intent, Your Honor, yes.

11        THE COURT:  Does the government have any objection to

12  that or does Mr. Engel have any objection to that?

13        MS. CREEGAN:  We do, Your Honor.  We think that the

14  rule of completeness does not require admitting these

15  statements.  Mr. Engel's statement is presented in its entirety.

16  This press conference is part of an effort by the conspiracy to

17  whitewash some of these actions.  So it's in furtherance of the

18  conspiracy that Mr. Bundy recharacterizes some of his previous

19  statements, but it's not allowable or appropriate to bring in

20  self-serving hearsay that was toward that effort.  We've brought

21  in the admission.  That's the only proper segment that should be

22  admitted.

23        MR. ENGEL:  Your Honor, Cliven Bundy is asking, What

24  did people hear, with a microphone in his hand, and he asks me

25  to come forward.

1        THE COURT:  Right.  So what the government is saying is

2    that the statements by Cliven Bundy afterwards are not

3    inculpatory.  They're exculpatory.  Therefore, they're hearsay

4    that is not admissible.  So the Rules of Evidence permit

5    inculpatory statements as not being hearsay, but exculpatory

6    statements are not.  So that's -- it's a legal distinction, so I

7    know it's something that you may not have already known.  You

8    can talk to Mr. --

9        MR. ENGEL:  It's all the same conversation.  We're not

10   completing the conversation.

11       THE COURT:  I realize that, but it's an out-of-court

12   statement and only inculpatory out-of-court statements are

13   permitted.  The exculpatory statements can't be admitted as

14   hearsay.

15       MR. TANASI:  Your Honor, if I may just briefly speak to

16   a little more of that.  I understand the distinction between

17   inculpatory and exculpatory statements for purposes of the

18   hearsay component, but that's not the end-all be-all for the

19   completeness rule.  The completeness rule is to provide fairness

20   and context.  And, again, Mr. Bundy's statement provides

21   fairness in context.  And that's even based on the government's

22   own trial brief that came in, I think, last week.

23       Again, I understand the hearsay component -- hearsay

24   issue, but that's not the end-all be-all of Rule 106.

25       MS. CREEGAN:  Your Honor, I did brief this issue that

—2:16-cr-00046-GMN-PAL—

 1  defendant is not able to make an argument that the context needs
 2  to be set.  The rule of completeness requires that in order to
 3  show what the statement actually meant as to whether it was
 4  unfairly taken out of context, that there can be a simultaneous
 5  submission of another portion of the statement.  But it's not
 6  appropriate to say that there's other parts that we think will
 7  help put it in its proper setting.  And we've briefed some case
 8  law in that, including United States versus Doral and
 9  United States versus Vallejo.
10          THE COURT:  I agree.  Rule 106 -- the fairness standard
11  hasn't been met by the proffer.
12          MR. TANASI:  And, Your Honor, I know you're kind of
13  looking through it up there and I don't mean to interrupt, but,
14  again, in the government's own brief, United States v. Nakai,
15  413 F.3d 1019, rejecting efforts to introduce through
16  cross-examination otherwise inadmissible exculpatory prior
17  statements by defendants because the hearsay statements were not
18  necessary to place the admitted statement in context.  Context
19  is still an absolute portion of this decision.  It's not all
20  hearsay.
21          And same thing for the remainder of their brief, they
22  point out:  Moreover, Rule 106 does not render it admissible
23  evidence which is otherwise inadmissible under the hearsay
24  rules.  Understood.  They go on to cite United States versus
25  Sine where they say in their conclusion:  Thus, unless the

 1  defendants can establish some hearsay exception for any of the

 2  statements they wish to introduce, they're inadmissible

 3  regardless of Rule 106.

 4        So, again, you got the Nakai case which absolutely

 5  discusses the context, and that being the premise -- and that

 6  being at least a portion of the decision under Rule 106.  It's

 7  not just all hearsay and whether or not an exception applies.

 8        THE COURT:  All right.  Why don't we play the

 9  remainder.  You tell me how much of it you want to play and I'll

10  listen to it now so that I can determine whether or not there's

11  a need to play the second portion, either on direct or on cross.

12        MR. TANASI:  Absolutely.  Your Honor, maybe if we

13  can -- do you want to hear it from -- the very end or the entire

14  statement of Mr. Engel?

15        THE COURT:  The portion that you're seeking to admit.

16        MR. TANASI:  Okay.

17        THE COURT:  I don't know if it's previously marked.  Do

18  you have a name for it?

19        MR. TANASI:  447 -- or for defense exhibit, Your Honor?

20        THE COURT:  Yes.  So 447B is the portion that the

21  government played.  You want to go beyond that.  Have you named

22  that portion yet?  Does it have a -- on the witness list?

23        (Defense counsel conferring.)

24        MR. TANASI:  Court's indulgence.

25        THE COURT:  Okay.

1          MR. TANASI:  Defense 5045, Your Honor.

2          THE COURT:  5041?

3          MR. TANASI:  5.  5045.

4          THE COURT:  Thank you.

5          (Video playing.)

6          MR. TANASI:  Your Honor, that's it.  He receives the

7    microphone and says, No, that's not right.

8          THE COURT:  They're getting a little closer, though.

9          MS. CREEGAN:  Your Honor, we would submit this

10   statement of another person does not explain what Mr. Engel

11   meant or clear up some issue in what he was intending to say in

12   his own statement.  It was simply Mr. Bundy trying to

13   recharacterize his own statements the previous day, or two days

14   prior.

15          MR. TANASI:  Your Honor, I would just point out for the

16   record that we've heard countless videos so far that include

17   numerous people talking contained in the video itself as the

18   video gets in under one exception, but the other folks who are

19   also talking and are a part of that conversation may not

20   necessarily fit the same exception.  Again, in the spirit of

21   fairness and context, I think 106 allows at least that 10-second

22   portion to come in.

23          THE COURT:  Well, the statement by Mr. Bundy is:  No,

24   that's not exactly what happened, but he's getting a little

25   closer, though.  So it doesn't really clarify anything because

———— 2:16-cr-00046-GMN-PAL ————

1  it doesn't explain which part is closer and which part isn't the

2  part that happened.  So I don't think that it's necessary under

3  Rule 106 to play Exhibit 5045.

4       All right.  Any other issues you want to address before

5  we bring in the jury?  Now that we're getting more into the meat

6  of the evidence, I want to limit the speaking objections, but

7  still give everyone an opportunity to make their objection.

8       Anything else?  Okay.  Let's go ahead and bring in the

9  jury then.

10       COURTROOM ADMINISTRATOR:  Yes, Your Honor.

11       (Whereupon jury enters the room at 8:57 a.m.)

12       THE COURT:  Everyone may be seated.  We're joined by

13  the jury.

14       Will the parties please state their names for the

15  record.

16       MR. MYHRE:  Good morning.  Steve Myhre, Erin Creegan,

17  Nadia Ahmed, and Nick Dickinson on behalf of the United States.

18       THE COURT:  Good morning.

19       MR. TANASI:  Good morning.  Rich Tanasi for Steve

20  Stewart.  Also with us at counsel table is Gwen Wilson and

21  Bryan Glynn.  Thank you.

22       MR. MARCHESE:  Good morning.  Jess Marchese on behalf

23  of Eric Parker.

24       MR. LEVENTHAL:  Good morning.  Todd Leventhal on behalf

25  of Mr. Drexler.

1          MR. ENGEL:  Good morning.  Todd Engel representing

2    myself.

3          MR. PEREZ:  Shawn Perez on behalf of Ricky Lovelien.

4          MR. JACKSON:  Good morning, Your Honor.  Terry Jackson

5    on behalf of Gregory Burleson.  And also with me is Christine

6    Abbott.

7          THE COURT:  Thank you.  Good morning.  And Mr. John

8    George is here as well, as standby.  We have FBI Special

9    Agent Mark Seyler back on the stand.

10          Thank you, sir, for coming back in.

11          And we have Ms. Creegan.  You may continue now with

12    your direct examination.

13          MS. CREEGAN:  Thank you, Your Honor.

14                          DIRECT EXAMINATION

15    BY MS. CREEGAN:

16    *Q.*  Agent Seyler, drawing your attention back to Exhibit 337A.

17    Is this a CD or a DVD?

18    **A.**  Yes.

19    *Q.*  Is this a small portion of the interview that you conducted

20    of Eric Parker?

21    **A.**  Yes.

22          MR. MARCHESE:  No objection, Your Honor.

23          MS. CREEGAN:  I'm sorry.

24          MR. MARCHESE:  Parker.

25          MS. CREEGAN:  At this time we would move to admit

2:16-cr-00046-GMN-PAL

 1  Exhibit 337A.

 2          THE COURT:  Go ahead.

 3          MS. CREEGAN:  May we publish?

 4          THE COURT:  Yes.

 5          COURTROOM ADMINISTRATOR:  I'm sorry, Your Honor --

 6          THE COURT:  Just to the witness and counsel.  I believe

 7  337A.

 8          MS. CREEGAN:  Was there an objection to admission?

 9          MR. MARCHESE:  No objection.

10          MR. TANASI:  None from Stewart.

11          MS. CREEGAN:  I'm sorry.  I may be -- is the exhibit

12  admitted?

13          THE COURT:  No.  You haven't asked for it to be

14  admitted yet.

15          MS. CREEGAN:  I apologize.  The government would move

16  to admit Exhibit 337A.

17          MR. MARCHESE:  And no objection Parker.

18          MR. TANASI:  No objection Stewart, Your Honor.

19          MR. LEVENTHAL:  I believe this is only coming in for

20  Mr. Parker, though, right?

21          THE COURT:  Right.

22          MR. LEVENTHAL:  Correct.  So --

23          THE COURT:  Only offered against Mr. Parker.  Is that

24  right, Ms. Creegan?

25          MS. CREEGAN:  Correct.

──────────── 2:16-cr-00046-GMN-PAL ────────────

1          MR. LEVENTHAL:  Only.

2          THE COURT:  Only.

3          MR. LEVENTHAL:  Okay.

4          THE COURT:  This is not offered against any of the

5   other defendants, and the jury should not consider it as

6   evidence to be used to determine the issues regarding the other

7   defendants; only to be considered when you're considering

8   Mr. Parker.

9          MS. CREEGAN:  Permission to publish.

10         THE COURT:  Yes.  Exhibit 337A is admitted.

11         (Government's Exhibit 337A is admitted against

12  Defendant Parker.)

13         (Video playing.)

14  BY MS. CREEGAN:

15  *Q.*  Agent Seyler, in that conversation, is that you asking the

16  question?

17  *A.*  Yes, it is.

18  *Q.*  Is that Eric Parker responding to you?

19  *A.*  Yes, it is.

20  *Q.*  And if you see the person that responded to that question in

21  this courtroom, would you please identify that person by

22  pointing out where they are sitting and what they are wearing.

23  *A.*  Yes.  He's sitting in the front row on the left side, in a

24  white long-sleeved shirt.

25         MS. CREEGAN:  Your Honor, we'd ask that the record

1    reflect that he's identified Defendant Eric Parker.

2             THE COURT:  The record will so reflect.

3    BY MS. CREEGAN:

4    *Q.*  Agent Seyler, did you inquire further as to what firearms,

5    if any, Defendant Parker might have brought to the Bundy Ranch

6    in April of 2014?

7    *A.*  Yes.

8    *Q.*  Did he answer that question?

9    *A.*  Yes, he indicated he brought a Saiga rifle and a Ruger

10   pistol.

11   *Q.*  Did he indicate where those firearms were located at the

12   moment that you were speaking to him?

13   *A.*  At his house.

14            MS. CREEGAN:  I'd like to call up for the Court,

15   counsel, and the witness only Exhibit 60.

16   BY MS. CREEGAN:

17   *Q.*  Agent Seyler, do you recognize this picture?

18   *A.*  Yes, I do.

19            MS. CREEGAN:  I'd like to call up for the Court,

20   counsel, and the witness only Exhibit 154.

21   BY MS. CREEGAN:

22   *Q.*  Do you recognize what's depicted in Exhibit 154?

23   *A.*  Yes, I do.

24            MS. CREEGAN:  Can I bring up 394.

25

—2:16-cr-00046-GMN-PAL—

1  BY MS. CREEGAN:

2  *Q.*  Do you recognize what's depicted in this picture?

3  *A.*  Yes.

4          MS. CREEGAN:  And can I bring up 452.

5  BY MS. CREEGAN:

6  *Q.*  Do you recognize what's depicted here?

7  *A.*  Yes, I do.

8  *Q.*  And, Agent Seyler, for Exhibits 60, 154, 394, and 452, what

9  are they?

10 *A.*  Those are photographs of activity on April 12th.

11 *Q.*  These are photographs.  Were you participating in obtaining

12 these photographs in any way?

13 *A.*  Yes, I supervised the download of those photographs from a

14 public Dropbox folder on the Internet.

15 *Q.*  Did you turn those photographs over, put them into FBI

16 records?

17 *A.*  Yes, I did.

18          MS. CREEGAN:  Your Honor, we're not going to move to

19 admit these.  We're going to lay additional foundation with a

20 subsequent witness.

21          THE COURT:  Okay.

22          MS. CREEGAN:  Your Honor, I would make a motion at this

23 time to admit what's been previously shown to another witness as

24 443.  I believe we've laid sufficient foundation at this time.

25 It is a communication of Carol Bundy that she is a

1   coconspirator.

2          THE COURT:  What is the additional foundation that's

3   been laid?

4          MS. CREEGAN:  Showing through Exhibits --

5          THE COURT:  Oh, the certificate of custodian of records

6   for -- that we talked about yesterday at the beginning?  Is that

7   what you're referring to?

8          MS. CREEGAN:  And also reviewing Exhibits 23, 25, 26,

9   and 37 that show Carol Bundy coordinating with OMA.  We believe

10  we've laid sufficient foundation that she's a coconspirator.

11         We would move to admit Exhibit 444, which is an e-mail

12  sent by Carol Bundy and received by Hugh Gourgeon -- 443.

13  Excuse me.

14         THE COURT:  Any objection to Exhibit 443?

15         MR. TANASI:  Court's indulgence.

16         (Defense counsel conferring.)

17         MR. TANASI:  Your Honor, yes, Stewart objects, hearsay

18  and relevance.

19         MR. MARCHESE:  Parker joins, adds authentication.

20         THE COURT:  Authentication, Ms. Creegan?

21         MS. CREEGAN:  Can you pull up Exhibit 444.

22         MR. JACKSON:  I would object on same grounds.

23         MS. CREEGAN:  Your Honor, this is an e-mail which is

24  received by Hugh Gourgeon after he attends an event.  He's on a

25  list serve, and it purports to tell him that there's only one

 1   official source of communication.  And I think by the name, by

 2   him receiving it after having participated, that's sufficient to

 3   show that it is coming from a coconspirator.

 4        THE COURT:  All right.  Well, he did testify that he

 5   received it.  So the authenticity is met.  And now we have more

 6   information about Carol Bundy.  So the Court finds that there

 7   is -- the burden has been met for an 801(d)(2)(E).

 8        So Exhibit 443 is admitted.

 9        (Government's Exhibit 443 is admitted.)

10        MS. CREEGAN:  Permission to publish.

11        THE COURT:  Yes.

12   BY MS. CREEGAN:

13   *Q.*  And, Agent Seyler, while I have you, I'm going to ask you

14   just to read -- could you read starting about the middle of the

15   page where it says:  We have only one official page.

16   **A.**  Yes.  We only have one official page.  While we love all the

17   support on the other Facebook pages and groups, we only have one

18   page, hhtps//www.Facebook.com/Bundy Ranch.

19   *Q.*  Thank you.

20        MS. CREEGAN:  You can take that down.

21        Can we bring up for Court, counsel, and the witness

22   only --

23        THE GUARD:  Your Honor.

24        THE COURT:  Yes.

25        THE GUARD:  We have a problem.

———2:16-cr-00046-GMN-PAL———

 1          THE COURT:  Oh.  Aaron, it looks like we've got one

 2   monitor out.

 3          (Discussion held off the record.)

 4          THE COURT:  Is it working now?

 5          COURTROOM ADMINISTRATOR:  Yes, Your Honor.

 6          THE COURT:  Oh.  Thank you.

 7   BY MS. CREEGAN:

 8   Q.  And, Agent Seyler, let me ask you a couple more questions

 9   about Exhibit 60, 154, 394, and 452.  Where did you obtain these

10   pictures from?

11   A.  Those were obtained from a Dropbox folder on the Internet.

12   Q.  Was this a publicly accessible website?

13   A.  Yes.  It was at the time, yes.

14   Q.  And can you explain what Dropbox is?

15   A.  Dropbox is an Internet service that allows you to collect a

16   number of items and then share them with other individuals,

17   either everyone publicly or just individuals of your choosing.

18   Q.  And what was the name of the individual that was purported

19   to have this Dropbox?

20   A.  I believe it was Shannon Bushman.

21   Q.  Thank you.

22          MS. CREEGAN:  Can I please bring up for Court, counsel,

23   and the witness what's been marked as Government's Exhibit 458.

24          THE COURT:  Can I just ask an additional question in

25   case this comes up later?  How does he know that this Dropbox

—————— 2:16-cr-00046-GMN-PAL ——————

1  was associated with Shannon Bushman?

2        THE WITNESS:  Yes.  We looked at the metadata on the

3  photos that were in the box, which is basically the data about

4  the photos that you can view, and it indicated that the person

5  that took the photos was Shannon Bushman.

6        THE COURT:  Well, the metadata doesn't tell you who

7  took the photo, but it can tell you what device was used to take

8  the photo.  So is that what you're talking about, is the device?

9  The metadata told you which device was used to take the photo?

10 BY MS. CREEGAN:

11 Q.  Does the metadata for the Dropbox contain names and other

12 information?

13 A.  Yes, by metadata we look at the properties of each file, and

14 the files indicated that they were the property of this

15 individual.

16 Q.  And how were you able to view that in the metadata?

17 A.  You can use a number of different ways.  One of the ways is

18 to right click on one of the photos and choose properties, and

19 it will bring up information about the photo itself.

20 Q.  Would this be that the individual entered their name in some

21 way?

22 A.  Or that that name was entered on the device or the computer

23 that was used to upload the photos.

24 Q.  Thank you.

25        MS. CREEGAN:  Can we bring up just for the witness,

1  counsel, and the Court Exhibit 458.

2  BY MR. CREEGAN:

3  Q.  And, Agent Seyler, what kind of record is this?

4  **A.**  This is an e-mail from the Operation Mutual Aid Gmail

5  account.

6  Q.  And on what date was this e-mail sent?

7  **A.**  April the 10th, 2014.

8  Q.  And does this replace what you previously reviewed as

9  Exhibit 38?

10  **A.**  Yes.

11  Q.  Proposed Exhibit 38.

12          And is this a fuller view of the -- some of the

13  recipients of this e-mail?

14  **A.**  Yes.

15  Q.  And do you recognize in particular any of the recipients of

16  this e-mail?

17  **A.**  Yes, I recognize one of the individuals listed on the third

18  line.

19  Q.  Who is that?

20  **A.**  Cap, for Captain Rick Lovelien MTDF.

21  Q.  And what's the e-mail address associated with that name?

22  **A.**  It's MTDF@mail.com.

23          MS. CREEGAN:  Your Honor, we would move for the

24  admission of Exhibit 458.

25          THE COURT:  Any objection?

———— 2:16-cr-00046-GMN-PAL ————

1          MR. MARCHESE:  Same objections Parker, hearsay,

2    relevance, authenticity.

3          MR. TANASI:  Stewart joins, Your Honor.

4          MR. LEVENTHAL:  Drexler joins.

5          MR. ENGEL:  Engel joins.

6          MR. PEREZ:  Lovelien joins.

7          MR. JACKSON:  Burleson joins.

8          THE COURT:  And as to authenticity, this was an e-mail

9    that was recovered by FBI Agent Seyler in response to the

10   subpoena that was sent, and then this information came with the

11   custodian of records that we talked about yesterday.  Is that...

12   BY MS. CREEGAN:

13   *Q.*  Agent Seyler, was this received in response to a search

14   warrant on operationmutualaidI@gmail.com?

15   ***A.***  Yes.  From Google, yes.

16   *Q.*  And was there an accompanying certificate of authenticity

17   from Gmail as to this account?

18   ***A.***  Yes.

19          THE COURT:  All right.  So the objection's overruled.

20   Exhibit 458 will be admitted.

21          MS. CREEGAN:  Permission to publish.

22          THE COURT:  Yes.

23          (Government's Exhibit 458 is admitted.)

24   BY MS. CREEGAN:

25   *Q.*  And, Agent Seyler, who is this an e-mail from and to?

2:16-cr-00046-GMN-PAL

1    *A.*   This is from Operation Mutual Aid and to, I believe, over

2    300 e-mail recipients at that time.

3    *Q.*   And, again, when is this e-mail sent?

4    *A.*   April the 10th of 2014.

5    *Q.*   And can you read just the first four lines.

6    *A.*   Nevada alert.  We are requesting help to distribute the

7    following to any and all media, blog, patriot groups, etc.:

8    One, secure the Bundy family from government incursion, which

9    includes protection of all personnel responding in support of

10   the Bundys, i.e., protestors, extended family, and friends.

11   Two, to return the confiscated Clark County, Nevada property

12   currently blocked by federal personnel to its rightful stewards,

13   the people of Clark County, Nevada.  Three, to secure and return

14   to Mr. Bundy's ranch the mounting number of cattle which have

15   been confiscated by BLM agents and private contractors.

16   *Q.*   Thank you.

17            MS. CREEGAN:  You can take that down.

18            Court's indulgence.

19            (Prosecution conferring.)

20            MS. CREEGAN:  No further questions.  Thank you.

21            THE COURT:  Cross?

22            Mr. Perez, do you want to go first or last?

23            MR. PEREZ:  Sure.  Why not.

24            THE COURT:  It's up to you.

25

—————2:16-cr-00046-GMN-PAL—————

1                     CROSS-EXAMINATION

2  BY MR. PEREZ:

3  *Q.*  Good morning, Agent Seyler.  My name is Shawn Perez.  I

4  represent Mr. Ricky Lovelien.

5  *A.*  Good morning.

6  *Q.*  I have just a few questions for you.

7            Now, you've been with the FBI for how long now?

8  *A.*  21 years.

9  *Q.*  Okay.  And in this particular investigation, you were --

10  your function was primarily in gathering Facebook posts,

11  pictures, and things from the Internet?

12  *A.*  No, I had a number of other responsibilities as well.

13  *Q.*  And what were those other responsibilities?

14  *A.*  I was the case agent so I was also involved in supervising

15  the investigation, determining how interviews were conducted,

16  and conducting interviews myself.

17  *Q.*  Okay.  But you did a lot of the -- yesterday we saw quite a

18  few Facebook posts.  Did you personally gather that information

19  or was that a designated function to somebody that worked under

20  you?

21  *A.*  I gathered some of those.  Others that we presented

22  yesterday I didn't gather, but just observed that they were

23  there.

24  *Q.*  Okay.  And did you do any analysis of the Facebook posts?

25  *A.*  I'm not sure what kind of analysis you mean.

1  Q.  Well, I mean -- well, let's start at the beginning.  Let's

2  talk about Facebook for a minute.

3        Obviously, you're familiar with Facebook and how it

4  works?

5  A.  Yes.

6  Q.  Okay.  Can you explain to me -- and we've seen a number of

7  different things.  We've seen notifications.  We've seen reposts

8  and posts and private messages.  And it's all confusing to

9  somebody as old as me.  I don't use Facebook.

10        So what's the wall?

11  A.  A wall is something that is on the actual Facebook page

12  itself.  And when someone views your Facebook page, they can see

13  things that are posted to your wall.  You can post items to your

14  wall, and depending on the settings that you have in your

15  account, you can allow others to post things to your wall as

16  well.  It's, like, the first thing that you look at when someone

17  views your Facebook page.

18  Q.  Okay.  Now -- and so every Facebook page has a wall?

19  A.  Yes.

20  Q.  Okay.  Now, you said something about friends.  What are

21  Facebook friends?

22  A.  "Friends" is a Facebook term indicating someone that you

23  have agreed to accept a friend request from.  And it allows,

24  depending on your settings, that ability -- that friend to see

25  certain things on your page.  You can limit things on your

────────── 2:16-cr-00046-GMN-PAL ──────────

 1   Facebook page only to friends to view.  It also allows you to

 2   communicate via private message with that individual.

 3   *Q.*  And as far as the wall goes, that can also be public,

 4   correct?

 5   **A.**  Things on the wall can be public, yes.

 6   *Q.*  Okay.  So you don't necessarily have to be a friend to view

 7   what's on the wall?

 8   **A.**  That -- depending on the settings, yes.  The user can

 9   restrict that if they want to.

10   *Q.*  Okay.  Well, speaking of settings, now, yesterday there was

11   some discussion about tagging an individual.  Can you explain to

12   me tagging, just briefly.

13   **A.**  Yes.  When you post something, you can put someone's

14   Facebook name with a link, essentially, in the post.  So, for

15   instance, if you're posting a picture of someone, you can

16   indicate that that picture is this individual, which then allows

17   the user to click on that and get a link to the actual Facebook

18   page of that individual.

19   *Q.*  But that person that you've tagged really has no control

20   over what -- of you posting that tag on your wall, correct?

21   **A.**  No.  You receive a notification that you've been tagged, and

22   then you have the option of attempting to untag yourself.

23   *Q.*  Because if you're not sophisticated with Facebook and

24   tagging and untagging, then you wouldn't know what to do,

25   correct?

──────────── 2:16-cr-00046-GMN-PAL ────────────

1          MS. CREEGAN:  Objection, speculative.

2  BY MR. PEREZ:

3  Q.  Well, I mean, what is the process of untagging?

4  A.  You could go about clicking "untag" in Facebook.  I've never

5  done it myself, but I understand it's an option for you.

6  Q.  Okay.  And then private messaging, in private messaging do

7  you necessarily have to be a, quote, unquote, friend, Facebook

8  friend?

9  A.  Yes.

10  Q.  Okay.  There's no way to send a private message to somebody

11  that you may just see their Facebook page, you can't send them a

12  private message?

13  A.  You can send a different type of message, but not a message

14  chat like what we put on yesterday.  In order to have those type

15  of private conversations, you have to be a friend with that

16  individual.

17  Q.  Okay.  And then the Facebook page itself has different areas

18  also as well, correct?

19  A.  Yes.

20  Q.  And those are things like events?

21  A.  Yes.

22  Q.  And groups?

23  A.  Correct.

24  Q.  Okay.  Now, groups can be both public and private, correct?

25  A.  Correct.

—— 2:16-cr-00046-GMN-PAL ——

1  Q.  And if it's public, anyone can post anything they want in

2  that group?

3  A.  I believe you still have to be a member to post in that

4  group, but I could be wrong.  But you're certainly restricted on

5  the private groups; not everyone can post there.

6  Q.  Okay.  And how do you join a group?

7  A.  When you view the group page, one of the options that lights

8  up is you can click on "join."  If it's a group that's

9  completely open, you will just be allowed to join the group.  If

10 it's a restricted group, a closed group, then the administrator

11 would have to admit you to the group.

12 Q.  Okay.  Now, you mentioned something about settings.  I'm

13 assuming that we're talking about privacy settings?

14 A.  Those are some of the settings, yes.

15 Q.  What are the other settings?

16 A.  Again, you can choose how you want to receive messages.  So,

17 for instance, we discussed yesterday about how Ryan Payne had

18 chose to receive certain messages via e-mail.  There are many,

19 many settings that you can change on Facebook, depending on how

20 you want to be notified, what you want others to be notified of

21 when you post, how much you would like your friends to be able

22 to view, how much you would like the public to be able to view.

23 There's a lot of different settings you can --

24 Q.  Okay.  So any group of people might have any number of ways

25 that they want to receive this information or post the

1  information, correct?

2  *A.*  Yes.

3  *Q.*  And, I mean, there's no -- there's no one method.  So for

4  example, I mean, you're talking about Ryan Payne, you know,

5  requesting an e-mail notification.  Not everyone would receive

6  an e-mail notification?

7  *A.*  Yes.

8  *Q.*  Unless they designated that, correct?

9  *A.*  Yes, that is correct.

10  *Q.*  Okay.  Now, inside -- well, in your investigation of the

11  Facebook page and your discussion of metadata, which is

12  essentially data on data, correct?

13  *A.*  Correct.

14  *Q.*  The -- are you able to tell what the settings are on each of

15  the Facebook accounts?

16  *A.*  Only if we obtain that information via search warrant.  So

17  looking at it without getting it via search warrant, no, you're

18  not able to tell what the --

19  *Q.*  Okay.  Well, you had a search warrant for the Facebook

20  information that you gathered, correct?

21  *A.*  Yes, we did.

22  *Q.*  Did you look into the privacy settings?

23  *A.*  On Mr. Lovelien's account?

24  *Q.*  On Mr. Lovelien.

25  *A.*  We've looked at them.  I don't remember what they were set

1   on.

2   Q.  Okay.  Now, inside Facebook you can set up different pages

3   as well, correct?

4   A.  You can open an account, yes.  And so Mr. Lovelien had an

5   account.  Oftentimes that's referred to as a Facebook page.

6   Q.  Okay.  And then you can also link a website to Facebook,

7   correct?

8   A.  You can -- on your Facebook page you can indicate that you

9   have a certain website you'd like to see people go to and you

10  can put that in there, yes.

11  Q.  Okay.  And then in Facebook there's also a timeline?

12  A.  Yes.

13  Q.  Okay.  And what does the timeline do?

14  A.  The timeline basically shows different posts that you may

15  have made or what people may have posted to your timeline.  It's

16  just kind of an indicator of some of the Facebook activities

17  that you've conducted; not all, but some of them.

18  Q.  Okay.  And the time signature that's on each of the posts,

19  that's on the wall, right, on the main wall, your timeline?

20  A.  Yes.

21  Q.  Okay.  And each of those posts have a time stamp or a

22  signature, a date, on there?

23  A.  Yes.

24  Q.  Okay.  And is that -- I know we had some discussion about

25  UTC and, you know, whether the time stamp on a particular post

—— 2:16-cr-00046-GMN-PAL ——

1  would be related to where that person was.  How does that work

2  as far as the time signature on the posts on the wall?

3  *A.*  So when you're viewing it not from a search warrant, it will

4  post with the -- probably the location of the computer that it's

5  at at the time.  So it's not yet a UTC time.

6  *Q.*  Let me stop you right there.  You said without a search

7  warrant.  We'll go back to with a search warrant, but without a

8  search warrant you said it will tell you where the person is?

9  *A.*  No.  When you look at it, it's where you are, where you're

10  viewing, so it says what time.  So it's basically for your

11  Facebook account.  So if they posted it at that time, it's the

12  time that you're viewing it.

13  *Q.*  But not the time that they posted it?

14  *A.*  Not necessarily.

15  *Q.*  Okay.  So if something was posted on April 7th in -- you

16  know, in the East Coast, I mean, it would show up, what, be a

17  three-hour difference on your Facebook?

18  *A.*  That's my understanding, yes.

19  *Q.*  Okay.  And then you said with a warrant.  What's the -- what

20  different information would you get then from that time

21  signature?

22  *A.*  So when you obtain it via warrant, Facebook provides it all

23  in a single time, which is UTC time, so that you can reference

24  exactly where it was -- or where the -- what the time was if you

25  know where the person is.  So if we know, for instance, that an

───── 2:16-cr-00046-GMN-PAL ─────

1  individual is in Nevada, I can subtract seven -- in 2014, seven

2  hours and get the exact time that it was in Nevada.

3  Q.  Right.  Now --

4          THE COURT:  I'm sorry.  Can we go back to the date and

5  time displayed on the timeline.  I'm not sure that that was

6  clear to me.  So are you saying that that -- that what Facebook

7  uses -- or displays on timeline is the date and time of the

8  location of the device used to post the information?

9          THE WITNESS:  No, to my knowledge, it's the viewer's

10  date and time.  So that if you're able to look at a page, it's

11  for the use of the viewer.  I can see that someone posted

12  something five minutes ago, which Facebook does that rather than

13  tell you what time it is.  If it was within a few minutes, it

14  will say, This was posted five minutes ago.  But, otherwise, it

15  will display the time that you're viewing it, so...

16          THE COURT:  So if you're on the East Coast, I'm on the

17  West Coast, we're looking at the same page, the date and time

18  would be different for each of our views?

19          THE WITNESS:  Correct.

20          THE COURT:  Okay.  Thank you.

21          Sorry.  I just needed --

22          MR. PEREZ:  Clarified it a little bit for me as well.

23  BY MR. PEREZ:

24  Q.  And then you said, like, "five minutes ago."  I mean, so if

25  it's posted within a matter of minutes or something like that,

1  that's only while you're viewing it, right?

2          Well, strike -- let me make that a little clearer.  If

3  I'm viewing a Facebook wall and someone has posted something in

4  the last five minutes, it would just say, Five minutes ago, and

5  I can assume that it was posted that date five minutes -- you

6  know, five minutes from the time that I'm looking at it,

7  correct?

8  *A.*  Correct.

9  *Q.*  Now, when exactly does that -- I'll use the word "refer" to

10  the actual date and time?  Is it, like, days later or the same

11  day?

12  *A.*  I'm sorry.  I don't understand your question.

13  *Q.*  Well, I mean, some of the Facebook posts -- and we'll get to

14  some of the examples because we've got about 35 of them to go

15  through, but there's -- the date is on there.  And, obviously,

16  that's not five minutes ago or whatever.  I mean, when does it

17  actually convert from, like, minutes ago to a date?

18  *A.*  No, you're mixing two different things.  So the records at

19  Facebook are always the same.  When we do a search warrant on

20  the records, they provide their records which are in UTC time.

21  For the convenience of the viewer and for their product, when

22  I'm viewing a Facebook page with my Facebook account, that time

23  is changed by Facebook so it appears on my computer as the

24  current time that I'm viewing it.

25          So there's no change in the records.  The records are

——————— 2:16-cr-00046-GMN-PAL ———————

1   always kept at Facebook under UTC time.  It's just the

2   algorithm, the program that they use as I'm viewing it, changes

3   it so that I can see it at my time.

4   *Q.*  Okay.  Can those dates and times ever be changed on those

5   messages?

6   **A.**  No.  They're in -- once we get them back via search warrant,

7   they're going to be the same UTC time, which is Universal Time.

8   *Q.*  Well, no -- well, let's say prior to search warrant or any

9   law enforcement accessing it.  Is there any way someone could go

10  and change the date on a Facebook post?

11  **A.**  I don't know how -- how you would mean that.

12  *Q.*  Well, I mean, if something happened on, you know, April 7th

13  and it actually happened on April 8th or April 9th.  I mean, is

14  that possible to change those dates and times?

15  **A.**  The records in Facebook are going to stay the same, to my

16  knowledge.  So when we get them back via search warrant, that's

17  not going to be a record that's been changed.  That's the record

18  that that activity occurred UTC time.

19  *Q.*  So if I wanted to post something and -- you know, if I

20  wanted to post something and I want it to be a certain date, I

21  would have to repost it then, correct, for a new date?

22        Let's say I posted something yesterday and I wanted to

23  post it again -- I wanted it to have today's date, I could just

24  repost it, right?

25  **A.**  That's one way you can, yes.

—— 2:16-cr-00046-GMN-PAL ——

1   *Q.*  And it would have today's date.

2          Okay.  Now, we looked at a -- I believe it's a website,

3   and you can explain it to me, for Operation Mutual Aid?

4   *A.*  Yes.

5   *Q.*  Okay.  Now, was that linked to a Facebook account?

6   *A.*  I don't recall if they had their Facebook account listed on

7   there or not.  If you mean the link that all of the activity on

8   Facebook also occurred on the website, no, that was not the

9   case.

10  *Q.*  How about the activity that had occurred on the website

11  itself, posting itself back on Facebook via notification?

12          MS. CREEGAN:  Objection, vague.

13          THE COURT:  Sustained.

14          Can you rephrase that?  I didn't understand the

15  question either.

16  BY MR. PEREZ:

17  *Q.*  Okay.  So you had it one way.  Okay.  That, you know, if

18  posted on Facebook, it wouldn't necessarily post on the website.

19  But I could set up Operation Mutual Aid that if I made a post

20  there, that you would get a notification, correct?

21  *A.*  On Facebook you -- if you set up an Operation Mutual Aid

22  Facebook account, you could set notifications from that Facebook

23  account to go out, yes.

24  *Q.*  So could I direct Facebook to alert me to a notification on

25  a website as far as a change?

———— 2:16-cr-00046-GMN-PAL ————

1   *A.*  I'm not familiar with that function, no.

2   *Q.*  Okay.  On --

3           MR. PEREZ:  Can we pull up 172.

4   BY MR. PEREZ:

5   *Q.*  Now, 170 -- this is a website, correct, a web page?

6   *A.*  Yes, it is.

7   *Q.*  Okay.  Now, I notice it says it's a forum, general

8   discussion.  Do you see that line right there?

9   *A.*  Yes.

10  *Q.*  What exactly is a forum?

11  *A.*  A forum is part of the web page.  It enables users or

12  members of that website to share information with one another.

13  It's similar to a chat that you might have on Facebook with a

14  number of people.  Allows you to choose a topic, and then under

15  that topic you have a number of posts by the users.

16  *Q.*  So, basically, people's personal opinions, whatever they

17  want to post?

18  *A.*  Yes.

19  *Q.*  Okay.  And is there any control over the forum as to what

20  can be posted?

21  *A.*  Yes, the administrator of the forum is able to set

22  guidelines as to who can post, whether just members or general

23  members of the public.  It can also delete posts if they find

24  them not to be of their liking.

25  *Q.*  Okay.  Now, looking at Exhibit 172, can you tell me when

PATRICIA L. GANCI, RMR, CRR

1  that -- that particular forum was created?

2  *A.*  That forum would have been created -- that particular forum

3  was created with the website in April of 2013.  That subheading,

4  Dawn of a New Day, was created in June of 2013.

5  *Q.*  So not in 2014?

6  *A.*  Correct.

7  *Q.*  So this is some time before the incident in Bunkerville,

8  correct?

9  *A.*  Correct.

10  *Q.*  Okay.  Have you ever been to Bunkerville?

11  *A.*  I've been by it, but I've never been there, no.

12  *Q.*  Never stopped there.  Okay.

13        Now, in looking at this Dawn of a New Day -- well,

14  strike that.  We'll move on.

15        I noticed yesterday on some of the Facebook posts, I

16  believe --

17        MR. PEREZ:  86, Bryan.  I think it's 86.  Maybe not.

18        THE COURT:  86 or 96?

19        MR. PEREZ:  No, it might be 90 -- well, we can probably

20  do this without that.

21  BY MR. PEREZ:

22  *Q.*  There's a notation on some of the tops of the Facebook

23  record where it says that it's blocked, and then it's got a

24  notation for blocker.  Do you know what that signifies?

25  *A.*  Yes.  You have the ability to actually block certain people

 1  from posting to your site or contacting you.  That's one of the

 2  options.  I'd have to look at the exact reference.

 3          THE COURT:  When you say "you," you mean the user?

 4          THE WITNESS:  I'm sorry.  Yes, the user of the account.

 5          MR. PEREZ:  It's 186, Bryan.

 6  BY MR. PEREZ:

 7  *Q.*  Now, at the top you can see it says:  Blocker and Blocked.

 8  **A.**  Yes.  In this case two individuals have blocked Rick

 9  Lovelien from contacting them.

10  *Q.*  Okay.  And in your investigation did you look into why that

11  happened or follow those links?

12  **A.**  No.

13  *Q.*  Okay.  Now, following down -- we can use this same exhibit.

14  Now, there's groups on there.  Now, in your investigation --

15  well, strike that.

16          Obviously, you were given the name of Mr. Lovelien to

17  research his Facebook page, correct?

18  **A.**  That wasn't why I was initially given Mr. Lovelien's name,

19  but yes.

20  *Q.*  But it was part of your investigation?

21  **A.**  We did, yes, investigate his Facebook activity.

22  *Q.*  Okay.  And as part of reviewing his Facebook records and

23  things like that, did you follow the links?  Like, for example,

24  on this page, on 186, there's these groups here.  Now, did you

25  click on those individual groups?  Those are hyperlinks,

───────────────── 2:16-cr-00046-GMN-PAL ─────────────────

1  correct?

2  *A.*  Correct.

3  *Q.*  And what is a hyperlink?

4  *A.*  A hyperlink will allow you to click on these, and it will

5  take you to that group page.

6  *Q.*  Okay.  And in investigating these particular -- or this

7  particular page, while you're looking at it, did you follow-up

8  on these groups?

9  *A.*  Only some of them.

10  *Q.*  And how did you decide who to follow up on and who not to?

11  *A.*  Some I was aware of and some of them appeared to be solely

12  involved in political activity, which is not something the FBI

13  investigates.  So it would have only been clicking on the ones

14  that would somehow be relevant to Mr. Lovelien's activity in

15  Bunkerville and the militia.

16        MR. PEREZ:  Bryan, scroll that up a little bit there.

17  I don't know if I can do that from here.  No, the other way.

18  Sorry.

19  BY MR. PEREZ:

20  *Q.*  So, for example, General James 'Mad Dog' Mattis who, I

21  believe, is the Secretary of Defense?

22  *A.*  Correct.

23  *Q.*  You probably didn't check that one out?

24  *A.*  No.

25  *Q.*  Okay.  Do you know if you looked at any of these particular

─────────── 2:16-cr-00046-GMN-PAL ───────────

 1  individuals in these groups?

 2  *A.*  I know that we had explored the Montana State Defense Force

 3  group, which is a closed group, so we could not view any posts

 4  in that.

 5  *Q.*  Now, speaking of the Montana Defense Force [sic], that

 6  website was down, correct?  You weren't able to get any records;

 7  you were only able to maybe screen shot a little bit?

 8  *A.*  So, they had a website and a Facebook page.  What are you

 9  referring to?

10  *Q.*  Well, was the website up and operating when you were

11  gathering this information?

12  *A.*  The website, to my knowledge, wasn't at that time.

13  *Q.*  Okay.  It was not?

14  *A.*  Right.  They also had a Facebook group.

15  *Q.*  Okay.  And -- well, let's talk about the website first.

16  When was that that the website was down?

17  *A.*  I'm not sure when it went down.

18  *Q.*  Well, when were you doing your investigation?  What month?

19  Year?

20  *A.*  That would have been in 2013 that we looked at that website.

21  *Q.*  In 2013, before the event?

22  *A.*  Correct.

23  *Q.*  So you were looking at the Montana Defense Force [sic]

24  before the Bunkerville incident?

25  *A.*  Ayes.

————— 2:16-cr-00046-GMN-PAL —————

1    *Q.*  Okay.  Now, why was that?

2            MS. CREEGAN:  Objection, relevance.

3            MR. PEREZ:  Well, Your Honor, he's got records in here

4    from 2013.  He's telling me he's looking at Mr. Lovelien.  I'm

5    wondering what's going on now.  Jury might want to know.

6            MS. CREEGAN:  Still object on relevance grounds.

7            MR. PEREZ:  Why is it not relevant?  I mean, we're

8    talking about militias here.

9            I can start over, Your Honor.  It's ...

10           THE COURT:  Well, the problem is, we have codefendants

11   here.  So why don't we take a 10-minute break.  We'll ask the

12   jury just to go outside, stretch, and then we'll have you come

13   back in.

14           Please do not discuss this case with anyone.  Do not

15   read or listen to or view anything that touches upon this case

16   nor perform any research or any independent investigation nor

17   form any opinion.

18           Let's please stand for the jury.

19           (Whereupon jury leaves the room at 9:37 a.m.)

20           THE COURT:  All right.  You may be seated.  The jury

21   has left.

22           It's not relevant to the charges, but I don't know if

23   it's relevant to the defenses because we don't know exactly what

24   the answer is nor necessarily all of the defenses.  So I'll

25   allow you to ask him the question now outside the presence of

1  the jury, and then we'll decide whether or not it's relevant.

2        MR. PEREZ:  Okay.

3  BY MR. PEREZ:

4  *Q.*  Well, you said that you've been investigating Mr. Lovelien

5  since 2013?

6  *A.*  No, that would be inaccurate.

7  *Q.*  Okay.  Well, how did he come on your radar in 2013?

8  *A.*  In May of 2013 we initiated what the FBI calls an assessment

9  on the Montana State Defense Force itself and not on

10  Mr. Lovelien directly.

11  *Q.*  Okay.  And was there some incident that opened up that

12  investigation?

13  *A.*  Yes, there were two things that came together simultaneously

14  at that time.  We received information that two of the

15  individuals that were involved in the Montana State Defense

16  Force were likely convicted felons.  As a result, the activity

17  they were conducting with firearms appeared to be illegal.

18        We also received information from local law enforcement

19  at the time that members of the MTDF had allegedly made

20  representations that they were willing to use force to drive

21  federal agents out of a certain county.  And so we opened up

22  what the FBI called an assessment at that time.

23  *Q.*  Okay.  And who were those two individuals, those two felons?

24  *A.*  Those were Joseph Shropshire and Randy Eaton.

25  *Q.*  Okay.  Are they still members of the Montana -- well, the

————— 2:16-cr-00046-GMN-PAL —————

1   Montana State Defense Force no longer exists, correct?

2   **A.**   To my knowledge, yes.

3   *Q.*   Okay.

4           MR. PEREZ:  Your Honor, a lot of the other questions, I

5   mean, I certainly want the jury to hear.  I mean, he had

6   mentioned that there were 60 members of the Montana Defense

7   Force [sic], but, I mean, I don't necessarily think that that's

8   correct.  You know, I want to know where he's getting this

9   information from.

10          THE COURT:  So one thing at a time.  So are you

11  withdrawing your question then --

12          MR. PEREZ:  I mean, I'm not going to go back --

13          THE COURT:  -- for the jury or do you want the jury to

14  hear that there were two felons that were part of this

15  organization that had firearms, which is illegal --

16          MR. PEREZ:  Well, you know --

17          (Court reporter requests one person speak at a time.)

18          THE COURT:  And that's what Ms. Creegan was saying, was

19  that it was not relevant.  And I didn't know what the answer was

20  either, and I wasn't sure it was going to implicate any of the

21  codefendants.

22          MR. PEREZ:  Exactly.  Well, I mean, you know.

23          MR. MARCHESE:  And it doesn't necessarily implicate any

24  of the codefendants.  But, quite frankly, I'm going to object on

25  behalf of Mr. Parker, although it doesn't directly make him

—————— 2:16-cr-00046-GMN-PAL ——————

1  relevant to any of this conversation.  I just think that,

2  generally speaking, the relevance is very small and the optic is

3  not good for Mr. Parker or any of the codefendants, in my

4  opinion, but, obviously, they have more than competent counsel

5  that can make their own records.

6          MR. LEVENTHAL:  I'm going to agree.

7          THE COURT:  Like I said, it's not relevant to the

8  charges, and that's Ms. Creegan's position as well.  My

9  question, and the reason why I had to ask the jury to leave, is

10  whether or not it's relevant to any of the defenses.

11          So it's up to you first, Mr. Perez, if you want to seek

12  to ask the question in front of the jury.  If you don't, then we

13  don't need to worry about the objection.

14          MR. PEREZ:  It is and I can work around it.

15          THE COURT:  Unless someone else is going to elicit the

16  same question and answer, then we should probably address that

17  now.

18          MR. PEREZ:  Absolutely.

19          MR. TANASI:  For the record, Your Honor, with all due

20  respect to Mr. Perez, I --

21          MR. MARCHESE:  No --

22          MR. PEREZ:  No offense.

23          THE COURT:  One at a time.  One at a time.

24          So, Mr. Marchese, you're objecting; you don't want the

25  jury to hear this?

 1           MR. MARCHESE:  No, Your Honor.

 2           THE COURT:  Okay.  Mr. Tanasi?

 3           MR. TANASI:  I'm joining Mr. Marchese.

 4           MR. LEVENTHAL:  I join on behalf of Mr. Drexler as

 5  well.

 6           MR. ENGEL:  I join also.

 7           THE COURT:  And, Mr. Jackson, do you want the jury to

 8  hear this question and answer or not?

 9           MR. JACKSON:  I haven't decided yet.  I know that they

10  may want to bring up evidence of my client's connecting to a

11  militia, but I don't -- haven't seen that information yet and it

12  hasn't come up yet.  So I'm going to not take any position at

13  this time concerning the FBI's involvement in investigation of

14  militia prior to the Bunkerville incident.  Some of it's

15  prejudicial.  Some of it may be relevant to this case.  So I'll

16  take no position at this time.

17           THE COURT:  Okay.  Just as to this particular question

18  about why the FBI was investigating the Montana Defense Force

19  [sic] in 2013 and the answer being the two incidents that the

20  witness just explained, do you have any objection to the jury

21  hearing that question and answer?

22           MR. JACKSON:  I'm sorry.  I didn't hear you, Your

23  Honor.

24           THE COURT:  Do you have an objection to the jury

25  hearing the question and answer that this witness just gave

1  outside the presence of the jury?

2       MR. JACKSON:  I'm taking no position on it.  So I guess

3  that would be no objection, but I'm not -- other counsel made an

4  objection and I ask the Court to rule accordingly.

5       THE COURT:  All right.  So, Mr. Perez, do you still

6  seek to ask the question and receive the answer in front of the

7  jury or do you withdraw the question?

8       MR. PEREZ:  I can go around it.  I would like to ask

9  him one more question outside the presence because he did say

10 there were two reasons, and one of them was Mr. Eaton and the

11 other gentleman whose name I couldn't pronounce anyway.  But

12 what was the other reason?

13      THE WITNESS:  We had received information from local

14 law enforcement that unknown members of the Montana State

15 Defense Force may have indicated that they were willing to

16 remove federal agents from a certain county.

17      MR. PEREZ:  Okay.  Yeah, I don't care about that

18 either.  I mean, I do, but I don't.  It's not really relevant

19 here so I'll move on, Your Honor.  We'll go into the members.

20      THE COURT:  Okay.  So we'll call the jury back in, and

21 I'm going to tell them that all of the parties agree that the

22 answer to the question is not relevant to the charges because,

23 otherwise, they're left with the misconception that we're hiding

24 something from them that is relevant.  And you all are agreeing

25 that it's not relevant.

—2:16-cr-00046-GMN-PAL—

1           MR. PEREZ:  Correct.

2           THE COURT:  Okay.  So let's call back in the jury.

3           (Whereupon jury enters the room at 9:46 a.m.)

4           THE COURT:  All right.  Everyone may be seated.  We've

5     got the jury joining us back again.  And we have Special

6     Agent Seyler on the stand.  Cross-examination has been Mr. Perez

7     on behalf of Mr. Lovelien.

8           And so the jury is instructed that we have asked and

9     answered the question, and all of the parties agree that it's

10    not relevant, very tangential.  And so everybody agrees that

11    we're not going to be asking and answering the question in front

12    of the jury.  And Mr. Perez withdraws the question.

13          So you may continue, Mr. Perez.

14          MR. PEREZ:  Thank you, Your Honor.

15    BY MR. PEREZ:

16    *Q.*  A couple more questions about the Facebook posts that we saw

17    yesterday.  I notice there was the notation False.

18    *A.*  Yes.

19    *Q.*  What does that refer to?

20    *A.*  It would -- I'd have to actually see the record itself to

21    see if I understood what that was referring to.  You have a

22    number of options so sometimes you can select whether you want

23    something or not and it will say true or false, depending on

24    what you've selected.  Just like an on/off switch.

25          MR. PEREZ:  Bryan, 188.

—————— 2:16-cr-00046-GMN-PAL ——————

1   BY MR. PEREZ:

2   *Q.*  Do you see it says:  Marked as spam.  I'm assuming the false

3   is in reference to that.  And then there's:  Hidden, Rejected,

4   and Accepted.  What does that mean?

5   *A.*  The false would be a reference to whatever is in the column

6   next to it.  So it was not hidden.  It was not rejected.

7   Accepted would be true.  I'd have to see where this came from on

8   his Facebook page.  I assume this is likely friend requests.

9          So Josh Holt would have sent a friend request to Ricky

10  Lovelien, who accepted it.  But I'm just assuming that's part of

11  this Facebook page.  You'd have to scroll pages up to see the

12  title under which heading this occurs, so.

13  *Q.*  Well, it just says:  Facebook business record 104.  It's

14  Exhibit 188.

15  *A.*  Right.

16  *Q.*  I mean -- okay.  Well, let's talk about this document for a

17  minute and maybe we can eliminate it.

18          What are pokes?

19  *A.*  Pokes are something similar to messages, like, a quick

20  notification where you can flash somebody and say:  Hey,

21  somebody wants to talk to you.

22  *Q.*  Okay.  I mean, is there any significance to a poke?

23  *A.*  You know, if you're concerned that someone's ignoring you

24  because they're busy, you can poke somebody and it'll flash up

25  on your Facebook screen if you're there that somebody wants to

chat with you.

I've never used it. I'm not sure exactly how it manifests itself on the computer screen.

*Q.* Now, there were a number of notifications that we looked at yesterday indicating a hyperlink. In your investigation, did you click on the hyperlinks for the notifications?

***A.*** It would depend on which ones they were. I'm not sure which ones you're referring to, so ...

*Q.* Well, I mean --

MR. PEREZ: Well, Bryan, 174. I think you might have to blow this up because I can't even see it on this page.

BY MR. PEREZ:

*Q.* I mean, there's a hyperlink there.

***A.*** Yes.

*Q.* Now, it looks like -- now, this is a little bit confusing here because I don't know if it came from a Facebook page, if this was e-mail. Can you explain to me where this is from.

***A.*** Yes. This was from Ryan Payne's e-mail account. This was an e-mail he received from Jerry Bruckhart. In that post Jerry Bruckhart included a link, a hyperlink, to this article.

*Q.* So this is not a notification then. This is just an e-mail between those two individuals?

***A.*** That's correct.

*Q.* And that none of the other defendants here are c.c.ed or blind copied or anything on that e-mail?

1  *A.*  Not on this e-mail.

2  *Q.*  Okay.  Is there anything else significant about this

3  particular exhibit, other than it says:  Prepare for showdown?

4  *A.*  Yes, it's significant in that this was the first time I'm

5  aware of that Operation Mutual Aid, their two leaders, were

6  discussing the Bundy Ranch incident.

7  *Q.*  What was the date for this?  Do we know?

8          MR. PEREZ:  Bryan, I think you got to scroll up a

9  little.  To the very top, I think.

10         THE WITNESS:  This was April 7th of 2014.

11 BY MR. PEREZ:

12 *Q.*  So now, on April 7th, that was the first time that anyone --

13 that you saw anything that was referring to this Nevada

14 incident, the Bunkerville incident?

15 *A.*  That's the first time that I am aware that the two leaders

16 of Operation Mutual Aid shared information about it.

17 *Q.*  Okay.  And at 7:21 a.m., what time zone would that be in?

18 *A.*  That would depend on Gmail's settings, and I will not hazard

19 a guess as to exactly which time zone that is, whether that's

20 Ryan Payne's time zone or Jerry Bruckhart's time zone.  Could be

21 either one.

22         MR. PEREZ:  All right.  You can take that down, Bryan.

23 BY MR. PEREZ:

24 *Q.*  Now, in the prior exhibit that I showed you where we had the

25 listings of groups?

1  *A.*  Yes.

2  *Q.*  And there's also lists of, I'm assuming it must be friends.

3  And let me look for the proper exhibit here.

4        MR. PEREZ:  187, Bryan.

5  BY MR. PEREZ:

6  *Q.*  Now, this page 76 of this Facebook record, whose Facebook

7  account is this?

8  *A.*  I can't tell from that page.  I'd have to see the -- what

9  account that it came from.

10  *Q.*  Okay.  But from this exhibit you can't tell that this is

11  Mr. Lovelien's Facebook?

12  *A.*  Not from any of the activity that I see here.

13  *Q.*  And there's no -- scrolling down the list of names here, do

14  you -- is there any names that stand out to you?

15  *A.*  Yes, there is a post here -- or a name.  It says:  MTDF

16  unit.

17  *Q.*  Okay.

18  *A.*  MTDF would be -- could be associated with Montana State

19  Defense Force, but I'm not sure.

20  *Q.*  Okay.  Now, when you came across a page like this in your

21  investigation and you saw all of these individuals on here, are

22  these links?  I mean, are these hyperlinks?  Can you click on

23  these and go to this person's Facebook page?

24  *A.*  No.  These are PDF essentially, digital printed pages, eight

25  and a half by 11 pages, that we get back from Facebook.  And so

1  I get them on a stand-alone computer, and so I can't click on a

2  link to the Internet when I see these.  These are the records we

3  got back from a search warrant.  This isn't me on a computer

4  accessing someone's Facebook account.

5  *Q.*  Right.  Okay.  But yesterday we had a little bit of

6  discussion about unindicted coconspirators and how there were

7  some communication between unindicted coconspirators and,

8  perhaps, Mr. Lovelien.

9          From these lists, I mean, is that how you determined

10  whether or not they were involved?

11          MS. CREEGAN:  Objection, vague.

12          MR. PEREZ:  Well, I mean -- I'll rephrase that,

13  Your Honor.

14  BY MR. PEREZ:

15  *Q.*  I mean, for example, you referenced a Mark Kessler as being

16  a coconspirator?

17  ***A.***  I never used that term, no.

18          MS. CREEGAN:  Objection, Your Honor.  This is a legal

19  argument.

20  BY MR. PEREZ:

21  *Q.*  Well, I believe it was ... well, no.  Strike that.

22          Obviously, you had some information that you worked

23  from to determine whether or not a communication between one

24  person and another would be relevant to the case, correct?

25  ***A.***  Are you talking about the Facebook review that I

 1  conducted --

 2  *Q.*  Yeah, the Facebook review.

 3  *A.*  So what we do when we conduct a Facebook review, we have

 4  literally thousands of PDF pages.  I literally go through every

 5  one, one by one, and determine whether there's anything on that

 6  page that's relevant to the warrant that we obtain that

 7  information from.  So that's what we would do.

 8          So with this page I would look at this and determine

 9  whether there was anything here.  A person's friends could be

10  potentially relevant to that investigation.  We have information

11  on this page that MTDF is listed on there.  That could

12  potentially be related to the investigation as well.

13  *Q.*  Okay.  Now, speaking of MTDF.  You also mentioned that there

14  were 60 members.  Where did you get that information from?  Is

15  it posted somewhere?

16  *A.*  I did not say that there were 60 members of MTDF.  The

17  question was how many were members of the closed MTDF Facebook

18  group.

19  *Q.*  Okay.  Well, I'll stop you right there.  So 60 members of

20  that Facebook group?

21  *A.*  Correct.

22  *Q.*  Not necessarily 60 members of MTDF?

23  *A.*  Correct.

24  *Q.*  Okay.  Do you know how many members there were?

25  *A.*  I don't.

————————2:16-cr-00046-GMN-PAL————————

1  Q.  No guess?

2          MS. CREEGAN:  Objection, speculative.

3  BY MR. PEREZ:

4  Q.  Well -- okay.  I'll strike that.

5          Now, in your investigation of MTDF and Mr. Lovelien, I

6  mean, I'm not going to hide that.  He was at Bunkerville.

7  There's no question.  We've seen pictures of Mr. Lovelien there.

8  You went through approximately 12,000 Facebook pages, at least

9  that's what's been produced to us.  And I didn't see one

10 photograph of Mr. Lovelien pointing a weapon.  Is that correct?

11         MS. CREEGAN:  Objection, counsel's testifying.

12 BY MR. PEREZ:

13 Q.  Can you point to one picture of Mr. Lovelien pointing a

14 weapon, in any of your discovery?

15         THE COURT:  Mr. Perez, it's not his discovery.

16         MR. PEREZ:  Well, in --

17         THE COURT:  It's the government's discovery.  He hasn't

18 been here every single day.  So I'm not sure what you're

19 asking --

20         MR. PEREZ:  I'll start over again, Your Honor.

21 BY MR. PEREZ:

22 Q.  You compiled all of this Facebook information, correct, and

23 agents that work under you?

24 A.  Yes.

25 Q.  Okay.  And I would assume that any photograph of someone

1  pointing a weapon would be relevant, correct?

2  *A.*  No, it would only be pointing a weapon at -- involving this

3  operation.  So if I viewed him pointing a weapon at an MTDF

4  training in 2013, I likely wouldn't have considered that

5  relevant.

6  *Q.*  Okay.  Now, yesterday we did see a photograph that you

7  identified Mr. Lovelien's specific weapon, the gun butt having

8  some sort of silhouette on it.  And do you recall that?

9  *A.*  Yes, I indicated that the markings on the butt of that rifle

10  resembled the markings of a rifle that was also depicted in

11  Mr. Lovelien's Facebook account.

12       MR. PEREZ:  Court's indulgence, Your Honor.  I have to

13  find that exhibit.

14       THE COURT:  Yes.  Is it 192?

15       MR. TANASI:  192.

16       MR. PEREZ:  192.  Can you pull up 192, Bryan.

17  BY MR. PEREZ:

18  *Q.*  Okay.  Now, that -- this particular image has, obviously,

19  nothing to do with Bunkerville.

20  *A.*  Yes.

21  *Q.*  It looks like he's standing in the snow.

22       MR. PEREZ:  Next page.  Okay.

23  BY MR. PEREZ:

24  *Q.*  And that is the silhouette of the gun butt, correct?

25  *A.*  Yes, it is.

1   *Q.*   Now, this stuff underneath here, this where it says:  Photo,

2   and it's got this http, that's the metadata you were talking

3   about, right?

4   **A.**   That is how Facebook has their metadata in there, yes.

5   That's not all the metadata about what the original photo would

6   be, but that's Facebook's information regarding that photo.

7   *Q.*   Okay.

8           MR. PEREZ:  Next page, Bryan.  Okay.  Now, that's the

9   full weapon there.  Is there another page?  Is that the last?

10  Okay.

11          Court's indulgence, Your Honor.

12          (Defense counsel conferring.)

13          MR. PEREZ:  There are so many pages here.  It's a

14  little tough to find everything.

15          191.  Pull it up, Bryan.

16  BY MR. PEREZ:

17  *Q.*   Now, this picture, 191, this has the same gun, correct?

18  **A.**   It has a rifle that has the same tattoo and skin on it, or

19  it would appear to resemble the tattoo and skin that we saw

20  earlier.

21  *Q.*   Right.  It's hanging on his right shoulder, correct?

22  **A.**   I can't see if he's -- it's hanging or he's holding it, but

23  yes --

24  *Q.*   Well, if you look down below, if you follow the gun butt

25  straight down, you see it looks like the shadow of the barrel

1    there on the ground, correct?

2    *A.*   I don't see the shadow of the barrel, no.

3             THE COURT:   You want a mark on it?

4    BY MR. PEREZ:

5    *Q.*   Well, do you see the barrel -- right underneath the arm of

6    the person in front of him.   I can put a little ...

7    *A.*   That's, I guess, certainly a possibility.   I actually viewed

8    the rifle as going down behind Mr. Engel.   So I'm not sure if

9    that's his rifle or not, but it certainly could be.

10   *Q.*   Okay.   Well, he's certainly not pointing that weapon at

11   anybody, correct?

12   *A.*   No, it doesn't appear so.

13   *Q.*   Okay.

14            MR. PEREZ:   You can take that down.

15   BY MR. PEREZ:

16   *Q.*   Now, when you were looking at the Facebook posts and someone

17   wrote something, you know, posted a particular statement, I

18   mean, did you analyze the statement for what the content meant?

19            MS. CREEGAN:   Objection, vague.

20   BY MR. PEREZ:

21   *Q.*   Well, I mean, did you interpret the statement?

22            THE COURT:   Which statement?

23            MR. PEREZ:   Well, any statement.

24   BY MR. PEREZ:

25   *Q.*   I mean, I write a post on there and I say, you know, Let's

1   keep the pressure on them.  I mean, do you take that just from

2   that particular post or how do you put that into context?  What

3   did you do?

4   *A.*  It would really depend on the statement as to what it was as

5   to how much extra thought I would have to put into it.

6   *Q.*  Okay.

7           Do you know when Mr. Lovelien became friends with

8   Mr. Bruckhart?

9   *A.*  Do I know how he became --

10  *Q.*  No, when.

11  *A.*  Became Facebook friends with him?

12  *Q.*  Right.

13  *A.*  Yes, I believe it would have been after April 12th.

14  *Q.*  So it was after the event.  So he wasn't friends with him

15  before?

16  *A.*  I don't know what his relationship outside of Facebook was,

17  but he wasn't Facebook friends with him before, to my knowledge.

18  *Q.*  Okay.  So then Mr. Lovelien -- if Mr. Bruckhart had posted

19  something in a private group, then Mr. Lovelien would not have

20  had access to that, correct?

21  *A.*  That would depend on whether he was also part of the same

22  private group.

23  *Q.*  Well, if it -- okay.  Well, explain that a little further,

24  right.  I don't think I follow you.

25          So if Mr. Bruckhart has a group, wouldn't he have to

-2:16-cr-00046-GMN-PAL-

1   invite Mr. Lovelien or accept his friend request or something?

2   *A.*  Not necessarily page to page.  So the group page would be

3   different than Mr. Lovelien's private page.  You could choose to

4   run a group that you don't want to actually be friends --

5   Facebook friends with the actual members of the group.  You

6   could let them in, but you don't necessarily have to be Facebook

7   friends with all of them.

8   *Q.*  Okay.  And just being Facebook friends or being part of a

9   group doesn't necessarily subscribe -- doesn't necessarily mean

10  that you subscribe to everything that's on that person's

11  Facebook, correct?

12         MS. CREEGAN:  Objection, argumentative.

13         THE COURT:  Sustained.

14  BY MR. PEREZ:

15  *Q.*  Well, if -- well, let's take, for example, the Bundy

16  website.  There's a Bundy website, correct, or a Bundy Facebook

17  page?

18  *A.*  I believe there was -- yes, there's a Bundy Ranch Facebook

19  page.

20  *Q.*  And do you know how many friends the Bundy Facebook page

21  has, offhand?

22  *A.*  No.

23  *Q.*  Okay.  But probably more than 10, I'm sure?

24  *A.*  I would wager it does.

25  *Q.*  Right.  Now, when you have -- I mean, you're investigating

 1  this incident in Bunkerville and it involves the Bundy Ranch.  I

 2  mean, it's not a secret.  We know there's militia-type people

 3  that are there.

 4        MS. CREEGAN:  Just going to object to the testifying.

 5        THE COURT:  Just ask the question.

 6  BY MR. PEREZ:

 7  Q.  I'm trying to get at, you know, how you focussed your

 8  investigation on certain Facebook pages and certain posts.  I

 9  mean, we know there's a thousand pages here, more.  How did

10  you -- how did you refine that search?

11        MS. CREEGAN:  Objection, vague.

12  BY MR. PEREZ:

13  Q.  Well, how did you refine your Facebook search?

14        THE COURT:  I thought it was asked and answered.  He

15  already said he retrieved it from -- as a result of the search

16  warrant --

17        MR. PEREZ:  Right.  But how did he refine that --

18        THE COURT:  -- which ones were actually responsive to

19  the search warrant that he sent.

20        MR. PEREZ:  Right.  And in that search he received

21  12,000 pages of Facebook posts -- or Facebook data.

22  BY MR. PEREZ:

23  Q.  And I believe that's primarily just from Mr. Lovelien,

24  correct?

25  A.  Correct.

———— 2:16-cr-00046-GMN-PAL ————

1  *Q.* And there wasn't 12,000 pages of patriotic rhetoric, was

2  there?

3          MS. CREEGAN:  Objection, argumentative.

4          THE COURT:  Sustained.

5  BY MR. PEREZ:

6  *Q.* Well, all right.  Let's go through ... I believe it's --

7  Exhibit 213 is -- it's about 200 pages, right?  It starts at

8  page 1791 and goes to 1949.

9  **A.** Okay.

10  *Q.* Okay.  And there's all of these recipients.  It looks like

11  there's more recipients than communication, correct?  I mean,

12  let's take this first page, for example.  I mean, recipients is

13  about at least a third of the page on the top, maybe more.

14  **A.** Yes, one of the reasons there are so many thousands of pages

15  when we get a Facebook return is specifically because of

16  communications like this.  The way Facebook produces every

17  single message in a communication like this is, they print all

18  of the recipients at the time that were present in the

19  conversation.  So they list them all for every single -- even if

20  the communication is just the word "no," they're going to print

21  that, and sometimes the list of participants can be more than a

22  page.  And so to have a very short conversation sometimes will

23  run several hundred pages.

24  *Q.* Now, in this particular post, though, not all of these

25  individuals responded?

1  *A.*  Not all of the individuals participated, no.

2  *Q.*  No.  So they're not really participants; their name is just

3  on the post?

4       MS. CREEGAN:  Objection, argumentative.

5  BY MR. PEREZ:

6  *Q.*  Well, is that true?

7       MS. CREEGAN:  Objection, argumentative.

8  BY MR. PEREZ:

9  *Q.*  I mean, so you can't say for sure that any of these people,

10  these recipients, are actually participants?

11  *A.*  They received the message, yes.  They -- it would have shown

12  up in their Facebook account.  Whether they received it at the

13  time or even 10 minutes later, they would have been able to

14  review the conversation that had gone on.

15  *Q.*  Could have been weeks later, correct?

16  *A.*  Theoretically, yes.

17  *Q.*  So now on this 213 where -- I'm assuming that this must be

18  the beginning of the conversation?

19  *A.*  No, it is not.

20  *Q.*  So it says:  Rick, this chat is about you.  We have your

21  six.  What you say.

22       Now, that's not Rick Lovelien, is it?

23       THE COURT:  It's:  What say you, not what you say.

24  BY MR. PEREZ:

25  *Q.*  Or what say you.

—2:16-cr-00046-GMN-PAL—

1  *A.*  I'd have to see what the context was up above that.  This
2  may have been the beginning of that conversation, but I'd have
3  to see, again, the previous page, page 1790, to see if there was
4  additional conversation --
5  *Q.*  Right.  So we really don't know who this was about -- or who
6  this Rick is.
7  *A.*  I would have to see what the conversation was, whether it
8  was referring to Rick Lovelien.  I know Rick Lovelien
9  participated in that conversation, and there were references to
10  Rick Lovelien's activity in that conversation.
11  *Q.*  So he responded somewhere in here?
12  *A.*  Yes, he did participate in that -- in that message, yes.
13  *Q.*  Do you know where?  I mean, there's --
14  *A.*  I would have to look through every individual page, but I
15  recall him participating in different militia chats and that he
16  had participated in them.
17  *Q.*  Well, I mean, we've got a lot of -- a lot of comments here.
18  I mean, it seems to be -- well, like, it's a little broken up.
19         MS. CREEGAN:  Objection --
20  BY MR. PEREZ:
21  *Q.*  It looks like there's a second chat that actually starts
22  on -- right around page 8 -- well, it looks like this initial
23  chat ends on 1804 and then there's another comment, correct?
24  *A.*  I'd have to see page 1804.
25         MR. PEREZ:  Bring up 1804.

———— 2:16-cr-00046-GMN-PAL ————

1          THE WITNESS:  So I see the same conversation here.

2    BY MR. PEREZ:

3    Q.  Okay.  And then going through forward, I'm still looking for

4    anything by Rick Lovelien.  There's a -- if you go to page --

5    let me see.

6          MR. PEREZ:  Well, go to page 1886.

7    BY MR. PEREZ:

8    Q.  Now, you see some recipients there and then you see the

9    author, Rick Lovelien, correct?

10   A.  Yes.

11   Q.  And then it says the date it was sent?

12   A.  Correct.

13   Q.  And what date was that?

14   A.  This would be April the 8th.

15   Q.  Of what year?

16   A.  Of 2014.

17   Q.  And what does Rick say there in the body?

18   A.  The entire point of the militia's going to Nevada is to

19   prevent the violence, not to start it.

20   Q.  Okay.  Now, you had mentioned that you have investigated

21   militia-type groups before, correct?

22   A.  Yes.

23          MS. CREEGAN:  Objection, relevance.

24          MR. PEREZ:  Okay.  I am aware of the objection.

25

 1  BY MR. PEREZ:

 2  *Q.*  Now, what's your understanding of militia?

 3          MS. CREEGAN:  Objection, relevance.

 4          MR. PEREZ:  Well, it's his understanding.

 5          THE COURT:  How is that relevant?

 6          MR. PEREZ:  Well, we'll go to an exhibit then.

 7  BY MR. PEREZ:

 8  *Q.*  Okay.  Exhibit 199, and there's a conversation from, it

 9  looks like, Rick Lovelien -- between Rick Lovelien and James

10  Lardy.  And then at the bottom of the page is Mr. Lovelien's

11  response.  And in there -- if you read that -- well, why don't

12  you read that body for me right there, so ...

13  **A.**  The entire paragraph?

14  *Q.*  Yeah.

15  **A.**  Hi James.  Will try to answer the best I can.  The MTDF is a

16  legitimate militia.  For all intents and purposes, we are a

17  citizens state guard.  However, we operate outside the federal

18  and state government.  We are self-governed.  The combat

19  training is only a small part of what we do.  We also do

20  security ops for other groups at their rallies, such as the Oath

21  Keepers.  We also do search and rescue, disaster relief, and so

22  on.  We are working to get recognized by the state, and Governor

23  Bullock may call upon us if we are needed.  However, we do not

24  have to answer his call if I feel that it is not in our or the

25  state's best interest.

1           We are doing basic training, mostly combat at the

2   moment, but will be doing training in medical, survival, food

3   storage, threat assessment, among other things.  We are here to

4   protect our families, our communities, and our state against any

5   threat, foreign or domestic.  If you have more questions, I am

6   available.

7   *Q.*  Okay.  Now, you reviewed a lot of Facebook pages and I

8   presume you wrote a report about that?  You write a 302?

9   *A.*  I wrote a 302 on the review of Mr. Lovelien's Facebook

10  review, yes.

11  *Q.*  Okay.  And do you recall what you -- when did you write

12  that?

13  *A.*  I'd have to see my 302 to get the date.  It would have been

14  approximately June or July of 2014.

15          MR. PEREZ:  Your Honor, may I show that to the witness?

16  I'm not very good at working in mirrors.

17  BY MR. PEREZ:

18  *Q.*  Okay.  So the date on the top right?

19  *A.*  That would be the date it was entered into our system.  That

20  would be April 2014 -- 2015.

21  *Q.*  Okay.  So that's when you -- when you started your

22  investigation of Mr. Lovelien's Facebook account?

23  *A.*  No.  This would be something other than my review of his

24  Facebook account.  This is a 302 regarding an Internet viewing,

25  a public viewing of Mr. Lovelien's Facebook account.  I had

———2:16-cr-00046-GMN-PAL———

1  essentially logged onto the Internet and viewed what was there

2  at the time, which was long after we'd reviewed his search

3  warrant in 2014.

4  Q.  Okay.  And each one of these -- what's the U in front of

5  that paragraph there?

6  A.  It stands for unclassified.

7          MS. CREEGAN:  Objection, hearsay.

8          MR. PEREZ:  Well, I'm just asking what's the

9  significance of that.

10          MS. CREEGAN:  Renew the objection to reading from a

11  document.

12  BY MR. PEREZ:

13  Q.  Now if --

14          MR. PEREZ:  You can just turn that off for a second.

15  BY MR. PEREZ:

16  Q.  Then that report would be an indication of what you

17  reviewed, correct?

18  A.  No.

19  Q.  Well --

20  A.  That --

21  Q.  -- explain to me -- explain to me what a 302 is.

22  A.  A 302 would be our report on our investigative activity.

23  Q.  Okay.  And you come to some conclusions in there or is it

24  just factual?

25  A.  To the best of our ability, we keep it as factual as

—— 2:16-cr-00046-GMN-PAL ——

1   possible unless there's a reason to make a conclusion.

2   Q.  Okay.  And now, in your 302 --

3          MS. CREEGAN:  Objection to any -- to eliciting hearsay

4   from the 302.

5          THE COURT:  Sustained.

6   BY MR. PEREZ:

7   Q.  Okay.  Well, when you wrote that ... strike that.

8          So in your review of the documents, did you come to the

9   conclusion that Mr. -- that the things that you viewed from

10  Mr. Lovelien didn't appear to call for any kind of violent

11  action against the government?

12         MS. CREEGAN:  Objection, argumentative and irrelevant.

13  BY MR. PEREZ:

14  Q.  Well, did you come to that conclusion?

15         MS. CREEGAN:  Objection.

16         THE COURT:  Do you want to rephrase the question?  I'm

17  sustaining it otherwise, but I'll give you a chance to rephrase

18  it.

19  BY MR. PEREZ:

20  Q.  Right.

21         I'll just flat out ask you.  Looking at the Facebook

22  posts for Mr. Lovelien, did you see anything that called for

23  some sort of, you know, violent action against the government?

24         THE COURT:  Are you directing it to whether he saw

25  anything --

1           MR. PEREZ:  Did he hear anything?  Did he see anything

2  on Facebook?

3           THE COURT:  -- that Lovelien posted?

4           MR. PEREZ:  That Lovelien posted.

5           THE WITNESS:  So regarding the specific search warrant

6  review of Mr. Lovelien's Facebook account?

7  BY MR. PEREZ:

8  Q.  Well, on 4/25 -- or 4/22 when you generated your report --

9  A.  That's not the report on my Facebook review.  That would

10  have been the report of me viewing something on Mr. Lovelien's

11  public Facebook account.  That was not the -- the 302 that you

12  showed me did not have anything to do with the review of the

13  search warrant.

14  Q.  Okay.  Well, let's put this back up.  Let's see if we can

15  refresh your memory a little bit.

16           MS. CREEGAN:  Objection.  The witness has not asked to

17  have his memory refreshed.

18           THE COURT:  You have to ask a question first.

19  BY MR. PEREZ:

20  Q.  Well, you said you have reviewed numerous things, numerous

21  postings and documents, correct?

22  A.  That is correct.

23  Q.  Okay.  And, I mean, did you come to any conclusion on your

24  own about what those postings and documents meant?

25           MS. CREEGAN:  Objection, relevance.

1          THE WITNESS:  No.

2     BY MR. PEREZ:

3     *Q.*  No?  Well ...

4          All right.  Well, let me ask you.  After reviewing

5     these Facebook posts, did you see anything that professed

6     violence against the government?

7          MS. CREEGAN:  Objection, relevance.

8          MR. PEREZ:  It's very relevant.

9          (Court reporter requests one person speak at a time.)

10          THE COURT:  All right.  So the objection, Ms. Creegan,

11     go ahead and say it again.

12          MS. CREEGAN:  Relevance, his conclusions.

13          THE COURT:  All right.  And, Mr. Perez, I think it's

14     the phrasing of the question --

15          MR. PEREZ:  Okay.  We'll change --

16          THE COURT:  -- saying anywhere, anything --

17          (Court reporter requests one person speak at a time.)

18          THE COURT:  Just a minute, Mr. Perez.  Let me finish my

19     explanation.  Otherwise, I'm just going to sustain the objection

20     and not give you a chance to rephrase it properly.

21          I think what you're trying to ask him is, you're trying

22     to ask the witness whether in his review, whether from the

23     search warrant or the visual postings he saw himself or

24     supervise that other people did, was there any information that

25     he saw from -- posted by Mr. Lovelien or e-mails or chatted or

1  poked or whatever --

2         MR. PEREZ:  Right.

3         THE COURT:  -- that indicated violence.  Is that your

4  question?

5         MR. PEREZ:  That's correct.

6         THE WITNESS:  Yes.  He indicated that he wished for

7  individuals associated with the militia to travel armed to

8  Nevada to confront an ongoing law enforcement operation.  That

9  in and of itself is bringing guns to a law enforcement operation

10  and, certainly, causes the problem -- or could potentially cause

11  violence.

12  BY MR. PEREZ:

13  *Q.*  So just bringing -- the fact of just bringing the gun there

14  makes that violent?

15  **A.**  No.  And also advocating for OMA's position, which was that

16  they will not leave, they will not surrender unless BLM, unless

17  law enforcement capitulates to what they want.

18  *Q.*  But in all of these Facebook posts that we went through

19  yesterday, I never saw anything about stop -- that -- generated

20  by Mr. Lovelien.  If you can correct me, I mean, that's fine.

21  Just show me something that says that Mr. Lovelien wanted to

22  interfere with the gather of the cattle.

23         MS. CREEGAN:  Objection, argumentative.

24  BY MR. PEREZ:

25  *Q.*  Do you have anything?

—— 2:16-cr-00046-GMN-PAL ——

1           MS. CREEGAN:  Objection.

2           THE WITNESS:  Yes.

3           THE COURT:  You can answer the question.

4           You need to take this down from the screen.

5           MR. PEREZ:  Oh.  Sorry, Your Honor.  Modern science.  I

6    don't know Facebook.  I don't know that either.

7           THE WITNESS:  So I know that MTDF put out a Facebook

8    message regarding the OMA objectives, which specifically said

9    they were supposed to stay there until the cattle were released.

10   BY MR. PEREZ:

11   Q.  Right.  But from your knowledge, how many of the MTDF

12   members actually traveled to Nevada?  Do you know?

13   A.  Are you talking about members of MTDF's Facebook group or

14   just members?

15   Q.  No, not the Facebook group.  Actual --

16   A.  I don't know the membership of MTDF.  Their Facebook group,

17   there were several.

18   Q.  Okay.  And they were not necessarily members of the -- of

19   that particular, we'll use the word "militia."  Is that correct?

20   A.  I'm not sure whether they were or not.  I don't know how

21   they maintained their membership rolls.

22   Q.  Okay.  And we also saw some Facebook posts from Mr. Lovelien

23   where he says that:  We were running security, correct?

24   A.  That was a post, yes, from his sister, I believe.

25   Q.  Right.  And then we just looked at something that said the

1  reason for the militia going there is not to start violence, but

2  to prevent violence, correct?

3  *A.*  That is what they said, yes.

4  *Q.*  Okay.  And any reason to dispute that?

5  *A.*  Yes, there were individuals there whose job it was to

6  provide security for that event, and they were already there and

7  doing their job.  The militia going down, as Mr. Lovelien and

8  Mr. Payne did with firearms and disrupting that operation, would

9  not be providing security for that event.

10  *Q.*  Okay.  Now, are you -- well, let's talk about just

11  Mr. Lovelien.  All right?  I mean, as far as disrupting.  We've

12  seen -- obviously, we've reposted one so that you could identify

13  Mr. Lovelien.  And I believe he was standing there at ease, like

14  this, and my legs are apart, my hands are in back, looking out

15  at whatever he was looking at, looks like the rally point,

16  correct?

17  *A.*  Correct.

18  *Q.*  Okay.  He wasn't doing anything to interfere then, was he?

19  *A.*  I don't think there was anything to interfere with at that

20  point.

21  *Q.*  Okay.  Exactly.

22        Now, then we saw the picture of Mr. Lovelien on the

23  bridge with the very distinct weapon, and that's how you

24  identified him.  And he's doing what?

25  *A.*  He's there as a part of an operation --

—— 2:16-cr-00046-GMN-PAL ——

1    Q.  No.  What is he physically doing --

2           MS. CREEGAN:  Objection.  He's --

3           THE COURT:  If you're going to ask the question, you

4    need to let the witness answer the question.  You can't

5    interrupt.

6    BY MR. PEREZ:

7    Q.  What is he physically doing?

8    A.  He's standing there with a rifle, as people are attempting

9    to get cattle.

10   Q.  Okay.  They're attempting to get cattle, but is he doing

11   anything to interfere with that?

12   A.  He's standing there with a rifle as those individuals are

13   attempting to disrupt --

14   Q.  Okay.  So just --

15          MS. CREEGAN:  Objection, interrupting the witness's

16   answer.

17          THE COURT:  Mr. Perez, you really need to wait until he

18   finishes answering your question.

19   BY MR. PEREZ:

20   Q.  So what you're saying is that just his presence, his mere

21   presence, was enough to interfere?

22   A.  Under the circumstances, his presence with a rifle was

23   significantly interfering with that operation.

24   Q.  But he never --

25          MR. MARCHESE:  I'm going to object.  It calls for a

 1   legal conclusion.

 2         MR. JACKSON:  I'm going to object and join in that

 3   objection.  That's a legal conclusion that's --

 4         THE COURT:  And the question was a legal question

 5   asking about mere presence.  So, no, overruled.

 6   BY MR. PEREZ:

 7   *Q.*  All right.

 8         Mr. Lovelien -- well, let's go to another exhibit.

 9         Let me ask you, did Mr. Lovelien use an e-mail account?

10   *A.*  I'm not sure whether he used it or not.  I know he had one.

11   *Q.*  Okay.  I noticed that on some of the Facebook pages there

12   is -- there is a registered e-mail.  Now, is that just for

13   purposes of Facebook?

14   *A.*  Yes, you're required to open a Facebook page with an e-mail

15   account.

16   *Q.*  Okay.  But you don't necessarily have to use that e-mail?

17   *A.*  Correct.

18   *Q.*  And in your intelligence gathering on this, did you -- did

19   you look for e-mails as well?

20   *A.*  We did not subpoena or conduct search warrants on any of

21   Mr. Lovelien's e-mail accounts.

22   *Q.*  Any particular reason why not?

23   *A.*  Did not feel it was relevant.  We had no information at that

24   time that he was using those accounts to communicate regarding

25   this matter.

———— 2:16-cr-00046-GMN-PAL ————

1   *Q.* Okay.  Now ...

2         Now, you had mentioned that metadata tells you where

3   posts were made from, correct?  You know who made it?  Is that

4   correct?

5   *A.* The metadata -- no, not necessarily.

6   *Q.* Well, let me ask you.  If I wanted to post something using

7   someone else's account, I could do that, correct?

8   *A.* So you're referring specifically to Facebook?

9   *Q.* Yes.

10  *A.* So if someone was signed into their computer --

11  *Q.* Right.

12  *A.* -- and left under that Facebook account, theoretically you

13  could walk up behind them and sign in -- or -- and post

14  something under their name, yes.

15  *Q.* Right.  And there is really no way to know who actually

16  posted something.

17  *A.* There are ways that you can identify --

18  *Q.* I didn't ask you --

19         THE COURT:  You need to let him answer the question.

20  BY MR. PEREZ:

21  *Q.* Well, I didn't ask you for a narrative.  I mean, it's a

22  simple yes or no.

23  *A.* Yeah.  For instance, if I watch you post something, I can

24  see that you posted something.

25  *Q.* Well, if you're not there, you don't know who posted it, do

—————————— 2:16-cr-00046-GMN-PAL ——————————

1   you?

2   **A.**   No, it's certainly possible that someone else could have

3   taken over their account.

4   *Q.*   Right.  Okay.  Now, in order to post anything on Facebook

5   from a location like Bunkerville, you would have to have, what,

6   a smart phone?

7   **A.**   Correct.

8   *Q.*   Can you -- can you -- you can't text to Facebook, correct?

9   **A.**   Not to my knowledge.

10  *Q.*   Okay.  And you can't call Facebook and post anything?

11  **A.**   Not to my knowledge.

12  *Q.*   So it has to be -- you have to have some access to the

13  Internet?

14  **A.**   Correct.

15  *Q.*   Okay.

16          Now, we saw a bunch of different, it looked like

17  private messages, and there were spaces in between where you

18  said that was, like, the end of the message.  And there were a

19  number of messages yesterday where the message was directed to

20  Mr. Lovelien and he did not respond.  I mean, do you know if he

21  actually received those messages?

22  **A.**   He would have received them and been able to view them in

23  his Facebook account.

24  *Q.*   But if -- and so if there's no response, we don't know if he

25  saw it, correct?

1  *A.*  I don't know if he -- if he looked at them afterwards.

2  *Q.*  And we certainly don't know if he subscribed to what was in

3  the message, correct?

4  *A.*  Correct.

5  *Q.*  Now, James Lardy, James Lardy's name came up yesterday as

6  being an unindicted coconspirator, correct?

7  *A.*  Yes.

8         MS. CREEGAN:  Objection to asking for a legal

9  conclusion from a witness.  That's my legal characterization for

10  evidentiary purposes.

11         THE COURT:  Correct.

12  BY MR. PEREZ:

13  *Q.*  All right.  Let's go to Exhibit 200.  And down at the bottom

14  of that page, the substance of that, the body of that, that's a

15  private message?

16  *A.*  Yes.

17  *Q.*  Is that Mr. Lardy's resigning his position with MTDF,

18  correct?

19  *A.*  Temporarily, yes.

20  *Q.*  Well, but he's resigning, correct?

21  *A.*  Yes.

22  *Q.*  Okay.  And so, I mean, at -- and this was on what day?

23  *A.*  This would have been April the 8th.

24  *Q.*  So that was before the 12th of April --

25  *A.*  Correct.

1   *Q.*  -- and the incident there.

2          So at that point he was no longer a member of MTDF

3   after the --

4   *A.*  I don't know what their rules are for whether they're part

5   of the group just because they send a Facebook message, if

6   there's some ritual they have to go through to be dismissed from

7   the group.

8   *Q.*  Right.  And then yesterday there was -- there was a Facebook

9   post, I believe it was a repost.  Now, how does a repost work?

10  *A.*  If you like something that someone else has said, you can

11  actually send it out on your page as well.

12  *Q.*  Okay.  Well, that brings me to another question.

13         Now we're talking about like.  So if I like something

14  on Facebook, I think it's got the little thumbs-up or something

15  on there?

16  *A.*  Correct.

17  *Q.*  Is there -- I mean, there's no connotation for someone

18  liking something or -- I mean, it's -- can you just click on

19  that?

20  *A.*  You'd have to actually look at the page and then --

21  *Q.*  Okay.

22  *A.*  -- there's an option to click on it.

23  *Q.*  And then what happens when you like something?

24  *A.*  The page itself keeps track of how many people like it.  And

25  then Facebook actually then, when we do a search warrant, tells

1 us how many pages you liked.

2 *Q.* Okay.  And then -- but when I like something, does that,

3 like, send a notification to another page?  Does it generate any

4 other document?

5 *A.* Not to my knowledge.

6 *Q.* Okay.  So, I mean, if I like, you know, something on the

7 ASPCA, it doesn't send some sort of another message to another

8 animal website or something?

9 *A.* I'd have to check whether -- not to another website.  I'd

10 have to check whether it notifies the Facebook account holder

11 itself; if that's one of the options they can choose.  I doubt

12 there's an option for that, but that may be possible that it

13 notifies via Facebook whoever has that page.

14 *Q.* So if you post something and I like it, you would know that

15 I like that?

16 *A.* I could actually look and see who liked my page.  I know

17 that, yes.

18 *Q.* Okay.  And when you were doing your investigation of the

19 Facebook pages, did you look and see who liked certain things?

20 *A.* Very rarely that would be something that we would do.

21 *Q.* Okay.  So liking something didn't necessarily lead you to

22 any sort of further investigation of that individual?

23 *A.* We would be able to maybe identify someone that we were

24 interested in for some reason.

25 *Q.* I noticed on, you know, the 12,000 or so pages of Facebook

—— 2:16-cr-00046-GMN-PAL ——

1   posts -- well, let's deal with just Mr. Lovelien's Facebook

2   posts.  There's no messages between, like, Mr. Lovelien and,

3   let's say, Mr. Parker, for example?

4   *A.*  Not that I'm aware of.

5   *Q.*  And none between him and Mr. Stewart?

6   *A.*  No.

7   *Q.*  Okay.  And Mr. Engel?

8   *A.*  No.

9   *Q.*  Okay.  Mr. Burleson?

10  *A.*  No.

11  *Q.*  Okay.  So no communication with any of these people?

12  *A.*  Not via Facebook that I'm aware of.

13  *Q.*  Okay.  No private messages?

14  *A.*  No.

15  *Q.*  So was Mr. Lovelien actually a member of the Operation

16  Mutual Aid?

17  *A.*  I believe he did join after Bunkerville, but not before.

18  *Q.*  So he wasn't a member of Mutual Aid before?

19  *A.*  As far as an actual member on their website, not to my

20  knowledge.

21  *Q.*  Okay.  What about a member of the organization?

22  *A.*  Not to my knowledge.  It was a fairly loose organization.

23  It was a coalition.  So who was actually members, I don't know.

24  At some point, on approximately April the 10th, he had somehow

25  gotten on OMA's e-mail list.

───── 2:16-cr-00046-GMN-PAL ─────

1    Q.  Okay.

2    A.  Most of the people that were on there were members of their

3    Facebook -- of their website.

4    Q.  Okay.  Well, let me ask you.  You say somehow got on there.

5    Wouldn't he have had to have given up his e-mail address or

6    something?

7    A.  He would have likely have had to give it to Ryan Payne or

8    Jerry Bruckhart.

9    Q.  Okay.  Do you know when Mr. Payne and Mr. Lovelien became

10   acquainted?

11   A.  The earliest information I have was April 7th of 2014.

12   Q.  Because -- was there a Facebook post?

13   A.  Yes, they became friends and communicated with each other.

14   I don't know if they were communicated -- if they had

15   communicated outside of Facebook prior to that time.

16   Q.  Okay.  Did Mr. Payne have a website?

17   A.  The Operation Mutual Aid had a website.

18   Q.  That was his website?

19   A.  That was Jerry Bruckhart and his website, yes.

20   Q.  Okay.  I notice that there was a repost of Operation Mutual

21   Aid's, I guess, plan or whatever.  You say Operation Mutual Aid

22   was sort of a loose group, correct?  Those were your words.

23   A.  Yes, there was no formal ceremony to get into the group,

24   that I'm aware of.

25   Q.  Okay.  And organization-wise loose?

1   *A.* It was a coalition is the way they defined it.  So there

2   were more -- some individuals that were more involved than

3   others.

4   *Q.* Okay.  And so just viewing that -- well, let me ask you --

5   strike that.

6         When you go to a website, the website collects

7   information, correct?  Unless you have the privacy settings.

8   *A.* It can, yes.

9   *Q.* Okay.  Now, is that a way of a website collecting e-mail

10  addresses and things like that?

11        MS. CREEGAN:  Objection --

12        THE WITNESS:  I don't understand what you mean.

13        MS. CREEGAN:  -- vague.

14  BY MR. PEREZ:

15  *Q.* Well, let me ask you.  You understand what cookies are,

16  correct?

17  *A.* Yes.

18  *Q.* Okay.  And what is a cookie?

19  *A.* A cookie will essentially track -- help a website track data

20  and, basically, sets -- helps different websites figure out what

21  you might be interested in.

22  *Q.* Okay.  It tracks, I believe it's called, the IP address.  Is

23  that correct?

24  *A.* I'm not sure if it's the IP address or the MAC address on

25  the computer, but probably the IP address.

——— 2:16-cr-00046-GMN-PAL ———

1   Q.  Okay.  What's the IP address?

2   **A.**  The IP address would be the Internet Protocol address,

3   basically, what numbers you're using to access the Internet.

4   Q.  Okay.  And is an IP address connected to a particular place?

5   **A.**  Not necessarily, no.  For instance, there's IP addresses

6   associated with a Verizon phone which you could use anywhere in

7   the country.

8   Q.  Okay.  And -- but what about, like, a computer?  Is that --

9   is the -- well, strike that.

10         Is the IP address registered to the access point to the

11  Internet or is it -- or is it the thing that you use to access

12  the Internet?

13  **A.**  It would, essentially, be the access point, yes.

14  Q.  So wherever that particular WiFi signal is coming from,

15  so -- correct?

16  **A.**  Again, not necessarily.  Like, a Verizon phone you could be

17  anywhere so it's not a particular spot.

18  Q.  Well, we have WiFi in this court --

19  **A.**  Yes.

20  Q.  -- and I use a laptop over there.

21  **A.**  Yes.

22  Q.  What would the IP address be?  Do you know?

23  **A.**  No.

24  Q.  Okay.  Is there any way to know?

25  **A.**  If we could figure out who the Internet service provider was

1  for this particular WiFi, we could go to that company and ask

2  them what might have been assigned here.

3  Q.  So what you're saying is, it's that -- that connection point

4  and not the device that is the IP address?

5  A.  Correct.  It changes periodically.

6  Q.  So when you do a Facebook post or -- does it register the IP

7  address anywhere?

8  A.  When we receive the Facebook search warrant returns back, it

9  shows us what IP addresses were used to access that Facebook

10  account, so yes.

11  Q.  Okay.  So if an access to a particular Facebook page took

12  place on April 12th, you would know where that particular access

13  was done, correct?

14  A.  We would know what IP address was used on that day, yes.

15  Q.  Okay.  Do you know if they had WiFi at Bunkerville?

16  A.  I know there were a number of individuals that were able to

17  post from there.  I don't know if they were posting via their

18  phones just via 4G or 3G, what they had, or they were accessing

19  WiFi.

20  Q.  Do you know what type of phone Mr. Lovelien had?

21  A.  I don't.

22  Q.  Do you know if he had the capability of posting to the

23  Internet on the 12th?

24  A.  He could have certainly done that if he would have borrowed

25  anyone's phone or computer that was there, yes.

1    Q.  Okay.  So only by borrowing something.  So if he borrowed

2    somebody else's computer or phone to make that post, it would

3    show that person's IP address?

4    **A.**  That's correct.

5    Q.  And in the data that you turned over to the U.S. Attorney's

6    Office from this investigation, did that contain the IP

7    addresses for certain posts?

8    **A.**  Not for certain posts.  It was just general time frame of --

9    so the way it comes is, all the IP addresses that were used on

10   certain -- on dates.  So it wouldn't be per individual post.  It

11   would be per time.

12   Q.  What do you mean "per time"?  Like, are you talking about a

13   block of time in a day?

14   **A.**  Right.  For instance, on April 11th this particular account

15   was accessed from these IP addresses.

16   Q.  Okay.  Do you know -- I mean, there are some posts close in

17   time on Mr. Lovelien's Facebook to the time when he was in

18   Bunkerville.  I mean, did you -- did you log any information as

19   to the IP address?

20   **A.**  I'm not aware of posts to that account during the time that

21   Mr. Lovelien was in Bunkerville.

22   Q.  Okay.  And do you know when Mr. Lovelien arrived in

23   Bunkerville?

24   **A.**  On April the 10th.

25   Q.  April the 10th.  Okay.  And do you know when he left?

 1   *A.*   I believe it was April the 13th.

 2   *Q.*   Okay.  And so between April 10 and April 13, you didn't see

 3   any Facebook posts from Mr. Lovelien?

 4   *A.*   I don't recall seeing any.  I would have to review it again

 5   to make sure.

 6          THE COURT:  Is this a good time to take a break,

 7   Mr. Perez?

 8          MR. PEREZ:  That's fine.

 9          THE COURT:  All right.  So I remind the jury during

10   this break, go ahead and use the restroom, but do not discuss

11   this case with anyone, not even your fellow jurors, nor allow

12   anyone to discuss it with you.  Please do not read or listen to

13   or view anything that touches upon this case in any way.  Do not

14   attempt to perform any research or any independent

15   investigation, and please do not form any opinion about this

16   case.  We'll go ahead and take a 15-minute break.  It's 10:46.

17   Plan to be back here close to 11.

18          And, Agent Seyler, likewise, after the jury leaves you

19   may also stretch, use the restroom, and we'll try to be back

20   here by 11.

21          (Whereupon jury leaves the room at 10:46 a.m.)

22          THE COURT:  All right.  Off record.

23          (Recess taken at 10:46 a.m.)

24          (Resumed at 11:05 a.m.)

25          THE COURT:  All right.  You may be seated.  Let's bring

—————————2:16-cr-00046-GMN-PAL—————————

1    in the jury.

2            (Whereupon jury enters the room at 11:07 a.m.)

3            THE COURT:  All right.  Everyone may be seated.  We're

4    joined by the jury.  We have FBI Agent Mark Seyler back on the

5    witness stand.

6            And, Mr. Perez, you may continue with your

7    cross-examination on behalf of Mr. Lovelien.

8            MR. PEREZ:  Thank you, Your Honor.

9    BY MR. PEREZ:

10   *Q.*  Agent, you said that Mr. Lovelien arrived in Bunkerville on

11   April 10th?

12   *A.*  Approximately, yes.

13   *Q.*  Do you know approximate time of day at all?

14   *A.*  I don't right now.  I'd have to review the records.

15   *Q.*  Okay.  And where did he leave from to go to Bunkerville?

16   *A.*  Libby, Montana.

17   *Q.*  And where's Libby, Montana?  Montana's a pretty big state.

18   I mean, is it --

19   *A.*  Far northwest Montana.

20   *Q.*  Okay.  That's some distance from Bunkerville?

21   *A.*  Yes.

22   *Q.*  Do you know approximately how long it takes to travel from

23   Bunkerville -- or to Bunkerville, I should say?

24   *A.*  I don't.  It would be over 10 hours.

25   *Q.*  Okay.  You don't have any idea how many miles?

1   *A.*   I don't.

2   *Q.*   Okay.  And you said, like -- I mean, Montana's sort of a

3   long state, if I get my geography right.  North -- the north

4   part of the state on the west or the north --

5   *A.*   Far northwest corner, yes.

6   *Q.*   Far northwest corner.  Okay.

7          Do you recall, in looking at Mr. Lovelien's Facebook

8   page and his wall, approximately how many friends he has?

9   *A.*   I don't remember.

10  *Q.*   You don't.  Okay.

11         MR. PEREZ:  Bryan, 190.

12  BY MR. PEREZ:

13  *Q.*   Okay.  You see the -- now, what's the date on this Facebook

14  post?

15  *A.*   This would have been September, actually, 25th of 2013.

16  *Q.*   Okay.  And you say the 25th because you're subtracting time

17  from the UTC?

18  *A.*   Correct.

19  *Q.*   So just for argument sake, what time of the day would that

20  be?

21  *A.*   Approximately 10 o'clock in the evening, Montana time.

22  *Q.*   Okay.  And then it says that Rick Lovelien updated his

23  status.  What does that mean?

24  *A.*   Again, this is a message that can go out to anyone that --

25  of your Facebook friends that have chosen to receive your status

1   updates.  You don't have to receive people's status updates if

2   you don't want to, but it would have gone out on his page and

3   then to anyone that had checked that they wanted to receive

4   those updates.

5   Q.  So let me see if I get this correctly.  So if I don't want

6   to receive somebody's status update, I set my page to prevent

7   from receiving those messages?

8   A.  Correct.

9   Q.  Okay.  Now, websites work the same way?

10  A.  It depends on the website.

11  Q.  And I know we talked about cookies a little while ago, but

12  when you go to a website, they gather information on you,

13  correct?

14  A.  It can gather certain information, yes.

15  Q.  And websites can send that information out to other

16  websites, correct?

17  A.  I guess the individuals that run those websites could choose

18  to forward that information somewhere else, yes.

19  Q.  Okay.  And in order to prevent a website from sharing that

20  information -- and it's called sharing, correct?

21  A.  Correct.

22  Q.  Okay.  In order to prevent that from happening, you would

23  have to opt out of that sharing?

24  A.  You can choose not to have cookies when you activate sites.

25  Certain sites won't allow you to actually enter the site unless

1  you have cookies enabled.

2  *Q.*  Okay.  Do you know if Operation Mutual Aid operated that

3  way, with cookies?

4  *A.*  Their website?  I don't know.

5  *Q.*  You don't know.

6       So you didn't actually get behind the website and look

7  at, you know, the -- I guess it would be the technical side of

8  the website and the setup?

9  *A.*  That's correct.

10  *Q.*  Just the content?

11  *A.*  Just what we were able to actually see ourselves, yes.

12  *Q.*  Okay.  On this, 190 here, can you read me what the message

13  is.

14  *A.*  I, Rick Lovelien, am an -- excuse me -- am an American born

15  and raised.  My message to the federal government is simple.  I

16  demand my country back from those who are not fit to run it.

17  You are supposed to work together to create a better world, not

18  fight amongst yourselves over things that should have been

19  solved long ago.  This is not your country.  It never was.  It

20  belongs to the people, the cab drivers, the fast food workers,

21  the doctors, the carpenters, the mothers and fathers, and the

22  children of every walk of life.

23       No longer will we sit by as you pollute our great

24  country.  No longer will we remain silent as you outright lie to

25  us on the evening news.  No longer will we allow those in power

 1  to walk on the very Constitution our forefathers fought and died

 2  to protect.  You are an insult to them and to this country.  I

 3  am an American and I demand our country back.  And if you will

 4  not give it back, then we are quite prepared to take it back.

 5  So help me God.

 6  Q.  Okay.  And that sort -- I mean, that sort of tells you the

 7  type of person that -- the individual that wrote this.  I mean,

 8  usually when they write this message like this and they update

 9  their status, they're telling you about them, correct?

10         MS. CREEGAN:  Objection, speculative.

11         THE COURT:  Sustained.

12  BY MR. PEREZ:

13  Q.  Well, in this message, I mean, it seems that Mr. Lovelien is

14  explaining who he is, correct?

15         MS. CREEGAN:  Objection.  Same objection.  Same

16  question.

17         THE COURT:  Sustained.

18  BY MR. PEREZ:

19  Q.  Okay.  Well, let's look inside here.  Is there anything in

20  this -- in this message here that -- strike that.

21         Your investigation obviously resulted in your retrieval

22  of this particular post, correct?

23  A.  Correct.  It was one of the items I deemed relevant pursuant

24  to the warrant when I conducted the review of his Facebook

25  material.

1  Q.  Okay.  And why is it relevant?

2  A.  In light of his activities on April 12th, this post

3  indicates that Mr. Lovelien had a message to the federal

4  government and was prepared to take back his country, which in

5  light of his actions on April 12th, would appear that he was

6  willing to take action and do that.

7  Q.  Right.  Take back this country.  I mean, it seems to me that

8  I hear that a lot lately, don't you?

9          MS. CREEGAN:  Objection, argumentative.

10          THE COURT:  You're arguing and --

11          MR. PEREZ:  Well -- that's right, Your Honor.  I am.

12  I'm sorry.

13  BY MR. PEREZ:

14  Q.  Take back this country, I mean, does that necessarily imply

15  violence?

16  A.  In and of itself, no.  In this context, considering his

17  relationship with Operation Mutual Aid and their specific

18  references to using violence to do so, yes, I think it's

19  relevant.

20  Q.  Well, but this is on 9/26 of 2013, correct?

21  A.  Yes, you're --

22  Q.  And Mr. Lovelien wasn't associated with Mr. Payne or

23  Operation Mutual Aid until right around the Bunkerville activity

24  in 2014, correct?

25  A.  I don't know when he initially became involved with

1  Operation Mutual Aid.  Other members of his militia group were.

2  Q.  But you don't know that he was?

3  A.  He was the leader of the group, but you're right.  I don't

4  know.

5  Q.  Okay.  Now, on -- let's -- Exhibit 194.  Now, Exhibit 194,

6  if I'm not mistaken, these are private posts, private messages?

7  A.  Yes, this is an exchange of private messages.

8  Q.  Okay.  And Mr. Lovelien is the recipient of, I believe there

9  are, three messages on this page?

10 A.  Correct.

11 Q.  Okay.  And they were sent by Gerry Emery, correct?

12 A.  Correct.

13 Q.  And there's no response?

14 A.  From Mr. Lovelien, not that I can see on this page.

15 Q.  Okay.  But if there was, it would be on this page, right?

16 A.  If there -- this conversation may have continued so there

17 may be -- the next page may contain some type of response from

18 Mr. Lovelien --

19 Q.  But that's just a guess.

20 A.  -- I don't have it in front of me.

21 Q.  You don't know?

22 A.  I don't know.  I don't have the page in front of me.  I'd

23 have to look at page 956 or 957 and other pages that followed

24 it.

25 Q.  Okay.  Well, let's look at Exhibit 195, which is page 957 of

1  the Facebook.

2          Okay.  Now, this is a continuation of the same private

3  message thread, correct?

4  *A.*  Correct.

5  *Q.*  Okay.  Now, I see that Rick Lovelien is the recipient and

6  the author is, again, Gerry Emery, correct?

7  *A.*  Correct.

8  *Q.*  Now --

9          MR. PEREZ:  You can scroll down the page, Bryan.

10  BY MR. PEREZ:

11  *Q.*  Now, anywhere in there is there a response from

12  Mr. Lovelien?

13  *A.*  Not this specific private chat, no.

14  *Q.*  But if there was, it would be in there, correct?

15  *A.*  Unless he chose to respond to one of the other chats he was

16  participating with with Mr. Emery at the time.

17  *Q.*  Well -- okay.  So the other members of that chat would be

18  listed as recipients.

19  *A.*  I think you're -- yes, if they were part of this private

20  chat.

21  *Q.*  Right.

22  *A.*  But Mr. Emery and Mr. Lovelien, at this time frame, were

23  engaging in other private chats, as we've seen in some of the

24  other exhibits, that contained other individuals.

25  *Q.*  Okay.  Well, but if he was responding to one of these

1  particular messages, you would expect to see it in here,

2  correct?

3  *A.*  If he was responding and only wanted to respond to Mr. Emery

4  and not the other participants in the other chats, yes.

5  *Q.*  And we don't know that -- I mean, do you know if this was

6  part of a larger chat?

7  *A.*  Yes.  As I mentioned, at the time, Mr. Lovelien and

8  Mr. Emery were both involved in private chats on April 7th and

9  April 8th together about the Bunkerville incident and other

10  matters.

11  *Q.*  Right.  But it seems to me in looking at all of these

12  Facebook posts that we have, I mean, everything is pretty much

13  sequential.  I mean, if you -- if someone asks you a question on

14  Facebook and you respond and it's a private message, it would

15  be, like, right there, wouldn't it?

16  *A.*  I don't see any questions in any of these.  These are

17  statements by Mr. Emery.

18  *Q.*  Okay.  Well, there's ... there's I guess for lack of better

19  description -- let's bring it back down to, like, you know, to

20  1900s.  It's like mail.  I mean, that's -- Mr. Lovelien's the

21  recipient of this particular letter from Mr. Emery?

22  *A.*  Correct.

23  *Q.*  And there's no response from Mr. Lovelien?

24  *A.*  Not specifically to Mr. Emery, but, again, they were

25  communicating in another chat together at the same time, so ...

— 2:16-cr-00046-GMN-PAL —

1   Q.  Well, okay.  In this particular -- well, let's go back to

2   194.  And at the bottom of 194 there's a:  Pass this along if

3   you will, sent by Mr. Emery to Mr. Lovelien.

4   A.  Yes.

5   Q.  Like, sort of, Hey, you know, pass the word along, right?

6   A.  Yes, which Mr. Lovelien then passed along.

7   Q.  Okay.  Where?

8   A.  On the MTDF Facebook group, as Ryan Payne received that

9   specific message.

10  Q.  But you --

11  A.  Rick Lovelien specifically passed that message from

12  Mr. Emery along to all members of the MTDF Facebook group.

13  Q.  Right.  Okay.  Now, that message was posted on, looks like,

14  4/9 of '14, correct?

15  A.  Correct.

16  Q.  And what time would that be?

17  A.  Approximately 11 Nevada time, 11 a.m.

18  Q.  11 Nevada time.  Okay.  But Mr. Lovelien arrived in Nevada

19  on the 10th, right?

20  A.  Correct.

21  Q.  From that northwestern corner of Montana?

22  A.  Correct.

23  Q.  Okay.  Now, like, Exhibit 213 -- 213 was that 200-plus page

24  exhibit.  And now, that's -- that's a -- it's not really a

25  private chat, is it?  It's more like a group chat?

1   *A.*  No, it is a private chat in that I could not view what these

2   people were posting if I were on the Internet.  I would have to

3   obtain it via search warrant, which is what we did.

4   *Q.*  Okay.  Well, if that previous chat that we saw on -- what

5   was it -- 190 or 194 was part of a group chat, I mean, wouldn't

6   it be similar in the way it looks on the page?  I mean ...

7   *A.*  It does look very similar.  It's just that there are more

8   individuals.

9   *Q.*  Well, except for the sheer number of recipients.

10  *A.*  Yes.  Again, that's the same thing.  They just had how many

11  recipients were part of it.  You could have two recipients.  You

12  could have five recipients.  But in this case they had a number

13  of different recipients.

14  *Q.*  Right.  But you said that as far as, like, Exhibit 190 went

15  that, you know, well, you know, yeah, Mr. Lovelien may have

16  responded.  But it would have been part of another thread, I'm

17  guessing?

18  *A.*  If you're indicating was Mr. Lovelien communicating with

19  Mr. Emery at the time, yes, he was in one of these chats like

20  this that we reviewed.  I don't know if it's this particular

21  one, but one of the longer chats.

22  *Q.*  Right.  But I'm talking about this particular chat here in

23  Exhibit 190.  I mean, there's no response.  And then you're

24  saying, Well, it could have been in, you know, part of this

25  other response where there were more members.

1   *A.*  There was a response.  He sent the e-mail that Mr. Emery

2   asked him to forward along, and he -- or the message, and he

3   forwarded that along.  We've seen that in evidence.

4   *Q.*  Okay.  But you said -- well, not e-mail, though, correct?

5   *A.*  It was received in Ryan Payne's e-mail.  But Mr. Emery [sic]

6   took the very post that Emery suggested be forwarded on and did,

7   in fact, forward it on to his MTDF colleagues.

8   *Q.*  Right.  But that's Mr. Emery forwarding it on; not

9   Mr. Lovelien?

10  *A.*  No, that's Mr. Lovelien forwarding Mr. Emery's response

11  directly to his MTDF Facebook group.

12  *Q.*  And that wouldn't appear in this thread.  I mean, we're

13  looking at several pages in a row.

14  *A.*  It did appear in the MTDF Facebook group, as we've received

15  in Mr. Payne's e-mail.

16  *Q.*  But my concern is this.  I mean, we have sequential pages

17  where there is a chat and things seem to be following all along,

18  and there's no response anywhere in there.

19          MS. CREEGAN:  Asked and answered.

20  BY MR. PEREZ:

21  *Q.*  And, yet, you're saying that, yeah, it would have been.

22  Well, I mean, it would have been somewhere in there

23  sequentially, correct?  I mean, isn't that how Facebook is set

24  up, it's linear?

25          MS. CREEGAN:  Compound and asked and answered.

————— 2:16-cr-00046-GMN-PAL —————

1          MR. PEREZ:  Let me start that over.

2          THE COURT:  Yeah, it's, like, three different

3   questions.

4   BY MR. PEREZ:

5   Q.  When we started this discussion earlier this morning, we

6   talked about the timeline on Facebook, correct?

7   A.  Yes.

8   Q.  On the wall.

9          Okay.  And when you post things on the wall, it posts

10   them in a time and date organization, correct?

11   A.  Correct.

12   Q.  And unless you delete something, it's going to be there,

13   correct?

14   A.  Correct.

15   Q.  Okay.  Now, in your retrieving of documents and things like

16   that, there's indications of things being deleted, right?

17          Like we -- and let me go back.  I asked you about,

18   like, the word "false" when it shows up in the Facebook posts.

19   A.  Correct.

20   Q.  And then it's the -- one of the queries out to the left was

21   "deleted."

22   A.  Correct.

23   Q.  And it says, False.  Now, that means that there's nothing

24   deleted from that Facebook post, correct?

25   A.  Correct.

1  *Q.*  Okay.  So -- now, I don't see anything in here to indicate

2  that there's something deleted, and I don't see a response.

3          MS. CREEGAN:  Objection, vague as to what he's

4  referring to.

5          MR. PEREZ:  And -- well, I'm ...

6          THE COURT:  What are you referring to?

7  BY MR. PEREZ:

8  *Q.*  Well, all right.  Let's go back to the wall again.  I mean,

9  this is -- Facebook is an interesting creation, modern creation,

10  correct?  Social media?

11  **A.**  I think that it is interesting, yes.

12  *Q.*  Yes.  And a lot of people use it for communicating much the

13  same as they would mail, right?

14  **A.**  No, I think mail is a much slower communication.  I don't

15  think they're similar communication forms at all.

16  *Q.*  Right.  It's a very expedient means of communicating?

17  **A.**  It is one way of communicating, yes.

18  *Q.*  Okay.  And, you know, if -- well, I mean, on here I just

19  find it odd that we have all these --

20          MS. CREEGAN:  Objection to testimony from counsel.

21          THE COURT:  Mr. Perez, just ask the question.  Don't

22  comment on what you think about the evidence.

23  BY MR. PEREZ:

24  *Q.*  I still don't understand why a response wouldn't be on that

25  exhibit if there was, in fact, a response.

—2:16-cr-00046-GMN-PAL—

1   *A.*  Using your mail example, if you sent me a letter and asked

2   me to forward it and I went out and copied it and forwarded it

3   to a number of other individuals, which Mr. Lovelien did, that

4   would be my response to your request.  And Mr. Lovelien

5   responded to his request by forwarding that on his MTDF Facebook

6   page.  So that's where maybe we're having the problem

7   understanding.

8         Mr. Lovelien didn't do that himself.  He forwarded it

9   through the MTDF Facebook group, which then went to Ryan Payne.

10  That would have been a cut and paste from this e-mail -- or this

11  message that Mr. Emery gave him and sent out.  We've seen this

12  message exactly, the one Mr. Emery encouraged him to forward, in

13  the MTDF Facebook chat from Mr. Lovelien.

14        MR. PEREZ:  175, Bryan.

15  BY MR. PEREZ:

16  *Q.* So, now, would this be an example of him forwarding it?  I

17  mean, this is an example of -- or is this -- I mean, explain to

18  me what this is.

19  *A.*  This is an e-mail sent from the Operation Mutual Aid e-mail

20  account to a number of individuals that were on the OMA e-mail

21  list at the time.

22  *Q.*  Okay.  So this is not the type of notification or forwarding

23  that you're talking about?

24  *A.*  No, this e-mail does not involve Facebook whatsoever.

25  *Q.*  Okay.  And let's look at 174.  And is this something that

———————— 2:16-cr-00046-GMN-PAL ————————

 1  would be forwarded?

 2  *A.*  No.

 3  *Q.*  Or is this --

 4  *A.*  This is an e-mail between Ryan Payne and Jerry Bruckhart and

 5  did not involve Facebook whatsoever.

 6  *Q.*  Okay.  Exhibit 28, is that from the Facebook or is that from

 7  the website?

 8  *A.*  That is an e-mail from the Operation Mutual Aid Gmail

 9  account to, again, several OMA recipients.  It did not involve

10  Facebook whatsoever.

11  *Q.*  Okay.  Now, where do those -- do you have any idea of how

12  those e-mail addresses are gathered?

13  *A.*  Mr. Bruckhart compiled e-mails of individuals that were

14  interested in receiving Operation Mutual Aid information,

15  including individuals that were registered as members for his

16  website, as Mr. Lovelien's sister had done, or who indicated

17  they wanted to receive updates.  And so as these events in

18  Nevada went on, this e-mail list began to grow with individuals

19  that had -- Mr. Bruckhart added to this list.

20  *Q.*  Okay.  Now, let's go to 179.  Now, is this a repost?  What

21  exactly is this?

22  *A.*  Yes.  So this is an e-mail that Ryan Payne received in his

23  e-mail account.  Again, Ryan Payne had chosen his options on

24  Facebook to be notified via e-mail of any updates to the -- to

25  the MTDF Facebook group.  So this is one of the notifications he

 1   received when Mr. Lovelien posted a notice to the MTDF Facebook

 2   group.

 3   Q.  Okay.  And -- but Mr. Lovelien didn't necessarily direct

 4   this to Ryan Payne; it just -- it's Ryan Payne asking to be

 5   notified?

 6   A.  Mr. Payne was a member of the MTDF Facebook group.

 7   Mr. Lovelien directed this message to go to personnel from the

 8   MTDF Facebook group.  Therefore, he did direct it to Ryan Payne.

 9   Q.  And when was this message sent?

10   A.  The e-mail was sent on April 9th.  The message to the

11   Facebook group was also sent on April 9th.

12   Q.  And now, the time, the time on here is a little confusing

13   because we have 12:18 p.m. up in the top right, on April 9th.

14   Now, is that -- that would be the date and time that this

15   particular e-mail was generated or requested by Ryan Payne from

16   the posting on MTDF?

17   A.  That would be Google's record of the -- yes, Ryan Payne's

18   Gmail.  Likely, when it was received.

19   Q.  So is that Pacific Standard Time or ...

20   A.  That would depend on what Gmail settings are.  I don't know

21   what they are, whether it's set for all Eastern time.  Some

22   Internet companies have them -- all times are stamped on the

23   West Coast because that's where they're at.

24   Q.  So we really don't know what time that was sent.

25   A.  We know that it was somewhere on April 9th, but I wouldn't

———— 2:16-cr-00046-GMN-PAL ————

1   be able to testify here with any degree of accuracy as to which

2   time zone that was sent from.

3   Q.  So it could have been sent later on the day on the 9th?

4   A.  It would have been sent no later than 1:18 p.m. on April

5   9th.

6   Q.  Okay.  Now, the message itself has a different time stamp on

7   it.

8   A.  That's correct.

9   Q.  Okay.  And, now, there's an hour difference.  Now, is that

10  just because it's in a different time zone?

11  A.  That's because those are two different companies.  One is

12  Facebook's time.  The other one is Gmail's time.

13  Q.  Okay.  So does -- which one -- Gmail's the one at the top?

14  A.  Correct.

15  Q.  Top right.

16          And the -- on the bottom left in that post, who

17  generates that time?

18  A.  That would be the time generated by Facebook.

19  Q.  Okay.  And do we know if that's Pacific time?  I mean, do we

20  know?

21  A.  That would likely be the time that Mr. Payne's Facebook

22  settings were in at the time, so probably Mountain time.

23  Q.  So --

24  A.  He's the one receiving the message, so it would probably

25  have been set to his times.

───────────── 2:16-cr-00046-GMN-PAL ─────────────

1  *Q.*  Now, the sending and receiving of messages, is it like a

2  text?  I mean, is it instant?

3  *A.*  I don't know how fast it goes through.

4  *Q.*  Okay.  So, I mean, it could have been sent any time.  We

5  don't really know what time it was composed.

6  *A.*  The Facebook time would be essentially the same time that

7  Mr. Lovelien composed it.  When it made it through to Ryan's

8  e-mail, it appears here that they're both 18 minutes after the

9  hour.  So it would have been fairly close.

10  *Q.*  Right.  Okay.  Now, that link, I'm assuming that that Rick

11  Lovelien MTDF III, that's a hyperlink?  If you know.

12  *A.*  I'm not sure if that is a hyperlink that you can click on or

13  the one with the underline above it that says:  Rick Lovelien

14  MTDF III posted in MTDF.  One of those would be a link so that

15  when Ryan Payne saw this in his e-mail account, he would have

16  the ability to go immediately to this post and view it in the

17  group.

18  *Q.*  Okay.  So what you're suggesting is that from that Exhibit

19  190 that we were looking at before where Mr. Lovelien might have

20  responded to Mr. Emery, that there would be something similar to

21  this --

22          THE COURT:  I think you mean 194?

23  BY MR. PEREZ:

24  *Q.*  -- correct?

25  *A.*  I'm not following your question.

—2:16-cr-00046-GMN-PAL—

1   *Q.*  Well, I mean, on that e-mail thread, or that message --

2   private message thread at 190 where there's no response by

3   Mr. Lovelien, you said --

4         THE COURT:  190 is the status update.

5   BY MR. PEREZ:

6   *Q.*  Or is it -- maybe it's --

7         MR. PEREZ:  Excuse me, Your Honor, I misspoke.  I

8   believe it's --

9         THE COURT:  Is it the Gerry Emery post about DEFCON 1,

10  not a drill?

11        MR. PEREZ:  No, no.  That's the --

12        THE COURT:  That's 194.

13        MR. PEREZ:  195 where there's no response.  I believe

14  194 there's no response.

15        THE COURT:  Okay.  So your question is about 195?

16  BY MR. PEREZ:

17  *Q.*  Right.  So 194 there's no response.  So what you're saying,

18  though, is that there would have been something similar to that

19  last exhibit that we saw, that -- where it said:  Reposted by

20  Ricky Lovelien MTDF III, whatever?

21  **A.**  Yes, that text from Mr. Emery was posted in one of those

22  Facebook group messages received by Mr. Payne in his e-mail

23  address, as we've seen.

24        Mr. Lovelien, you're correct, did not send a response

25  back to Mr. Emery saying, Okay.  I'll do that.  He just did it.

—— 2:16-cr-00046-GMN-PAL ——

 1  *Q.*  Okay.  Well, then, like, for example, in Exhibit 194 --

 2         MR. PEREZ:  Bryan, 194.

 3  BY MR. PEREZ:

 4  *Q.*  In the middle, the message -- it looks like the second

 5  message on that page, the body says:  Reloading AP rounds.  A

 6  penny for your thoughts.

 7  **A.**  Yes.

 8  *Q.*  Now, that wouldn't be something that he would repost, would

 9  it?

10  **A.**  You know, I'd have to check his account and see if he did

11  repost that.

12  *Q.*  Okay.  But he didn't respond?

13  **A.**  He did not respond directly to Mr. Emery, no.

14  *Q.*  No.  Okay.

15         Go to 177, the second page.  I know this is a little

16  difficult to read.

17         Now, these are -- these look like e-mail addresses?

18  **A.**  Correct.

19  *Q.*  Now, do you know if these people requested this

20  correspondence or is this just a spam, basically?

21  **A.**  These are individuals which Jerry Bruckhart and Ryan Payne

22  included on their e-mail list of individuals they were going to

23  send Operation Mutual Aid information from.  They set up that

24  e-mail list.  They're the ones that indicated -- or decided to

25  send that out.  So they would be the ones to ask how they knew

—— 2:16-cr-00046-GMN-PAL ——

1  these people wanted the information.

2  Q.  Now, these appear to be in alphabetical order, correct?

3  A.  I don't know.

4  Q.  It looks like by user name.

5  A.  That could be, yes.  It appears to be.

6  Q.  Okay.  And Rick Lovelien's user name or e-mail was Rick

7  Lovelien MTDF.

8  A.  Captain Rick Lovelien MTDF was one of his user names, yes.

9  Q.  Okay.  Well, you don't see it in the Rs for Rick, correct?

10  A.  No.  And can we get the date of this e-mail?  And I can tell

11  you whether it would be in there or not.

12  Q.  4/7/2014.

13  A.  Based on my review, Rick Lovelien was not receiving that

14  particular e-mail -- was not on that e-mail list at that time.

15  I'm not aware of an e-mail address that he was associated with

16  on that -- on April 7th.

17  Q.  So Operation Mutual Aid prior to -- prior to the incident on

18  April 12th.

19  A.  Correct.  His sister is on there, but not him, as far as I

20  know.

21  Q.  Right.  Okay.

22         MR. PEREZ:  You can take that down, Bryan.

23  BY MR. PEREZ:

24  Q.  Now, sharing links, you can share a link, correct?

25  A.  On Facebook, yes.

——— 2:16-cr-00046-GMN-PAL ———

1    Q.  Yeah.  And those can be to, what, a website?

2    A.  You can share them on your Facebook page or share them with

3    another individual, yes.

4    Q.  Can you share a link to a private message?

5    A.  I'm not sure how that would work.

6    Q.  Okay.  So the only way to get a private message is if

7    somebody actually sends it to you?

8    A.  I think that would be accurate.

9    Q.  Okay.  So you're not going to post it, right?

10   A.  Unless you get a search warrant and get it as we did.

11   Q.  No, I'm asking -- you know, we're talking about individuals

12   here that were communicating with Mr. Lovelien.  I mean, if

13   there was a private message, I mean, that's the only way; it's

14   not going to be published somewhere else?

15   A.  No, what you could do and what Mr. Lovelien did, for

16   instance, with Mr. Emery, you could cut and paste information

17   from a private message and send it via e-mail, via Facebook

18   message, via any way.  You could send the private message out.

19   It's not locked down where you can't copy the text and send it

20   to someone.

21   Q.  Right.  Okay.

22        Did you ever find in your perusal of Facebook posts, a

23   mission statement for the Montana Defense Force [sic]?

24   A.  We might have.  I can't recall.

25   Q.  Okay.  I'm not sure if I asked you this, but I'll ask it

—2:16-cr-00046-GMN-PAL—

 1  again.  They'll let me know if I did.

 2         Do you know -- now, other than Mr. Lovelien, members of

 3  the actual Montana Defense Force [sic], how many of them

 4  traveled to Bunkerville?

 5  *A.*  Again, I don't know how they keep their membership rolls, so

 6  all I would know is individuals that were members of their

 7  Facebook group.

 8  *Q.*  The Facebook page.

 9  *A.*  Yeah.

10  *Q.*  Okay.  Do you know if Mr. Lovelien traveled with anybody in

11  his vehicle from Montana?

12  *A.*  Not in his vehicle.  I believe he convoyed down with one

13  other individual.

14  *Q.*  Okay.  And who was that individual?

15  *A.*  Nic Whiting.

16  *Q.*  Okay.  And did Mr. Lovelien communicate with Mr. Whiting via

17  Facebook?

18  *A.*  Yes.

19  *Q.*  Okay.  And that was prior to?

20  *A.*  Prior to, to coordinate their travel down, yes.

21  *Q.*  So they both left at the same time?

22  *A.*  Well, essentially.  Mr. Lovelien drove from farther north,

23  so he met Mr. Whiting around Missoula, Montana and traveled

24  down.

25  *Q.*  Okay.  And how far is Missoula from Bunkerville?  Do you

──────2:16-cr-00046-GMN-PAL──────

1  have any idea?

2  *A.*  I don't know the exact distance.

3  *Q.*  You're not sure exactly the travel time?

4  *A.*  Little bit less than it is from Libby.

5        MR. PEREZ:  Court's indulgence.

6        (Defense counsel conferring.)

7        MR. PEREZ:  No. 458.

8  BY MR. PEREZ:

9  *Q.*  Now, 458 is another post from the Operation Mutual Aid

10  website?

11  *A.*  Correct.

12  *Q.*  Okay.  And that was sent out to all these individuals?

13        THE COURT:  I'm sorry.  Your use of the word "post."

14  Is this a Facebook post or an e-mail?

15        THE WITNESS:  I apologize.  This is an e-mail from the

16  Operation Mutual Aid e-mail account.

17  BY MR. PEREZ:

18  *Q.*  Okay.  So it's not posted on Facebook, then, anywhere?

19  *A.*  This e-mail itself would have come across as an e-mail with

20  no relationship to Facebook.  Other individuals did take the

21  text that is contained in this e-mail and did post it to

22  Facebook.

23  *Q.*  Right.

24  *A.*  So it was also on Facebook, yes.

25  *Q.*  We've seen that.

PATRICIA L. GANCI, RMR, CRR

1    *A.*  But this e-mail itself would not have referenced Facebook.

2    *Q.*  Yeah, we've seen this reposted a number of times.  But,

3    like, for example, all -- I didn't mean to do that.  All these

4    names in here, those are all e-mail addresses, correct?

5    *A.*  Correct.

6    *Q.*  So where it says Captain Rick Lovelien, he would have had to

7    have access to that e-mail account at the time or would that be

8    his Facebook page?

9            MS. CREEGAN:  Objection.  Vague as to what he would

10   have to have access to.  For what?

11   BY MR. PEREZ:

12   *Q.*  Well, I mean, in order to get this message.  It looks like

13   it was sent to an e-mail account?

14   *A.*  Correct.

15   *Q.*  Okay.  So he would -- in order for him to see it, he would

16   have to have access to that e-mail account?

17   *A.*  He would have to access his e-mail account to view that,

18   yes.

19   *Q.*  Okay.  And what was the date of this particular e-mail?

20   *A.*  This was on April 10th.

21   *Q.*  Okay.  And the time signature on that?  I can't tell if

22   that's a 1 or a 7.

23   *A.*  It would appear to be 7:55 a.m., but I'm also having trouble

24   reading it.

25   *Q.*  Okay.  So we -- well, I mean, in any event, what time zone

—— 2:16-cr-00046-GMN-PAL ——

1  would that have been in?

2  **A.**  Again, that would have been Gmail's system and I'm not

3  familiar with how they set their time zones, whether that was

4  all East Coast or West Coast time zone.

5  *Q.*  Okay.  Do you know where the Operation Mutual Aid website is

6  hosted?

7  **A.**  The website itself?

8  *Q.*  Yeah.

9  **A.**  No, it was a company we'd not dealt with and I don't know

10  where the server is physically located.

11  *Q.*  Okay.  And as far as Operation Mutual Aid and Ryan Payne,

12  what state were they in, or Ryan Payne, I'm guessing?

13  **A.**  At that time Ryan Payne would have been in Bunkerville,

14  Nevada.  Jerry Bruckhart was in Pennsylvania.

15  *Q.*  Okay.  Do you know who actually posted -- or not posted.

16  Excuse me.  Who caused that e-mail to go out?

17  **A.**  Yes, through other communications about that e-mail, I'm

18  aware that it was Jerry Bruckhart.

19  *Q.*  So that was originated in Pennsylvania at the time?

20  **A.**  Jerry Bruckhart would have been in Pennsylvania when he sent

21  that e-mail, yes.

22  *Q.*  Okay.  And these -- this -- the body of this thing,

23  basically, it's their -- well, it looks like there's three

24  bullet points:  Secure the Bundy family, correct, and return

25  confiscated Clark County, Nevada property.  Is that what -- I'm

—— 2:16-cr-00046-GMN-PAL ——

1  having trouble reading this.

2  **A.**  Yes.  Those are some of the words in the bullet points, yes.

3  *Q.*  Okay.  And then directions, correct?

4  **A.**  Correct.

5  *Q.*  Now, it doesn't say anything about what they're doing, does

6  it?

7  **A.**  Yes, it says those are the objectives.  That's what they

8  intend to do.

9  *Q.*  Right.  But it -- okay.  Well, let's take the first one:

10  Secure the Bundy family from government incursion.

11        And what are they doing in there?  What does it say

12  they're doing or supposed to do?

13  **A.**  It says they are to do exactly what it says:  Secure the

14  Bundy family from government incursion, which includes

15  protection of all personnel responding in support of the Bundys,

16  i.e. protesters, extended family, and friends.

17  *Q.*  Okay.  So it says they're there to protect their family and

18  supporters, correct?

19  **A.**  Yes, what they're protecting them from is what's left open.

20  *Q.*  I didn't see -- I didn't see anything about -- well, it says

21  government incursion.

22  **A.**  What Operation Mutual Aid viewed as government incursion

23  would not be what most people in this country would view as

24  government incursion.

25  *Q.*  Okay.  Now, the -- well, now, you weren't at Bunkerville so

2:16-cr-00046-GMN-PAL

1  you weren't there on the 12th.  So you really have no idea as to

2  the timeline of events there, correct?

3           MS. CREEGAN:  Objection, compound.

4  BY MR. PEREZ:

5  *Q.*  Well, okay.  You weren't at Bunkerville?

6  *A.*  I was not at Bunkerville.

7  *Q.*  Okay.  And as far as the timeline of events at Bunkerville,

8  you really don't have any personal knowledge of that, correct?

9  *A.*  I was present in the Las Vegas command post on April 12th at

10  the time of the events.

11  *Q.*  Okay.  But you weren't watching on video, were you?

12  *A.*  Yes, I was.

13  *Q.*  Oh, you were.  And did you capture what you were watching on

14  videotape at the time?

15  *A.*  The aerial surveillance, which I believe has been played in

16  this court.  I was viewing that as it was happening.

17  *Q.*  So just aerial surveillance?  Or ground surveillance as

18  well?

19  *A.*  No, I viewed Pete Santilli's live feed of what was going on

20  at the time they were approaching I15.  That was my

21  on-the-ground view, was from Pete Santilli's live feed.

22  *Q.*  So -- but not from, like, body cam or dash cam video?

23  *A.*  I've viewed one of the trooper's dash cam videos.

24  *Q.*  Live while it was going on?

25  *A.*  No.

—2:16-cr-00046-GMN-PAL—

1    Q.   After the fact?

2    A.   After the fact.

3    Q.   So the video you were watching, you were watching live --

4    the live aerial footage?

5    A.   Live aerial footage and then the footage that Pete Santilli

6    was streaming live.

7    Q.   Okay.  And the aerial footage, was that from a fixed-wing

8    aircraft or a helicopter?

9    A.   I believe it was a fixed-wing aircraft.

10   Q.   And who was operating the aircraft?  Do you know?

11   A.   I don't know the pilots.

12   Q.   Were you also listening to audio live?

13   A.   Pete Santilli's audio.

14   Q.   And that's it?

15   A.   Yes.

16   Q.   Okay.  And where was Mr. Santilli's broadcast -- was it a

17   website?

18   A.   Yes, it would have been a website that he had had a

19   streaming service through.

20   Q.   And you recorded that website, that video?

21   A.   I didn't personally record it.  I was watching it.

22   Q.   Somebody recorded it?

23   A.   I'm not aware if they did or not.

24   Q.   But you watched it?

25   A.   I watched it.

—2:16-cr-00046-GMN-PAL—

 1   *Q.*  Do you know if there's a record of that video on Facebook --

 2         MS. CREEGAN:  Objection.  Beyond the witness's personal

 3   knowledge.  He's already answered that question.

 4         MR. PEREZ:  Well, no, it's Facebook, Your Honor.  I

 5   mean, he did all the Facebook recovery and --

 6         MS. CREEGAN:  That assumes facts not in evidence.  He

 7   did not say he did all Facebook recovery.

 8         MR. PEREZ:  Well, okay.

 9   BY MR. PEREZ:

10   *Q.*  Did -- in all this Facebook, is there any Facebook

11   correspondence between Mr. Santilli and Mr. Lovelien?

12   **A.**  Not that I'm aware of.

13   *Q.*  Okay.  Did you look at any Facebook belonging to

14   Mr. Santilli?

15   **A.**  No.

16   *Q.*  Did you watch any -- other than the video that you watched

17   streaming, did you have the opportunity to see any of

18   Mr. Santilli's video that he captured?

19         MS. CREEGAN:  Objection.  What's the relevance of this?

20         MR. PEREZ:  I'm just curious.

21         THE COURT:  You're asking if he had an opportunity to

22   view the video Santilli captured?  He just told you he watched

23   it live.

24         MR. PEREZ:  Well, he watched live stream, but, I

25   mean -- I'll start over with that.

───────── 2:16-cr-00046-GMN-PAL ─────────

1   BY MR. PEREZ:

2   Q.  You watched live streaming video from Mr. Santilli.  After,

3   you know, the event, were you aware of Mr. Santilli recording

4   anything else at Bunkerville at that time?

5            MS. CREEGAN:  Objection, relevance.

6            THE COURT:  What's the relevance?

7            MR. PEREZ:  All right.  I'll move on.

8   BY MR. PEREZ:

9   Q.  Okay.  On profiles on Facebook, I've heard the term "fake

10  profile."  Do you know what a fake profile is?

11  A.  Yes, generally.

12  Q.  And what is that?

13  A.  That would be someone who sets up a profile under a name

14  that is not their own.

15  Q.  Okay.  That's like an alias?

16  A.  Correct.

17  Q.  Okay.  And in your investigation of Mr. Lovelien's Facebook

18  account, did you find any alias for Mr. Lovelien, for example?

19  A.  Not to my knowledge, no.

20  Q.  No.  There were no fake -- fake posts or fake -- well, I

21  guess it's a fake profile.  No postings by someone with a fake

22  profile?

23           MS. CREEGAN:  Objection, vague.

24           MR. PEREZ:  Okay.  I'll strike that.  We'll start over.

25

——— 2:16-cr-00046-GMN-PAL ———

1  BY MR. PEREZ:

2  *Q.* When you were reviewing the Facebook posts and you followed

3  links and things like that, correct?

4  **A.** Correct.

5  *Q.* And you would see certain individuals that might be friends,

6  correct?

7  **A.** Correct.

8  *Q.* Okay. And some of those names stood out to you, right?

9  **A.** Correct.

10 *Q.* And you clicked on those links for those individuals, right?

11 **A.** If I was reviewing something live on Facebook at the time,

12 not from the search warrant review, but, yes, we took --

13 *Q.* No, I'm not talk -- yeah, I'm not worried about the search

14 warrant, you know. I mean, we're long beyond, you know, the

15 search warrant. No search warrant. I'm more concerned about,

16 you know, the inner workings of how you followed these links

17 around.

18       If you clicked on a person's link on a Facebook page,

19 that would take you to their page, right?

20 **A.** If I did that, yes, it would.

21 *Q.* Okay. You said, If you did that. Did you do that?

22 **A.** Not on nearly all of Mr. Lovelien's Facebook friends, only

23 the ones that we knew would have some relevance to this

24 investigation.

25 *Q.* Okay. And you got that information from some other source?

—— 2:16-cr-00046-GMN-PAL ——

1   *A.*  Usually, yes.

2   *Q.*  Okay.  I mean, but there was nothing on Mr. Lovelien's

3   Facebook that was -- maybe piqued your curiosity that you

4   followed?

5          MS. CREEGAN:  Objection, relevance.

6          MR. PEREZ:  Well ...

7          THE COURT:  What's the relevance?

8          MR. PEREZ:  I want to know how he followed these links.

9   I mean, we've had a -- we've had a lot of discussion of

10  individual --

11         THE COURT:  Your question was:  Was there anything that

12  piqued your curiosity?  That's pretty vague.

13         MR. PEREZ:  Well, okay.  I'll strike that.

14  BY MR. PEREZ:

15  *Q.*  So, you follow a link if it was somebody whose name was on

16  your radar, more or less, correct?

17  *A.*  Or if there was a reason to suspect they were somehow

18  relevant to this investigation.

19  *Q.*  So something would give you reason to suspect.  And is that

20  coming from the Facebook post itself?

21  *A.*  Oftentimes, yes.

22  *Q.*  And can you give me an example of what would cause you to

23  look further into that particular post or that particular

24  individual?

25         MS. CREEGAN:  Objection, relevance.

1          MR. PEREZ:  Well, he just said -- he ...

2          THE COURT:  He can answer the question.

3    BY MR. PEREZ:

4    *Q.*  So what would --

5    *A.*  For instance, I was pretty unfamiliar with Gerry Emery prior

6    to this investigation.  After viewing the conversations between

7    Gerry Emery and Mr. Lovelien, that would have caused me to click

8    on Mr. Emery's profile to see who it was that was encouraging

9    people to travel armed to Bunkerville.

10   *Q.*  That would be based on what Mr. Emery was posting rather

11   than what Mr. Lovelien had posted, correct?

12   *A.*  In that particular instance, yes.

13   *Q.*  Okay.  And those would be those private messages that we saw

14   in, what was it, 194 and 5?

15   *A.*  Yes, those would be the types of messages we're referring

16   to.

17   *Q.*  And those are the same messages that Mr. Lovelien -- there's

18   no response to those messages on those pages.

19   *A.*  No direct response to Mr. Emery in response to his request,

20   yes.

21   *Q.*  Okay.

22          MR. PEREZ:  I have nothing further at this point.

23          THE COURT:  Who would like to go next, Mr. Jackson?

24          MR. JACKSON:  If other counsel wants to go first, I'll

25   wait.

—————————2:16-cr-00046-GMN-PAL—————————

1          THE COURT:  Mr. Tanasi?

2          MR. TANASI:  Sure.  Thank you, Your Honor.

3                      CROSS-EXAMINATION

4    BY MR. TANASI:

5    *Q.*  Good morning, sir.

6    **A.**  Good morning.

7    *Q.*  I'm Rich Tanasi.  I represent Steven Stewart.  Just a few

8    quick questions for you on cross.  Okay?

9    **A.**  Certainly.

10   *Q.*  All right.

11          MR. TANASI:  So, Bryan, if you could please bring up

12   187.

13   BY MR. TANASI:

14   *Q.*  Okay.  Now, 187, is this a list of all of Mr. Lovelien's

15   friends?

16   **A.**  I'm not able to see the entire page.  No, there would have

17   been following pages with additional friends.

18   *Q.*  Sure.  We'll scroll through them.

19   **A.**  Okay.  If that's the conclusion of the list, that would

20   probably be sufficient.  I assume there's no other additional

21   pages.

22   *Q.*  Sure.  And Mr. Steven Stewart, he's not on that list,

23   correct?

24   **A.**  No.

25   *Q.*  No, he's not on that list?

————— 2:16-cr-00046-GMN-PAL —————

1  *A.*  He's not on that list.

2  *Q.*  Okay.

3          MR. TANASI:  If we can look at 211 briefly, Bryan.

4  Scroll down to the bottom, please.

5  BY MR. TANASI:

6  *Q.*  Okay.  You see down there on the bottom, sir, reference to

7  Stewart Rhoades?

8  *A.*  Yes.

9  *Q.*  Okay.  I've got a real kind of obvious question for you, but

10  just for the sake of the record and so that it's crystal clear

11  with the jury, that's not Steven Stewart, right?

12  *A.*  That is correct.

13  *Q.*  Thank you, sir.

14          And, in fact, in your review of Mr. Lovelien's Facebook

15  communications, you saw no Facebook communications between

16  Mr. Stewart, Steven Stewart, my client, and Mr. Lovelien,

17  correct?

18  *A.*  That would be correct.

19  *Q.*  Okay.

20          MR. TANASI:  Thank you.  Pass the witness.

21          THE COURT:  Okay.  Mr. Marchese?

22          MR. MARCHESE:  Yes.  Thank you, Your Honor.

23          THE COURT:  Or someone else.  I'm not trying to choose

24  you.

25          MR. MARCHESE:  No, I'm going to brief.

———————— 2:16-cr-00046-GMN-PAL ————————

1      THE COURT:  No one is offering to stand up.

2                    CROSS-EXAMINATION

3  BY MR. MARCHESE:

4  Q.  Good afternoon, sir.

5  A.  Good afternoon.

6  Q.  You were present when Mr. Parker was arrested back on

7  March 3rd of 2016?

8  A.  Yes, I arrived just a few seconds after he was arrested.

9  Q.  Okay.  And to your knowledge, there was no issues with his

10  arrest; he didn't fight any officers or anything like that,

11  correct?

12  A.  None whatsoever.

13  Q.  He was completely cooperative with the arrest.  Is that

14  correct?

15  A.  Yes, he was.

16  Q.  And then you were also present, obviously, when he was

17  transported from Ketchum, Idaho to, I believe it was, Boise,

18  Idaho was your destination?

19  A.  Yes.

20  Q.  Okay.  And that was the -- that was part of that interview

21  that was played earlier today.  Do you remember that?

22  A.  Yes.

23  Q.  Okay.  And that was a -- it was a long drive.  Fair to say?

24  A.  Yes.

25  Q.  And that interview was obviously recorded because a snippet

———————2:16-cr-00046-GMN-PAL———————

1  of it was played today, correct?

2  *A.*  Correct.

3  *Q.*  And during that interview you gave him the opportunity to

4  either speak to you guys or not to speak to him, and he opted to

5  speak to you, correct?

6  *A.*  Correct.

7  *Q.*  It was a cordial conversation; there was no animosity from

8  Mr. Parker towards yourself, correct?

9  *A.*  Correct.

10  *Q.*  And talked about a bunch of things, just basic background

11  information on Mr. Parker, correct?

12  *A.*  Correct.

13  *Q.*  Just his wife and his kids, correct?

14         MS. CREEGAN:  Objection, relevance.

15         THE COURT:  What's the relevance?

16         MR. MARCHESE:  Very foundational.  I'll move on.

17  BY MR. MARCHESE:

18  *Q.*  You talked about the Bunkerville incident, correct?

19  *A.*  Yes.

20  *Q.*  Okay.  He talked to you fully and freely about that,

21  correct?

22         MS. CREEGAN:  Objection to the characterization "fully

23  and freely."

24  BY MR. MARCHESE:

25  *Q.*  He talked to you about it, correct?

——————— 2:16-cr-00046-GMN-PAL ———————

1   *A.*  He did talk with us about it.

2   *Q.*  All right.  And he told you why he came down or went down to

3   Bunkerville, correct?

4         MS. CREEGAN:  Objection.  He is not able to introduce

5   hearsay with the defendant through this witness.

6         MR. MARCHESE:  I'm not -- all I asked is if he had

7   spoke about that.  I didn't ask for the specific information.

8         MS. CREEGAN:  This is still eliciting hearsay.

9         THE COURT:  So how did you phrase the question?

10        MR. MARCHESE:  He told him about why he came down.

11   That's it.  Yes or no.

12        THE COURT:  Okay.  Overruled.  He can answer that

13   question yes or no.

14   BY MR. MARCHESE:

15   *Q.*  Do you need me to ask it again?

16   *A.*  Yes, if you could please.

17   *Q.*  No problem.

18        When you spoke to Mr. Parker in the ride from Ketchum

19   to Boise, he told you -- "he" being Eric Parker, told you about

20   why he went down to Bunkerville, correct?

21   *A.*  Yes.

22   *Q.*  And he also told you what he did from the time frame in

23   which he was in Bunkerville, correct?

24   *A.*  Yes.

25   *Q.*  He was in Bunkerville, to your knowledge, for about maybe a

1   day, give or take?

2   *A.*  That was his statement, yes.

3          MS. CREEGAN:  Your Honor, we're objecting to eliciting

4   hearsay about what was discussed in the interview.

5   BY MR. MARCHESE:

6   *Q.*  Let me rephrase it.

7          Based on your personal knowledge of your investigation,

8   was it your understanding that he was in Bunkerville for

9   approximately one day?

10  *A.*  Yes.

11  *Q.*  Okay.  And Mr. Parker told you about when he left, correct?

12          MS. CREEGAN:  Again, objecting to eliciting facts from

13  the interview.

14  BY MR. MARCHESE:

15  *Q.*  Well, let's get to that interview real quick.  I'll withdraw

16  the question.

17          Would you have any reason to disagree with me?  That

18  interview was two hours and 14 minutes long, correct?

19  *A.*  That was about the distance of the trip, and we would have

20  recorded the entire conversation, yes.

21  *Q.*  Okay.  So that would be 134 minutes total.  You would agree

22  with that statement, correct?

23  *A.*  Yes.

24  *Q.*  And we played one minute of that interview here today in

25  court, correct?

——————— 2:16-cr-00046-GMN-PAL ———————

1  *A.*  Approximately, yes.

2  *Q.*  Okay.  So less than 1 percent of that interview was --

3           MS. CREEGAN:  Your Honor, we object to the relevance of

4  this question.

5           THE COURT:  What's the relevance, Mr. Marchese?

6           MR. MARCHESE:  I'll withdraw.

7           No further questions.

8           MS. CREEGAN:  Your Honor, we move to strike that

9  question.

10          THE COURT:  Absolutely.  You're leaving a very

11 misleading situation for the jury by implying that there is some

12 reason that is -- that the rest of the video wasn't played when

13 you know why the rest of the video wasn't played.

14          MR. MARCHESE:  Is there a question?

15          THE COURT:  I'm going to strike that and just instruct

16 the jury not to consider that.

17          MR. MARCHESE:  Okay.  Strike it.

18          THE COURT:  All right.  Let's go ahead and take our

19 lunch break.

20          I do remind the jury that you are not to discuss this

21 case with anyone nor permit anyone to discuss it with you.

22 Please remember also not to read or listen to or view anything

23 that touches upon this case in any way.  If you should

24 inadvertently come across any information or someone attempts to

25 talk to you about the case, you are ordered to tell us right

─────────────────── 2:16-cr-00046-GMN-PAL ───────────────────

1  away.  Please do not research or make any independent

2  investigation nor form any opinion about the case.

3         It's 12:07.  We'll plan to be back here about 1:00 or

4  1:10.  Let's go ahead and stand for the jury.

5         And, Agent Seyler, you can take your lunch break as

6  well, sir.  Please be back here by 1:00 so we can try to start

7  on time.

8         (Whereupon jury leaves the room at 12:07 p.m.)

9         THE COURT:  All right.  Off record.

10         (Recess taken at 12:08 p.m.)

11         (Resumed at 1:15 p.m.)

12         THE COURT:  All right.  It looks like everyone is here.

13  Can we bring in the jury?  You may all be seated.

14         So Mr. Dickinson is going to be joining us later.  It's

15  all right if we proceed without him?  Or is he gone for the day?

16         MR. MYHRE:  No, he'll be back later, Your Honor, but we

17  can start now if it's okay with the Court.

18         THE COURT:  Okay.  And who's going to be up next on

19  cross-examination?

20         Mr. Engel.  Thank you.

21         (Whereupon jury enters the room at 1:19 p.m.)

22         THE COURT:  All right.  Everyone may be seated.  We're

23  joined by the jury after the lunch break, and we have Special

24  Agent Mark Seyler back on the witness stand.  And now we'll

25  proceed with cross-examination by Mr. Engel.

2:16-cr-00046-GMN-PAL

1                          CROSS-EXAMINATION

2    BY MR. ENGEL:

3    Q.  Good afternoon, Agent Seyler.  My name is Todd Engel.  I'm

4    representing myself.

5    A.  Good afternoon.

6    Q.  So it's true that you were investigating militias and the

7    OMA prior to the events of the 12th, correct?

8              MS. CREEGAN:  Objection, relevance.

9              THE COURT:  Sustained.

10   BY MR. ENGEL:

11   Q.  Were you investigating the OMA website prior to the events

12   of the 12th?

13             MS. CREEGAN:  Objection, relevance.

14             THE COURT:  Sustained.

15   BY MR. ENGEL:

16   Q.  Were you -- prior to the 12th, were you looking into groups

17   that stated they were going to go to the Bundy Ranch?

18   A.  Yes, individuals and groups.

19   Q.  Okay.  And the information that you were investigating, were

20   you conveying that over to the BLM at the ICP?

21   A.  Some of it, yes.

22   Q.  Okay.  Did you have communications with the people at the

23   ICP?  Were they saying, Can you get us more, can you bring us

24   more information?

25             MS. CREEGAN:  Objection, relevance.

1           THE COURT:  What is the relevance, Mr. Engel?

2           MR. ENGEL:  Just trying to see if -- he stated he has

3    communications -- well, he was sending information to them.

4    Were they requesting any more information back from -- you know,

5    we know that there was --

6           THE COURT:  Why would that be relevant?

7           MR. ENGEL:  Well, there was fear on the 11th, we know

8    that.  And we want to know how people came to have fear on the

9    11th.

10          THE COURT:  All right.  Overruled.  He can answer the

11   question.

12          THE WITNESS:  I was in communication with one

13   individual at the ICP, yes.

14   BY MR. ENGEL:

15   Q.  And who was that?

16   A.  Special Agent Robyn Kirkham.

17   Q.  Okay.  And on -- and what was Robyn Kirkham's duties at the

18   ICP, do you know?

19   A.  I don't know what all of her duties were.  I know she was

20   collecting information regarding the threat.

21   Q.  Okay.  Was she running Facebook accounts from there?

22          MS. CREEGAN:  Objection, relevance.  Lack of personal

23   knowledge.

24   BY MR. ENGEL:

25   Q.  On the...

1            THE COURT:  Are you withdrawing the question?

2            MR. ENGEL:  No.

3            THE COURT:  Okay.  Then you need to ask if he knows.

4    You can't ask --

5            MR. ENGEL:  Okay.

6            THE COURT.  That's what the lack of personal question

7    objection -- lack of personal knowledge objection --

8    BY MR. ENGEL:

9    Q.  Do you know if Robyn Kirkham was running Facebook accounts

10   in other people's names?

11   A.  By "running," you mean she was looking at other people's

12   Facebook accounts?

13   Q.  No.  Did she take out Facebook accounts and open them in

14   other people's names other than hers?

15   A.  Yes, I believe she did.

16   Q.  Okay.  And what was the purpose of that?

17   A.  To gain information regarding the matter.

18   Q.  Okay.  So during the 12th, you stated you watched this from

19   the aerial view, correct?

20   A.  Correct.

21   Q.  Okay.  And that would be the FBI plane overhead?

22   A.  Correct.

23   Q.  And was Robyn Kirkham --

24            MS. CREEGAN:  Objection, relevance.

25            THE COURT:  Overruled.  He can answer -- your question

—— 2:16-cr-00046-GMN-PAL ——

1   was whether she was involved in watching the aerial?

2   BY MR. ENGEL:

3   Q.   Yeah.  Was she with you that day?

4   A.   Yes, she was.

5   Q.   Okay.  And where were you guys when that was occurring?

6   A.   At the Las Vegas field division here in Las Vegas.

7   Q.   Okay.  And were you aware that there were 29 FBI agents at

8   the ICP?

9          MS. CREEGAN:  Objection, relevance, facts not in

10  evidence.

11         THE COURT:  Yeah.  You're assuming that there were

12  people there and the number and all of that, and we haven't had

13  any evidence of it.  So you need to either rephrase your

14  question or ask a different question.

15         MR. ENGEL:  Okay.

16  BY MR. ENGEL:

17  Q.   Were you aware that Robyn Kirkham was running what's called

18  a misinformation campaign?

19         MS. CREEGAN:  Objection, facts not in evidence, lack of

20  personal knowledge.

21         THE COURT:  Sustained.

22  BY MR. ENGEL:

23  Q.   Were you aware that there were undercover agents involved --

24         MS. CREEGAN:  Objection, relevance, lack of personal

25  knowledge, facts not in evidence.

———————2:16-cr-00046-GMN-PAL———————

1            THE COURT:  No, overruled.  He can answer that

2    question.

3    BY MR. ENGEL:

4    Q.  Were you aware that there were undercover agents involved in

5    this incident?

6            THE COURT:  The question should be phrased:  Were there

7    any undercover agents?  And then if he says yes, then you say,

8    Did you -- you know, What did you know, or wherever.

9            So there's form of the question, and we've talked about

10   this before.  But --

11           MR. ENGEL:  She asked a good question.

12           THE COURT:  -- I'm going to give you some leeway.

13           THE WITNESS:  And I'm sorry.  I require a time frame.

14   Are you referring specifically to the time frame of April 12th?

15   BY MR. ENGEL:

16   Q.  Correct.  Yeah.

17   A.  There were no FBI undercover operations going on at that

18   time that I'm aware of.

19   Q.  With FBI or BLM?

20   A.  BLM may have been conducting their own undercover, but the

21   FBI, to my knowledge, was not conducting any FBI undercover

22   operations at that time.

23   Q.  Okay.  Did you know if Robyn Kirkham had sent any undercover

24   agents back to the Bundy Ranch?

25   A.  I am not aware of what she may have done or who she may have

1  sent, no.

2  *Q.* So you wouldn't know if she had undercover agents there in

3  the wash that day either?

4  *A.* No, I wouldn't have known that.

5  *Q.* Or up on the freeway?

6  *A.* I don't ever recall that being said, no.

7  *Q.* So you wouldn't be able to state if any of Robyn Kirkham's

8  undercover agents were --

9         MS. CREEGAN:  Assumes facts not in evidence.  There's

10  nothing to say that Robyn Kirkham had undercover agents.

11         THE COURT:  Sustained.

12  BY MR. ENGEL:

13  *Q.* Well, concerning the people that were in these posts, you

14  know, that we've been going over for two days:  JD Parks, James

15  Lardy, Marc A., Jerry Bruckhart.  Can you tell us if any of

16  those were undercover FBI agents posing as anybody other than

17  who they were?

18  *A.* None of those individuals were FBI undercover agents.

19  *Q.* Okay.  Gerry Emery?

20  *A.* Gerry Emery was not an undercover agent.

21  *Q.* Michael Reighley?

22  *A.* Michael Reighley, to my knowledge, wasn't.  I don't know who

23  Michael Reighley is.

24  *Q.* Kelli Gordon?

25  *A.* To my knowledge, Kelli Gordon wasn't either.  I don't know

 1  who she is.

 2  *Q.*  So you can't confirm or deny whether she was an undercover

 3  agent or not?

 4  **A.**  As I've stated, I am not aware of any undercover operations

 5  the FBI was undertaking at that time.

 6  *Q.*  How about Mark Kessler?

 7  **A.**  Mark Kessler is certainly not an FBI agent.

 8  *Q.*  Okay.  Concerning a little video clip that was played of me

 9  yesterday, isn't it true that that entire video is about 18 and

10  a half minutes long?

11          MS. CREEGAN:  Objection, relevance.

12          THE COURT:  Sustained.

13  BY MR. ENGEL:

14  *Q.*  Did you guys play a video -- small video clip of me

15  yesterday?

16  **A.**  Yes.  The government played a video, yes.

17  *Q.*  Isn't it true that that --

18          MS. CREEGAN:  Objection, relevance.

19          THE COURT:  I don't know what the question is.

20  BY MR. ENGEL:

21  *Q.*  I just want to know, is the video 18 and a half minutes

22  long?

23          MS. CREEGAN:  Objection, relevance.

24          THE COURT:  It's not relevant.  Sustained.

25

————— 2:16-cr-00046-GMN-PAL —————

 1  BY MR. ENGEL:

 2  Q.  So, was that video clip part of a larger video --

 3        MS. CREEGAN:  Objection, relevance.

 4        THE COURT:  I think the point that you're trying to

 5  make is not appropriate.  Let's move on.

 6  BY MR. ENGEL:

 7  Q.  Concerning all of these Facebook posts, you stated that

 8  somebody could have taken over their account, meaning that --

 9  meaning what?

10  A.  Meaning it would be possible for someone to, I guess, take

11  your computer or your phone, if you were already signed into

12  Facebook, and somehow access it and make posts.  That would be

13  theoretically possible for someone to do.

14  Q.  Okay.  So you would agree that beyond a reasonable doubt,

15  you can't --

16        MS. CREEGAN:  Objection, calls for a legal conclusion.

17        THE COURT:  Sustained.

18  BY MR. ENGEL:

19  Q.  Can you tell us 100 percent that these posts were posted by

20  the person in question?

21  A.  In many instances there was other corroborating information

22  to indicate that that individual was the one that was making the

23  posts.  You'd have to actually show me the post, and then I

24  could say whether or not I had other additional corroborating

25  information.  But I -- in no case did I ever encounter, in all

———————— 2:16-cr-00046-GMN-PAL ————————

1  of the Facebook review that I did, any instance where I

2  questioned that the person making the post was not the person

3  that was, in fact, the owner of the account.

4  *Q.* But it could be his secretary?

5  **A.** Whose secretary?

6  *Q.* Rick Lovelien's secretary.  Anybody on these posts.  It

7  could be somebody else other than the person, Rick Lovelien,

8  posting these posts.  It could be, correct?

9         MS. CREEGAN:  Objection, speculative.

10        THE COURT:  Overruled.  He can answer the question.

11        THE WITNESS:  That would be a --

12  BY MR. ENGEL:

13  *Q.* Yes or no.

14        THE COURT:  If you can.

15        MS. CREEGAN:  Objection to limiting the witness's

16  answer.

17        THE WITNESS:  I don't know how, given the posts that

18  Rick Lovelien made, it could have been anyone else, given the

19  information that he was passing on about where he was and what

20  he did.

21  BY MR. ENGEL:

22  *Q.* Were you standing next to Rick Lovelien when he made the

23  post?

24  **A.** I was not.

25  *Q.* So you can't be 100 percent certain that he made the post,

1    correct?

2    **A.**   I am as certain as I can be that he made those posts.

3    *Q.*   Without standing next to him seeing him --

4    **A.**   Without standing next to him and seeing him, yes.

5    *Q.*   Okay.  Concerning all of those posts, we've not seen one

6    single post talking about anybody going to the ICP on the 12th.

7    Isn't that correct?

8    **A.**   I'm pausing to think about all of the exhibits that we

9    introduced yesterday.  The Facebook posts, I don't recall

10   somebody mentioning the word "ICP."  There was a great deal of

11   talk about the BLM.

12   *Q.*   But nobody mentioned, Come to Bunkerville, Nevada, and on

13   the 12th we are going to the ICP?

14   **A.**   No one had that specific text in any message that I recall.

15   *Q.*   Okay.  Concerning Ryan Payne, we see that he's -- has this

16   OMA website, right?

17   **A.**   They -- yes, he is affiliated with an OMA website.

18   *Q.*   And he claims to be a national organization?

19   **A.**   OMA claimed to have, yes, have members in several states.

20   *Q.*   Okay.  And they claimed to be coordinating with militias

21   across the country?

22   **A.**   They did, and the Bundy family did, yes.

23   *Q.*   And they also said that thousands of militia were en route

24   to this location?

25   **A.**   I'd have to check the posts, but they indicated there was a

—— 2:16-cr-00046-GMN-PAL ——

1  number of militia members coming.

2  *Q.*  And there wasn't thousands of militia members at the Bundy

3  Ranch, correct?

4  **A.**  I don't know how many people were affiliated with the

5  militia groups.  There were a number of individuals that showed

6  up with firearms.  How many of them considered themselves part

7  of a militia, I don't know.

8  *Q.*  Would you agree there wasn't thousands of people at the

9  Bundy Ranch with weapons?

10  **A.**  Are you talking on April 12th?

11  *Q.*  On April 12th.

12  **A.**  I don't know how many there were.  There was a number and I

13  didn't get a head count.  There was certainly hundreds.  I don't

14  know if there was thousands.

15  *Q.*  And it looks like Ryan Payne has a claim that looks 60 -- 60

16  or more members with his OMA website.  Is that about right?

17  **A.**  On the website itself, that would have been by June of 2013.

18  There would have been more by the time of April 12th.

19  *Q.*  Okay.  So 60 or more members puts his national organization

20  at approximately 1.2 members per state, correct?

21  **A.**  Like I said, at that -- in 2014 there would have been other

22  members that were on the site.

23  *Q.*  Okay.

24  **A.**  These were website members.  They had an e-mail list of

25  over, I think, 212 members that went out on April 7th.  So that

 1  would have been how many people were interested in OMA's

 2  information at that time.

 3  *Q.*  So that would put their -- their e-mail membership at about

 4  four people per state for a national organization?

 5  **A.**  Some of those people actually represented militia groups

 6  rather than just individuals themselves.  So there may have been

 7  more than that.

 8  *Q.*  So he's coordinating with militias across the country,

 9  there's thousands of militia en route, and he has 60 to 100

10  members in his organization.  Does that sound about right?

11  **A.**  He was, in fact, coordinating with militia leaders from

12  across the country, including several that were not at that time

13  affiliated with OMA, but were, in fact, taking direction and

14  leadership from Ryan Payne.

15  *Q.*  Okay.  So we know that thousands didn't show up.  So would

16  you agree that Ryan Payne is an exaggerating blowhard?

17          MS. CREEGAN:  Objection, argumentative.

18          THE COURT:  Sustained.

19          MR. ENGEL:  No further questions, Your Honor.

20          THE COURT:  All right.  Mr. Jackson?

21          And just a quick instruction to the jury that there are

22  rules of evidence that control what evidence can and cannot be

23  received in evidence by a jury.  And the Court, which is me,

24  makes that decision; not the parties.

25          Go ahead, Mr. Jackson.

—— 2:16-cr-00046-GMN-PAL ——

1          MR. JACKSON:  Thank you.

2                    CROSS-EXAMINATION

3  BY MR. JACKSON:

4  *Q.*  Officer, you've been with the FBI how long?

5  **A.**  Approximately 21 years.

6  *Q.*  And you've worked in the areas -- ever worked in the area of

7  fraud?

8  **A.**  A little bit, yes.

9  *Q.*  Internet fraud?

10  **A.**  Some.

11  *Q.*  You're familiar with the Internet, from your testimony.  Is

12  that correct?

13  **A.**  Yes.

14  *Q.*  Approximately how many people would you estimate get on the

15  Internet every day in this country?

16  **A.**  The number would be millions.

17  *Q.*  So 10 million, 20 million, or more people every day get on

18  the Internet.  Is that right?

19  **A.**  Yes.

20  *Q.*  Or more?

21  **A.**  Very well could be, yes.

22  *Q.*  Many millions of people?

23  **A.**  Correct.

24  *Q.*  And there are also people that use the Internet improperly.

25  Is that right?

1   *A.*   You mean to commit crimes?

2   *Q.*   Right.

3   *A.*   Yes.

4   *Q.*   There are people that are called hackers.  Is that right?

5   *A.*   Yes.

6   *Q.*   Have you ever investigated anybody for hacking the Internet

7   or hacking -- doing fraud by what's called hacking?

8   *A.*   Not personally as a case agent, but I'm aware of such

9   investigations.

10   *Q.*   Okay.  And, of course, hacking is -- there's a lot of

11   different forms of hacking, but some of it is trying to get

12   somebody's password illegally.  Is that right?

13   *A.*   Yes, that is one of the forms of hacking.

14   *Q.*   And somebody skilled in that has the ability -- even if you

15   don't give them a password, they may have the ability to what's

16   called hack into someone's password by using various means of

17   either mathematical programs or their own skill at trying to

18   guess someone's password so they can overcome a password.  Is

19   that right?

20   *A.*   Correct, there are individuals who try to do that.  Yes.

21   *Q.*   And they can in fact, if they wanted to, hack into just

22   about anybody's computer in this country.  Is that right?

23   *A.*   No.

24   *Q.*   Well, they might not be able to hack into a secured

25   government computer that the Defense Department ran, but they

1  might be able to hack into an ordinary citizen's computer

2  without much trouble, if they were a skilled hacker.  Is that

3  correct?

4  **A.**  I don't know how skilled a hacker one would have to be.

5  There are certainly some systems that are more vulnerable than

6  others.

7  *Q.*  Okay.  But you would agree that there are people that have

8  the skills to hack into computers.  Is that right?

9  **A.**  Yes.

10  *Q.*  Now, they could also hack into someone's e-mail, then, or

11  their computer-generated e-mail if they had the skills to do it.

12  Is that right?

13  **A.**  Some people could do that to some e-mail systems, yes.

14  *Q.*  And not only are there hackers, there are other people that

15  take advantage of people's e-mail by sending you e-mail you

16  don't want.  Is that correct?

17  **A.**  Yes.

18  *Q.*  And that's called spam or unwanted e-mail of some form.  Is

19  that right?

20  **A.**  Yes.

21  *Q.*  If you go to your computer, sometimes you find e-mail there

22  that you didn't want or you didn't solicit.  Is that right?

23  **A.**  Correct.

24  *Q.*  If you don't check your e-mail every day, like I may not do,

25  it may build up.  It may remain there for a while.  Is that

———— 2:16-cr-00046-GMN-PAL ————

1  right?

2  *A.*  Correct.

3  *Q.*  Okay.  Now, not everybody is real sophisticated in using

4  computers.  Isn't that correct?

5  *A.*  Correct.

6  *Q.*  And not everybody uses computers just to transmit correct

7  and accurate information all the time.  Is that correct?

8  *A.*  Correct.

9  *Q.*  In fact, sometimes people use computers more for

10  entertainment than they use it for actually transmitting

11  accurate data.  Isn't that correct?

12        MS. CREEGAN:  Objection, relevance.

13        MR. JACKSON:  I think it's a simple question he can

14  answer.  We've been --

15        THE COURT:  I don't know there's any foundation for him

16  answering that question.

17  BY MR. JACKSON:

18  *Q.*  All right.  Well, you are somewhat of an expert in

19  computers.  You've testified here in court this last day and a

20  half or so.  Is that right?

21  *A.*  I have some knowledge of computers, yes.

22  *Q.*  All right.  And you believe that people use computers for

23  different reasons.  Is that right, especially the general

24  public?

25  *A.*  Yes.

—— 2:16-cr-00046-GMN-PAL ——

1    Q.  Some people use computers so they can do, like, their

2    banking and they want to be very specific in the way they use

3    their computers for banking.  Is that right?

4    A.  Yes.

5    Q.  Sometimes people just get on their computers so they can

6    chat with their friends.  Is that right?

7    A.  I would presume so, yes.

8    Q.  Well, you know that.  Do you ever use your computer to chat

9    with your friends?

10   A.  Not solely for that purpose, but yes.

11   Q.  Well, that's one function of using your computer.  Is that

12   right, especially your home computer or your personal computer?

13   A.  Yes.

14   Q.  You can go in a chat room and say, Hey, what's up bud, how

15   are you doing, and etc., right?

16   A.  Some people could, yes.

17   Q.  And sometimes when you're talking to your friends or your

18   associates, you kind of joke around or whatever and you just

19   shoot the bull with them or whatever a little bit.  Isn't that

20   right?  Some people do that?

21   A.  I don't do it on the computer, but I understand some people

22   do.

23   Q.  Well, when you're looking at all of the computer e-mails you

24   look at, you see -- you've looked at -- this isn't the only case

25   you've looked at computer e-mails, is it?

─────────── 2:16-cr-00046-GMN-PAL ───────────

1    *A.*  No.

2    *Q.*  How many cases have you looked at computer e-mails taken in

3    search warrants?  Have you done it more than 10 times?

4    *A.*  Yes.

5    *Q.*  Done it more than 100 times in the last 20 years?

6    *A.*  I don't think we'd be over that.  Probably somewhere over

7    20.

8    *Q.*  All right.  So somewhere between 20 and maybe 50 times

9    you've looked at computer e-mails that have been seized in

10   criminal cases.  Would that be fair to say?

11   *A.*  That would probably be fair, yes.

12   *Q.*  All right.  And in all of those cases, sometimes you have

13   people, you know, just talking with other people and they're

14   saying kind of silly stuff and whatever over the computer.

15   Isn't that right?

16          MS. CREEGAN:  Objection, relevance of other cases.

17          MR. JACKSON:  Well, I just want to get his knowledge

18   about what he knows about computers.  I think it's relevant.

19   He's testified in this case.

20          Or find out if there's anything different in this case

21   from any other case.

22          THE COURT:  It doesn't sound like you're asking about

23   his knowledge of computers.  It sounds like you're asking about

24   other information.

25          MR. JACKSON:  All right.  Let me rephrase the question.

1   I'll rephrase it.

2            THE COURT:   Thank you.

3   BY MR. JACKSON:

4   *Q.*  The videos you looked at in this case, they weren't -- or

5   not videos.  The computer data you looked at in this case from

6   e-mails wasn't remarkably different from the dozens of other

7   cases you've looked at before in your 20 years, was it?

8   *A.*  The comments made by the individuals were pretty different

9   than any other case I've ever worked on.

10  *Q.*  Okay.  But there was some parts of it were similar in terms.

11  Isn't that true?  The general comments that people make.

12  *A.*  Some of that, yes.

13  *Q.*  You've listened to wiretaps, too, haven't you?

14  *A.*  Yes, I have.

15  *Q.*  And when you listen to wiretaps, you listen to hundreds of

16  hours before you find the one nugget or two nuggets of

17  information that you think are relevant.  Isn't that right?

18  *A.*  No, not exactly.  But, yes, we do have to sift through the

19  information.

20  *Q.*  Right.  And that's what you did in this case.  You got all

21  of the hundreds of pages of e-mails to try to find something

22  that was relevant that you could tie into the different

23  defendants and their actions on 4 /12/14 and a few days before

24  and after that.  Isn't that right?

25  *A.*  We reviewed the information for relevance and took

1  information that was relevant for purposes of this trial.

2  *Q.*  And you used your best judgment in trying to come up with

3  something that you thought may or may not have been relevant to

4  each of these individual defendants that are here in court

5  today.  Is that right?

6  *A.*  Anything that would be relevant to the situation, yes.

7  *Q.*  All right.  But you couldn't possibly look at all of the

8  thousands of pages of information and each of the leads that it

9  would lead you to, but you had to narrow it down in some way.

10  Is that right?

11  *A.*  We would just address each page or each e-mail as to whether

12  it was relevant or not.  Whether we would be able to followup

13  further on that or not would be depending on, you know, the

14  situation, whether we had time.  But whether we could followup

15  on something wouldn't be our basis for why we would consider it

16  relevant or not.

17  *Q.*  Okay.  So you had a preconception when you were looking at

18  this -- these Internet postings or these -- this Internet data

19  in terms of evaluating it.  You said, I'm going to look at --

20  like, my client is Mr. Burleson.  I'm going to look at him and

21  see if there's anything there that might be interesting when I'm

22  looking at these e-mails.  Is that right?

23  *A.*  No.  It's not based on what is interesting.  We based our

24  search on what's contained in the search warrant.  The judge

25  will only allow us to take certain items, those items are

──────── 2:16-cr-00046-GMN-PAL ────────

1  spelled out in the warrant, and we take those items that are

2  responsive to the search warrant.

3  Q.  Okay.  So you were limited in some way by what the warrant

4  said?

5  A.  Correct.

6  Q.  And you tried to keep it within those bounds?

7  A.  Correct.

8  Q.  Okay.

9       Now, you were asked about militia groups before.

10  A.  Yes.

11  Q.  Is there a special unit in the FBI agent that was dealing

12  with militia groups on or about April of 2014?

13  A.  A specific militia unit?

14  Q.  Yes.

15  A.  No, there's no unit that's a militia unit.

16  Q.  So there wasn't a group of four or five or ten or two or

17  three units that were specifically concentrating on militia

18  groups on or about that time?

19  A.  We do have a unit at headquarters that specifically deals

20  with a number of types of cases.  One of the types of cases they

21  deal with are militia cases.  They try to coordinate the

22  investigations in the field that are related to that subject.

23  Q.  By "headquarters," was that here locally or was that

24  nationally?  Where do you mean?

25  A.  Washington, D.C.

1   *Q.*  Okay.  So now, did you have input from Washington, D.C.

2   while you were working this case?

3           MS. CREEGAN:  Objection, relevance.

4           MR. JACKSON:  It's a yes or no question.  I don't -- if

5   he didn't --

6           THE COURT:  I don't see how it's relevant.

7           MR. JACKSON:  What?

8           THE COURT:  I don't see how it's relevant.

9           MR. JACKSON:  All right.  I'll move on.

10          THE COURT:  Regardless if the answer's yes or no, I

11  don't see how it's relevant.

12  BY MR. JACKSON:

13  *Q.*  All right.  Did you have a local unit dealing -- you said

14  you didn't have a local unit dealing with militia on about April

15  of 2014.

16  **A.**  By "local unit," do you mean individuals whose sole

17  responsibility it is to look at --

18  *Q.*  Or whose major responsibility; maybe not sole responsibility

19  because I know you have all kinds of things you have to handle

20  in a busy office like the local FBI office.  But was it one of

21  your main responsibilities at that time?

22  **A.**  One of my main responsibilities was to look at

23  militia-related cases along with other similar types of cases.

24  *Q.*  Okay.  And so you really kind of were focusing on militia at

25  that time.  Is that correct?

 1   *A.*  We were focussed on individuals who were breaking the law or

 2   alleged to be breaking the law.  If they happen to also then be

 3   members of the militia movement, then we would engage an

 4   investigation of those individuals.  But we don't investigate

 5   anyone for being just part of a militia.

 6   *Q.*  You mentioned a -- a live stream that you were receiving

 7   from a Pete Santilli on the day of April 12th, 2014.  You were

 8   viewing that, I think, with Agent Kirkham.  What, you were in

 9   your office at that time.  Is that right?

10   *A.*  No, I had traveled from Montana that morning to Nevada, and

11   I was in the FBI office in Nevada.  That's not my office.

12   That's the Las Vegas field division.  And, yes, I was present

13   with Special Agent Kirkham at the time.

14   *Q.*  And that was in Las Vegas?

15   *A.*  Yes.

16   *Q.*  And what time did you first get that live feed from

17   Mr. Santilli about the events going on in the Bunkerville area?

18   *A.*  I don't recall what time the feed started.

19   *Q.*  Was it in the early morning, around 10, 11:00, or do you

20   have any idea when it was?

21   *A.*  It would have been after 9:30 or 10:00, which is when I

22   arrived in Las Vegas.

23   *Q.*  All right.  So when you got that live feed of Mr. Santilli

24   describing what was going on in the Bunkerville area at the

25   Bundy Ranch area, did you feel that it was necessary or that it

───────────────── 2:16-cr-00046-GMN-PAL ─────────────────

 1  would be in the interest of your FBI agents that you should go

 2  join them to assist them in any way?

 3          MS. CREEGAN:  Objection, vague.

 4  BY MR. JACKSON:

 5  Q.  All right.  Did you make any attempt to go join the agents

 6  that were in Bunkerville after you got that feed from

 7  Mr. Santilli?

 8          MS. CREEGAN:  Objection, again, vague, assumes facts

 9  not in evidence.

10          MR. JACKSON:  Well, I don't think it's vague.  I think

11  it's a specific question.

12  BY MR. JACKSON:

13  Q.  Did you go there to the Bunkerville area on that day,

14  4/12/14?

15  A.  I did not go there.

16          MR. JACKSON:  I have no further questions.

17          THE COURT:  Mr. Leventhal?

18          MR. LEVENTHAL:  Thank you.

19                       CROSS-EXAMINATION

20  BY MR. LEVENTHAL:

21  Q.  Good afternoon, Agent Seyler.

22  A.  Good afternoon.

23  Q.  How are you today?

24  A.  Good.  And yourself?

25  Q.  My name is Todd Leventhal.  I represent Mr. Drexler.

1        MR. LEVENTHAL:  Bryan, can we pull up 187,

2   Government's 187.

3   BY MR. LEVENTHAL:

4   Q.  You see that there?

5   A.  Yes.

6   Q.  Okay.  That indicates -- or that appears to be

7   Mr. Lovelien's Facebook page, correct?

8   A.  Yes.

9   Q.  Okay.

10       MR. LEVENTHAL:  If you could scroll down.

11  BY MR. LEVENTHAL:

12  Q.  And friends?

13  A.  Yes.

14  Q.  Okay.  And there's a list of friends four pages long,

15  correct?

16  A.  Correct.

17  Q.  Okay.  You never saw Mr. O. Scott Drexler or Drexler on that

18  list, correct?

19  A.  No, I never saw that.

20       MR. LEVENTHAL:  If we can pull up 168.

21  BY MR. LEVENTHAL:

22  Q.  Now, the government asked you a couple questions yesterday

23  regarding this Operation Mutual Aid, correct?

24  A.  Yes.

25  Q.  And they had you read from different statements, correct?

———— 2:16-cr-00046-GMN-PAL ————

1  *A.*  Yes.

2  *Q.*  If you could go up, could you read after it says:

3  Disclaimer.  Could you read that?

4  *A.*  Yes.  Disclaimer:  Any comments made by members that fall

5  outside of the mission statement are respective to their authors

6  and in no way represents the view of the entirety of Operation

7  Mutual Aid.

8  *Q.*  Okay.  Can you go down to the second paragraph and read that

9  for us, too.

10  *A.*  The one that begins with Congress?

11  *Q.*  Yes.

12  *A.*  Congress shall make no law respecting an establishment of

13  religion, or prohibiting the free exercise thereof; or abridging

14  the freedom of speech, or of the press; or of the right of the

15  people peaceably to assemble, and to petition the government for

16  a redress of grievances.  First Amendment Bill of Rights.

17  *Q.*  Okay.  Now, during your investigation were you -- did you

18  ever become aware that the BLM had put up a First Amendment

19  zone?

20          MS. CREEGAN:  Objection, relevance.

21  BY MR. LEVENTHAL:

22  *Q.*  Were you aware?

23          MS. CREEGAN:  Objection, relevance.

24          MR. LEVENTHAL:  It's his investigation.

25          THE COURT:  I'll allow it.

PATRICIA L. GANCI, RMR, CRR

—— 2:16-cr-00046-GMN-PAL ——

1            THE WITNESS:  Yes, I was aware.

2    BY MR. LEVENTHAL:

3    Q.  Okay.  Thank you.

4            MR. LEVENTHAL:  Bryan, can we put up 427.

5    BY MR. LEVENTHAL:

6    Q.  Okay.  Now, you were asked some questions --

7            MR. LEVENTHAL:  And if we could go to two minutes and

8    47 seconds.

9    BY MR. LEVENTHAL:

10   Q.  Now, you were asked by the government if you recognized that

11   person there, correct, with the hat, on the stage?

12   A.  Yes.

13   Q.  And you indicated that that was Ryan Payne, correct?

14   A.  Correct.

15   Q.  Okay.  And were you able to recognize or -- any of these

16   individuals below him?  This gentleman, this gentleman, this

17   gentleman -- not that gentleman.

18   A.  No, I don't recognize those individuals.

19   Q.  You don't recognize any of them, correct?

20   A.  Correct.

21   Q.  Okay.

22           MR. LEVENTHAL:  Now, can you just play that for one

23   second more.

24           (Video playing.)

25           MR. LEVENTHAL:  Back it up.

──────── 2:16-cr-00046-GMN-PAL ────────

1   BY MR. LEVENTHAL:

2   *Q.*  You were asked about what he's doing there, correct,

3   yesterday?

4   **A.**  I don't recall, but I identified him.  I remember that.

5   *Q.*  Okay.  Were you -- did you identify him as his thumb being

6   up?

7   **A.**  Yes.

8   *Q.*  Okay.  And you don't know what that's in response to, do

9   you?  You don't know whether he was asked, How was breakfast

10  this morning, do you?

11  **A.**  Correct.

12  *Q.*  And you don't know whether or not somebody from the crowd,

13  which he's facing, said, Hey, Gillespie just said BLM is ceasing

14  operations, thumbs-up, right?  You don't know that, do you?

15  **A.**  Correct.

16  *Q.*  Okay.

17          MR. LEVENTHAL:  If we can go to 224.

18  BY MR. LEVENTHAL:

19  *Q.*  The government showed you this Facebook page yesterday,

20  correct?

21  **A.**  Yes.

22  *Q.*  And asked you a number of questions, and you were able to

23  identify that there's Ryan Payne on there, OMD, correct?

24  **A.**  Correct.

25  *Q.*  And there's a Mark Kessler up there, correct?

———— 2:16-cr-00046-GMN-PAL ————

1   *A.* Correct.

2   *Q.* Now, I know that you were asked whether or not you knew that

3   whether or not Mr. Kessler was an FBI agent.  You indicated that

4   he was not, correct?

5   *A.* Correct.

6   *Q.* But do you know whether or not he was a government

7   informant?

8   *A.* Yes, I do.

9   *Q.* You do.  He was a government informant, correct?

10  *A.* He was not.

11  *Q.* He was not.  Okay.

12        MR. LEVENTHAL:  If we can go to 213.  Okay.  If you go

13  down the page a little bit.  Right there.

14  BY MR. LEVENTHAL:

15  *Q.* This person right here, Rick Light.

16  *A.* Yes.

17  *Q.* Again, same question.  Were you aware that Rick Light was a

18  government informant?

19  *A.* I'm not aware of that.

20        MS. CREEGAN:  Again, assumes facts not in evidence.

21        MR. LEVENTHAL:  I'm asking.  He said he's not.  I'll

22  move on.

23        THE COURT:  It's the form of the question.  You're

24  saying, Are you aware that, and so then that's assuming that it

25  actually is.

PATRICIA L. GANCI, RMR, CRR

—— 2:16-cr-00046-GMN-PAL ——

1          MR. LEVENTHAL:  I apologize.  Were you --

2          THE COURT:  Do you know if he was, that would be the

3    proper form.  But I think it's --

4          MR. LEVENTHAL:  If I may, Your Honor, I don't ask

5    open-ended questions on cross.  I try not to.  And so I

6    understand what the Court's saying, but I can lead on cross.

7    I'll move on.

8          THE COURT:  You can lead, which means ask for a yes or

9    no question, but you can't assume facts not in evidence.  I

10   think that was the objection.

11   BY MR. LEVENTHAL:

12   *Q.*  You were asked a couple of questions regarding Robyn

13   Kirkham.  Do you remember those questions?

14   **A.**  Yes.

15   *Q.*  Okay.  And were you aware that -- were you aware that Robyn

16   Kirkham had started a bogus undercover FBI operation with

17   Facebook?

18          MS. CREEGAN:  Objection, assumes facts not in evidence,

19   argumentative as to "bogus."

20   BY MR. LEVENTHAL:

21   *Q.*  Okay.  Were you aware that she started something under

22   the -- undercover -- well, if it wasn't bogus, it was real?

23          MS. CREEGAN:  Objection, vague, confusing, assumes

24   facts not in evidence.

25

───────────────── 2:16-cr-00046-GMN-PAL ─────────────────

1   BY MR. LEVENTHAL:

2   Q.  Did Robyn Kirkham go undercover online?

3   A.  Yes.

4   Q.  Okay.  Do you know what Robyn Kirkham's moniker was?

5   A.  Not off the top of my head, no.

6   Q.  Okay.  So as you sit here today, and you've gone through all

7   of these and I'm just testing the credibility of these papers,

8   you don't know who's Robyn Kirkham, who's not Robyn Kirkham when

9   all of these names pop up, correct?

10  A.  Actually, I said not off the top of my head.  If I saw it,

11  I'd recognize it.  I've seen the identity before.

12  Q.  Well, I don't understand.  So do I need to go through each

13  one of these pages that the government went through yesterday to

14  see if you recognize it?

15  A.  Yes.  I've not recognized that in any of the exhibits that

16  we've seen today or yesterday.

17  Q.  Okay.  You don't recognize it, but you know what it is.  Is

18  that what you're saying?

19  A.  I've seen it and I believe I would recognize it if I saw it,

20  yes.

21  Q.  Okay.  But you did not see it in any of the documents that

22  we saw?

23  A.  Not the one identity that I'm aware of, no.

24  Q.  Okay.  And, obviously, you've seen more documents than

25  what's been provided, correct?

————— 2:16-cr-00046-GMN-PAL —————

1  *A.*  Correct.

2  *Q.*  Okay.

3        MR. LEVENTHAL:  If we go to 214.  Can you erase that?

4  BY MR. LEVENTHAL:

5  *Q.*  Now, you were shown this picture by the government, correct?

6  *A.*  Yes.

7        COURTROOM ADMINISTRATOR:  Mr. Leventhal, this is not

8  admitted.

9        MR. LEVENTHAL:  It didn't come in yesterday?  Yeah, it

10 did.  They were asking questions on the --

11       COURTROOM ADMINISTRATOR:  I know it looks familiar, but

12 I don't have it.

13       MR. LEVENTHAL:  214?

14       Oh, 191, yes.

15       THE COURT:  I think it's 191 that you're referring to.

16       MR. LEVENTHAL:  191.  Go all the way down.

17       Okay.  It would be 191, Your Honor.

18       THE COURT:  Thank you.

19       MR. LEVENTHAL:  Okay.  Can I have 214, then, as

20 Proposed Defense Exhibit -- what number is that?  5046 --

21 Defense Proposed Exhibit 5046.

22 BY MR. LEVENTHAL:

23 *Q.*  Can you take a look at that.

24 *A.*  Yes.

25 *Q.*  Does that fairly and accurately represent 191, what you saw

—— 2:16-cr-00046-GMN-PAL ——

1  earlier?

2  *A.*  The photograph itself would appear to be the same

3  photograph.

4  *Q.*  Okay.  And it fairly and accurately represents that

5  photograph, correct?

6  *A.*  The photograph itself appears to be the same photograph,

7  yes.

8  *Q.*  Okay.  Do you recognize the screen shot?

9  *A.*  No, I don't recognize it as one that I would have produced

10  without seeing a 302 saying that that was one that I made.

11  *Q.*  So this would not have come from your computer?

12  *A.*  I'm not aware if it came from my computer or not.  I don't

13  recognize the screen.  I could look at it a little closer and

14  see if it's from my computer, see if there's anything that could

15  tell that it is.

16  *Q.*  Do you need me to --

17           MR. LEVENTHAL:  There you go.  If you could go up

18  there.

19  BY MR. LEVENTHAL:

20  *Q.*  What would draw your attention to whether or not that's your

21  screen?

22  *A.*  If you could scroll down to the bottom with the other

23  windows that were open.

24  *Q.*  Okay.  So you've got --

25           MR. LEVENTHAL:  Go down to the bottom.

 1          THE WITNESS:  No, I don't believe that was mine.  Those

 2   are not programs on the bottom that I would have been running.

 3   BY MR. LEVENTHAL:

 4   *Q.*  No?

 5   **A.**  No.

 6          MR. LEVENTHAL:  Okay.  Thank you.  I have nothing

 7   further.

 8          THE COURT:  I think we've heard from everyone, right?

 9   It was sort of out of order.  I got confused.  All right.

10          Any redirect?

11          MS. CREEGAN:  No redirect, Your Honor.

12          THE COURT:  All right.  Thank you, Special Agent

13   Seyler.  You're excused.  Please be careful on the way down with

14   those steps.

15          And the government may call its next witness.

16          MS. AHMED:  Thank you, Your Honor.  The United States

17   calls Special Agent Timothy Deppner.

18          THE COURT:  Good afternoon, Special Agent Deppner.

19   You'll be seated over here to my right.  Please be careful with

20   the steps on your way up.

21          MR. MARCHESE:  And I apologize.  What was this

22   witness's name, Your Honor?

23          THE COURT:  Special Agent Timothy Dutner [sic].  Did I

24   get that wrong?

25          MS. AHMED:  It's Deppner, Your Honor.

```
                      2:16-cr-00046-GMN-PAL
```

 1          THE COURT:  Spell it.

 2          MS AHMED:  Deppner, D-E-P-P-N-E-R.

 3          THE COURT:  Okay.  I thought it was a T; not a P.

 4  We'll have him spell it now for us.

 5          COURTROOM ADMINISTRATOR:  Would you please raise your

 6  hand.

 7          TIMOTHY J. DEPPNER, having duly been sworn, was

 8  examined and testified as follows:

 9          COURTROOM ADMINISTRATOR:  Thank you, sir.  You may be

10  seated.  Please state and spell your name for the record.

11          THE WITNESS:  Timothy James Deppner.  First and middle

12  name are common spelling.  Last name is D-E-P-P-N-E-R.

13                       DIRECT EXAMINATION

14  BY MS. AHMED:

15  Q.  Good afternoon, Agent Deppner.

16  A.  Afternoon.

17  Q.  Where are you currently employed?

18  A.  With the FBI as a special agent.

19  Q.  How long have you been a special agent with the FBI?

20  A.  About a year and a half.

21  Q.  Were you a special agent with the FBI in March of 2016?

22  A.  Yes.

23  Q.  Were you stationed in Oklahoma at that time?

24  A.  Yes.

25  Q.  Where in Oklahoma?

1  *A.*  The Muskogee office.

2  *Q.*  At the time on March 3rd, 2016, in the course of your duties

3  as an agent, were you involved in the post-arrest process

4  relating to Rick Lovelien?

5  *A.*  Yes.

6  *Q.*  What was your involvement in that?

7  *A.*  I was in the booking room at the U.S. courthouse when he was

8  booked by the U.S. Marshals.

9  *Q.*  Were you present during that whole booking process -- during

10  the majority of the booking process?

11  *A.*  Yes, I was in the room the entire time.

12          MS. AHMED:  Your Honor, may we publish to the witness,

13  counsel, and the Court what's been marked for identification as

14  Government's Exhibit 453?

15          THE COURT:  Yes.

16  BY MS. AHMED:

17  *Q.*  Agent Deppner, I'd ask you to look at the screen that's off

18  to your right side and take a look at this six-page document.

19          MS. AHMED:  Your Honor, although the document is six

20  pages, our intention is only to seek introduction of the last

21  four.  So --

22          THE COURT:  Last four?

23          MS. AHMED:  Yes, Your Honor.  453-3 through 453-6.

24  BY MS. AHMED:

25  *Q.*  Focusing your attention on those last four pages of this

———— 2:16-cr-00046-GMN-PAL ————

1  exhibit, do you recognize what they are?

2  *A.*  Yes.

3  *Q.*  Can you just generally describe what they are.

4  *A.*  Yes.  The booking photos that were taken when I was present

5  that day that you described this March.

6  *Q.*  The booking photos of Rick Lovelien?

7  *A.*  Yes.

8  *Q.*  And do these four pages of Exhibit 453 fairly and accurately

9  depict what you yourself observed on March 3rd, 2016?

10  *A.*  Yes.

11        MS. AHMED:  Your Honor, the government moves to admit

12  Exhibit 453-3 through 453-6.

13        MR. MARCHESE:  No objection Parker.

14        MR. TANASI:  No objection Stewart, Your Honor.

15        MR. LEVENTHAL:  No objection Mr. Drexler.

16        MR. ENGEL:  None Engel.

17        MR. PEREZ:  None Lovelien.

18        MR. JACKSON:  No objection to the photos.

19        THE COURT:  All right.  So Exhibit 453, pages 3

20  through 6 --

21        MS. AHMED:  Yes, Your Honor.

22        THE COURT:  -- are admitted.

23        MS. AHMED:  Thank you, Your Honor.  Your Honor, may we

24  publish those pages to the jury?

25        THE COURT:  Yes, you may.

1          (Government's Exhibit 453, pages 3 through 6, are

2   admitted.)

3   BY MS. AHMED:

4   *Q.*  Turning first to page -- Exhibit 453-3, Agent Deppner, can

5   you just describe generally to the jury what this depicts.

6   *A.*  Rick Lovelien.

7   *Q.*  It's the frontal view chest up?

8   *A.*  Yes, yes.

9   *Q.*  And then turning to 453-4, can you explain to the jury what

10  view of Mr. Lovelien this depicts.

11  *A.*  His right side.

12  *Q.*  And then turning to 453-5, can you explain to the jury what

13  this image depicts.

14  *A.*  His right arm with a tattoo on his right arm.

15  *Q.*  And turning to 453-6, can you explain to the jury what this

16  image depicts.

17  *A.*  His other arm, left forearm with a tattoo on it.

18  *Q.*  And you said that's his left forearm.  Is that correct?

19  *A.*  Yes.

20  *Q.*  Agent Deppner, do you see Rick Lovelien in the courtroom

21  today?

22  *A.*  Yes.

23  *Q.*  Can you indicate where you see him, describe where he's

24  seated generally and an article of clothing, if you can see, for

25  the record.

———————— 2:16-cr-00046-GMN-PAL ————————

1    *A.*  Seated behind you with a gray suit.

2    *Q.*  Did you ...

3           THE COURT:  You can stand up if you need to.

4    BY MS. AHMED:

5    *Q.*  If you see him.  If you're sure if you see him.

6    *A.*  Looks a lot different now.

7    *Q.*  If you're not sure, that's fine.

8    *A.*  Yeah.

9           MS. AHMED:  Your Honor, the Court's indulgence.

10          THE COURT:  Yes.

11          (Prosecution conferring.)

12          MS. AHMED:  You can take that exhibit down.  Thank you.

13   BY MS. AHMED:

14   *Q.*  Agent Deppner, just generally with respect to the booking

15   process that the FBI undergoes when someone's taken into

16   custody, can you explain the information that's obtained

17   regarding that individual.

18   *A.*  Data such as their name, date of birth, address, contact

19   information, those types of things.

20   *Q.*  Would you also obtain information such as their Social

21   Security number?

22   *A.*  Yes.

23   *Q.*  Would you also obtain fingerprints?

24   *A.*  Yes.

25   *Q.*  And are these all for the purposes of identifying the person

—————————— 2:16-cr-00046-GMN-PAL ——————————

1    correctly?

2    **A.**   Yes.

3         MS. AHMED:  Your Honor, nothing further.  Thank you.

4         Thank you, Agent Deppner.

5         THE COURT:  Any cross?

6         MR. MARCHESE:  Nothing from Parker.

7         MR. TANASI:  Nothing from Stewart, Your Honor.

8         MR. LEVENTHAL:  Nothing from Mr. Drexler.

9         MR. ENGEL:  Nothing from Engel.

10        MR. PEREZ:  Nothing from Lovelien.

11        THE COURT:  Mr. Jackson, did you have any cross?

12        MR. JACKSON:  I have no questions at this time.

13        THE COURT:  All right.  Thank you.

14        So, Special Agent Deppner, thank you for coming in

15   today.  You're excused.  Just please be careful on the way down

16   with those steps.

17        THE WITNESS:  Thank you.

18        THE COURT:  The government may call its next witness.

19        MS. AHMED:  Your Honor, the United States calls Special

20   Agent Joseph Woolstenhulme.

21        THE COURT:  Good afternoon, Special Agent Hugh [sic].

22   Please be careful with the steps there.

23        COURTROOM ADMINISTRATOR:  Raise your right hand.

24        JOSEPH WOOLSTENHULME, having duly been sworn, was

25   examined and testified as follows:

———————— 2:16-cr-00046-GMN-PAL ————————

1           COURTROOM ADMINISTRATOR:  Sir, you may be seated.

2   Please state and spell your full name for the record.

3           THE WITNESS:  Joseph Woolstenhulme, J-O-S-E-P-H,

4   W-O-O-L-S-T-E-N-H-U-L-M-E.

5                       DIRECT EXAMINATION

6   BY MS. AHMED:

7   Q.  Good afternoon, Agent Woolstenhulme.

8   A.  Good afternoon.

9   Q.  Can you -- are you currently employed?

10  A.  Yes.

11  Q.  Where are you employed?

12  A.  I'm a special agent with the Federal Bureau of

13  Investigation.

14  Q.  How long have you been a special agent with the FBI?

15  A.  I've been employed with the FBI for nine years.  I've been

16  an agent for four and a half years.

17  Q.  Prior to being an agent with the FBI, what position, if any,

18  did you hold with them?

19  A.  I was an intelligence analyst.

20  Q.  Were you a special agent with the FBI in April of 2014?

21  A.  Yes, I was.

22  Q.  Generally, in relation to your duties both as a special

23  agent and your duties as an investigative intelligence analyst,

24  do you have training in the use of social media in

25  investigations?

————— 2:16-cr-00046-GMN-PAL —————

 1   *A.*   Yes, I do.

 2   *Q.*   Generally, can you describe that training.

 3   *A.*   I've taken two or three courses on open-source search

 4   techniques, how to search social media, what to look for in

 5   social media, different tools that are openly available to the

 6   public on exploiting social media, you know, so you can search

 7   multiple users at the same time or multiple different social

 8   media sites from the same page, things like that.

 9   *Q.*   Can you explain to the jury what the phrase "open-source"

10   means.

11   *A.*   Open-source means it's available to anybody in the public,

12   basically, with an Internet connection.  You can just go on

13   Google or go online and look for whatever information is out

14   there.  It's available to everybody.

15   *Q.*   Now, in April of 2014 did you become involved in the

16   investigation of events taking place in the Bunkerville, Nevada

17   area, on April 12th, 2014?

18   *A.*   Yes, I did.  I was asked to assist with that investigation.

19   *Q.*   In the course of your investigation what steps, if any, did

20   you take in relation to open-source research?

21   *A.*   I initially conducted search queries using the Internet in

22   Google and other search engines, you know, for any images or

23   comments associated with, you know -- I just put in terms like

24   "Bundy" or "Bunkerville" or, you know, "battle of Gold Butte,"

25   things like that.

——————2:16-cr-00046-GMN-PAL——————

1   *Q.*  In doing so, did you come across any items that you

2   determined were relevant to your investigation?

3   **A.**  I did.

4   *Q.*  And, generally, can you describe what kind of items you came

5   across doing so.

6        MR. JACKSON:  I'm going to object.  It calls for

7   hearsay and move to strike it.  He hasn't made an adequate

8   foundation in any event.  What he got over the Internet I think

9   is hearsay -- that is, reliable hearsay wouldn't come in under

10  any exception.

11       THE COURT:  Ms. Ahmed?

12       MS. AHMED:  Your Honor, I think he's describing just

13  the steps that he took in an investigation.  I don't see how

14  describing what he obtained would -- I know that the answer

15  would not elicit any hearsay.  It's not going to elicit any

16  statements from any individuals that he obtained.

17       THE COURT:  So you're asking for categories, not what

18  he actually read?

19       MS. AHMED:  In -- yes, generally.

20       THE COURT:  All right.  So on that basis, he can answer

21  the question.

22       THE WITNESS:  I found Facebook pages.  I found

23  newspaper articles.  I found blog posts, things of that nature.

24  BY MS. AHMED:

25  *Q.*  Did you find photographs that depicted the April 12th, 2014,

— 2:16-cr-00046-GMN-PAL —

1  events as well?

2  *A.*  Yes, with all those Facebook pages, blog posts, there were

3  photographs associated with it.

4  *Q.*  Did you also find any videos that you determined depicted

5  the April 12th, 2014, events in Bunkerville?

6  *A.*  Yes, there were videos associated with the Facebook pages

7  that I found.

8          MS. AHMED:  Your Honor, may we publish to the witness,

9  counsel, and the Court what's been marked for identification as

10 Government's Exhibit 143?

11         THE COURT:  Yes.

12 BY MS. AHMED:

13 *Q.*  Agent Woolstenhulme, do you recognize what is depicted in

14 Government's Exhibit 143?

15 *A.*  Yes, I do.

16 *Q.*  And, just generally, can you describe what is in Exhibit

17 143.

18 *A.*  It's a capture of the screen of the Facebook page of David

19 Lee Williams, and on his Facebook account there's an image that

20 has two individuals on a bridge overlooking the wash where the

21 BLM was moving the cattle on April 12th, 2014.  There's two

22 individuals on the bridge --

23 *Q.*  Let me stop you right there.  Is this Exhibit -- Exhibit

24 143, is this item something that you yourself obtained from the

25 Internet?

1  *A.*  Yes, it is.

2  *Q.*  And the image that's depicted in this exhibit, is this

3  something that you recognize as having taken place on April

4  12th, 2014?

5  *A.*  Yes, it is.

6         MR. JACKSON:  I'm going to object unless there's a

7  further foundation laid.  I also object on confrontation

8  grounds.  I'd like to be able to confront and cross-examine

9  David Lee Williams, or if this witness was present on 4/12/14,

10  he can testify to the accuracy of this.  Otherwise, I think it's

11  hearsay and I think it's not admissible under any exception.

12         MR. TANASI:  Stewart joins, Your Honor.

13         MR. LEVENTHAL:  Drexler joins.

14         MR. MARCHESE:  Parker joins.

15         MR. PEREZ:  Lovelien joins.

16         THE COURT:  Ms. Ahmed?

17         MS. AHMED:  Your Honor, that question was foundational

18  to the next questions, which I will go down how he recognizes it

19  as being from that date.  And, Your Honor, for authentication

20  purposes I think, you know, we briefed this for the Court, of

21  course, but he can use extrinsic evidence in the course of his

22  investigation seeing other items to confirm that this is what it

23  purports to be, the photo.

24         THE COURT:  All right.  But that information hasn't

25  been elicited yet.

—2:16-cr-00046-GMN-PAL—

1           MS. AHMED:  Your Honor, that's the government's

2    intention now.

3           THE COURT:  Okay.

4           MS. AHMED:  Thank you.

5    BY MS. AHMED:

6    *Q.*  Now, Agent Woolstenhulme, can you describe how -- in terms

7    of the individuals that you were beginning to discuss that are

8    in the foreground, how do you know that these individuals -- how

9    did you learn that this was taken from April 12th, 2014, looking

10   at those two individuals in particular?

11   **A.**  As I searched the Internet for images associated with the

12   events that occurred on April 12th, 2014, I came to be familiar

13   with the clothing that was worn by many of the, I guess, most

14   photographed individuals.  And on those other websites, news

15   websites, Facebook blog posts, they had dates and they had names

16   and they had descriptions and said, you know:  This person was

17   at this location on this date and this time.  And I could see

18   what clothing they were wearing and I could see, you know, what

19   was in the background, how many people were there, you know,

20   news vehicles, police vehicles, other items that would not

21   normally be in that particular location.

22          MR. JACKSON:  Your Honor, I renew my objection.  He's

23   saying he's based his information on hearsay information that he

24   received; not that he based it on personal information.  And

25   it's not reliable hearsay, necessarily.  So he's basing his

——————2:16-cr-00046-GMN-PAL——————

1    hearsay testimony on other hearsay.

2             MR. MARCHESE:  Parker joins.

3             MR. TANASI:  Stewart joins, Your Honor.

4             MR. LEVENTHAL:  Drexler joins.

5             MR. ENGEL:  Engel joins.

6             MR. PEREZ:  Lovelien joins.

7             MS. AHMED:  Your Honor, consistent with the case law, I

8    think he's at least identified how he recognizes the people in

9    the forefront of the photo, but I can continue to ask him about

10   other aspects of the photo to see if he can further lay a

11   foundation for how he knows that this is what it is.

12            THE COURT:  All right.  Go ahead.

13   BY MS. AHMED:

14   *Q.*  Agent Woolstenhulme, do you recognize anything that's in the

15   background of the photo?

16   *A.*  Yes, I do.

17   *Q.*  Can you describe what it is that you recognize in this

18   photo.

19   *A.*  I recognize the terrain.  I'm familiar with that area.  I've

20   camped out there.  And I was up there about a week prior

21   assisting with some radio work.  So I'm familiar with that

22   terrain.  I'm also familiar with the BLM vehicles in the

23   background.

24   *Q.*  From your investigation do you recognize -- can you indicate

25   on this photograph where you see the BLM vehicles?  You can use

—— 2:16-cr-00046-GMN-PAL ——

1  your finger to circle.

2  *A.*  (Witness complies.)

3  *Q.*  And do you recognize this based on the investigation that

4  you undertook in relating to the events of April 12th, 2014?

5  *A.*  Yes, I do.

6         MS. AHMED:  Your Honor, the government moves to admit

7  Exhibit 143.

8         MR. TANASI:  Stewart objects, Your Honor.  Same grounds

9  as before.  And I'd also add hearsay, which I know has been

10 touched on, but as far as Mr. Williams' statement on the bottom.

11 And then as far as foundation is concerned, you know, we've

12 heard that he's reviewed different things and that he's

13 identified different things that led him to conclusions he can

14 reach, you know, with this picture, but we haven't heard exactly

15 what those things are or seen what those things are.  We haven't

16 seen the building blocks of the foundation.

17        MR. MARCHESE:  Parker joins.

18        MR. LEVENTHAL:  Drexler joins.

19        MR. ENGEL:  Engel joins.

20        MR. PEREZ:  Lovelien joins.

21        MR. JACKSON:  Burleson joins.

22        THE COURT:  I agree.  I think there's not a sufficient

23 basis yet, but it's not with prejudice.  You can continue to try

24 to lay a better foundation.

25        MS. AHMED:  Your Honor, may we publish to everybody

1    what's been previously admitted as Government's Exhibit 83?

2              THE COURT:  Yes.

3              MS. AHMED:  Will you play that.

4              (Video playing.)

5              MR. LEVENTHAL:  Objection, Judge.  Is she refreshing

6    recollection?  I mean, just playing a tape for somebody, I don't

7    understand what the purpose behind that is.  We've already seen

8    this.  It's been asked and answered.  We've gone through it, and

9    this is not laying the foundation for anything.

10             We're objecting to this picture, not this.  This has

11   been admitted.

12             THE COURT:  I was just going to say Exhibit 83 has

13   already been admitted.

14             MS. AHMED:  Your Honor, I'm showing this witness

15   Exhibit 83, which he's already indicated that the clothing and

16   the positions of individuals from his investigation was

17   consistent with other things that he's seen from April 12th,

18   2014.  So I can establish through this that the people that were

19   depicted in Exhibit 143 are wearing the exact same clothing that

20   you see in this screen at this moment, and that the terrain --

21   as he said, the terrain where the April 12th, 2014, events took

22   place.

23             MR. TANASI:  Your Honor, I'd add leading as well.

24             MS. AHMED:  I haven't asked any questions, Your Honor.

25   I'm showing him a video.

1      MR. TANASI:  And that's my point.  He's being shown the

2  video.  Then he's going to be asked if he's seen it.  Cart

3  before the horse.

4      MS. AHMED:  Your Honor, he took the photographs -- or

5  he took a screen shot -- a screen capture -- excuse me -- of

6  something he observed on the Internet, and he knows it to be

7  consistent with other things that he's observed in his

8  investigation.  And this is one of many things that were

9  obtained in the investigation.

10      THE COURT:  All right.  So ask him the question.

11  BY MS. AHMED:

12  *Q.*  Agent Woolstenhulme, do you recognize what's depicted in

13  Exhibit 83?

14  *A.*  Yes, I do.

15  *Q.*  And is this video something that's consistent with what you

16  observed in Exhibit 143?

17  *A.*  Yes, it is.  The clothing that the main individual who's

18  speaking is the same clothing as one of the individuals in the

19  other photograph.  And the individual with the blue shirt is

20  also crouched down in the other photograph.

21  *Q.*  And do you recognize this based on your investigation into

22  the events of April 12, 2014?

23  *A.*  Yes, I do.

24      MR. LEVENTHAL:  Recognize what?  The video?

25

─────────── 2:16-cr-00046-GMN-PAL ───────────

1   BY MS. AHMED:

2   *Q.*  Do you recognize the individual depicted in the video?

3   **A.**  Yes, I do.

4        MS. AHMED:  Turning back to Exhibit 143 just for

5   counsel, Court, and the witness.

6   BY MS. AHMED:

7   *Q.*  Is the image depicted in this consistent with what you

8   observed in Exhibit 83?

9        MR. JACKSON:  I'm going to object.  His statement on

10  this is irrelevant.  What he sees can be easily determined the

11  same by the jury.  He wasn't there.  He's simply commenting on

12  what some other exhibits that have been introduced on and it's

13  irrelevant, his testimony, as to what he sees in this because he

14  wasn't there.  And he did not take the pictures, and he was not

15  there when they were taken.

16       MR. LEVENTHAL:  There's no time on this, as well,

17  anywhere on this as to when this was taken, whether it's been

18  Photoshopped, whether it was used by some media organization to

19  put in a newspaper to better -- or sell more papers.  We don't

20  know and I can't ask him about it.

21       THE COURT:  Ms. Ahmed?

22       MS. AHMED:  Your Honor, I would say that all of these

23  arguments go to the weight; not the admissibility.  The

24  threshold for authenticity, as the Court is well aware, is

25  minimal in this context.  It's just -- he can articulate -- he's

1    already articulated that he recognizes the people in the

2    foreground, that he recognizes the BLM.  He indicated he

3    recognizes the terrain.

4         I can ask further questions about the bridges that are

5    depicted in it, but he's laid sufficient foundation to say that

6    this is what it purports to be.  And any of those arguments that

7    counsel raises go to weight; not admissibility.

8         THE COURT:  All right.  So this is a screen shot of

9    something that he saw on a publicly available website and he

10   saved this screen shot.

11        MS. AHMED:  He downloaded it.

12        THE COURT:  And you're offering it under Federal

13   Rule 901, and the evidence is that he's familiar with the

14   distinctive characteristics that are depicted in that photo when

15   compared to the other photos?

16        MS. AHMED:  Correct, Your Honor.  It would be no

17   different than if he was discussing closed-circuit cameras that

18   he had seen in any other kind of criminal cases where those

19   kinds of things are utilized.

20        THE COURT:  Well, right.  And so the purpose of the ...

21        All right.  So it is admissible, but the weight to be

22   given to it will be up to the jury as to decide how much weight

23   to be given to it.

24        MR. TANASI:  Your Honor, if --

25        THE COURT:  The distinctive characteristics, the

2:16-cr-00046-GMN-PAL

1   appearance, the content, the substance, the patterns, other

2   distinctive characteristics taken together with all of the

3   circumstances; but, again, the weight -- it's up to the jury how

4   much weight to give to it.  That's 901(b)(4).

5         MR. TANASI:  Your Honor, I understand the Court's

6   ruling.  If I may just add one more thing with respect to the

7   hearsay on the bottom.  I don't know if the Court's addressed

8   that issue.

9         THE COURT:  I haven't addressed that issue.  Do you

10  want it to be redacted?  I see there's already one portion that

11  says redacted.

12        MS. AHMED:  Your Honor, we have no problem --

13        THE COURT:  At least on my copy.

14        MS. AHMED:  I apologize, Your Honor.  The government

15  has no problem redacting further if counsel indicates if it's

16  the title or the caption.  Our interest is in the photograph.

17        THE COURT:  So is there something else that you are

18  requesting to be redacted so we can entertain that?

19        MR. MARCHESE:  We would prefer it just be the

20  photograph, at least Parker does.

21        MR. TANASI:  That's correct.  Stewart joins, Your

22  Honor.

23        MS. AHMED:  Your Honor, the government would move to

24  admit the redacted Exhibit 143.  We can, for purposes of

25  publishing to the jury, just pull out the photograph and submit

—————————————— 2:16-cr-00046-GMN-PAL ——————————————

1  an actually redacted version.

2           THE COURT:  All right.  We'll do that.

3           MS. AHMED:  If counsel's comfortable with this being

4  published to the jury, the government would move to admit 143

5  and to have it published to the jury.

6           THE COURT:  All right.  143 will be admitted in

7  redacted form.

8           (Government's Exhibit 143 is admitted in redacted

9  form.)

10           MS. AHMED:  Your Honor, may we publish?

11           THE COURT:  Yes.

12  BY MS. AHMED:

13  *Q.*  Agent Woolstenhulme, can you just describe briefly what's

14  depicted in this, for the jury.

15  **A.**  It's two individuals that are on the bridge.  It's the

16  northbound lane of I15 near Bunkerville or Mesquite, Nevada.

17  One individual is laying down on the ground with a rifle pointed

18  between the crack in-between the concrete barriers.  Another

19  individual is, I don't know, five yards away or so crouching

20  with his head just up over the barrier looking down toward where

21  the BLM vehicles are and where there's --

22           MR. LEVENTHAL:  Objection, calls for speculation.

23           MR. TANASI:  Stewart joins.

24           THE COURT:  You want to just ask a different question?

25           MS. AHMED:  Yes, Your Honor.

—2:16-cr-00046-GMN-PAL—

1  BY MS. AHMED:

2  *Q.*  Do you indicate -- do you see in this exhibit where the

3  BLM -- where BLM vehicles are, if any?

4  *A.*  Yes.

5  *Q.*  Can you circle where they are.

6  *A.*  (Witness complies.)

7  *Q.*  With respect to the individual in the blue shirt in the

8  foreground, just general direction that the individual's

9  looking --

10         MR. LEVENTHAL:  Objection, speculation.

11         MR. TANASI:  Stewart joins.

12         MR. MARCHESE:  Parker joins.

13  BY MS. AHMED:

14  *Q.*  -- north, south, east, west, generally what direction is it?

15  *A.*  It's looking northward.

16         MS. AHMED:  You can take that down.  Thank you.

17         Your Honor, may we publish to the witness, counsel, and

18  the Court what's been marked for identification as Government's

19  Exhibit 460?

20         And can we pull out just the photograph.

21  BY MS. AHMED:

22  *Q.*  Focusing on what's been pulled out, zoomed in,

23  Agent Woolstenhulme, on Exhibit 460, do you recognize what this

24  is?

25  *A.*  Yes, I do.

————— 2:16-cr-00046-GMN-PAL —————

1  *Q.*  Is this an item that you yourself downloaded from the

2  Internet -- or captured from the Internet?

3  **A.**  Yes, it is.

4  *Q.*  And how did you find this item?

5  **A.**  Similar manner as described before.  I typed in key word

6  searches for -- you know, in Google images, you know, Bundy

7  Ranch, militia, standoff, you know --

8  *Q.*  Do you -- generally describing -- can you generally describe

9  the content of Exhibit 460.

10  **A.**  It appears to be the same individual from the previous

11  photograph.  This time he's not laying down.  He's crouching and

12  appears to be looking over the concrete barrier while holding a

13  rifle.

14  *Q.*  Do you recognize anything else in this -- do you recognize

15  this as having taken place on April 12, 2014?

16  **A.**  Yes, I do.

17  *Q.*  And how do you recognize it as such?

18  **A.**  The individual depicted in the photograph, the primary

19  subject of the photograph, is wearing the same clothing as in

20  other photographs and other videos that have been positively

21  identified and dated at that time and that place.

22  *Q.*  Do you also recognize anything else in the photograph

23  that -- as to where it's taken?

24  **A.**  Yeah.

25          MR. LEVENTHAL:  I'm going to object to the prior

 1   answer.  Move to strike as hearsay or foundation.

 2           THE COURT:  He's describing what he sees in the

 3   photographs.

 4           MS. AHMED:  Yes.

 5           MR. LEVENTHAL:  No, he indicated that it's consistent

 6   with time, place.  There's no indication of any time on this.

 7   So what is it consistent with?  And if he's testifying that it's

 8   consistent with a certain time, it would be hearsay since he

 9   wasn't there.

10           MS. AHMED:  Your Honor, he can speak to the general --

11           THE COURT:  If you stick to comparison, I think it

12   would be easier to get through this.

13           MR. TANASI:  Stewart joins, Your Honor.

14           MR. MARCHESE:  Parker joins.

15           MR. ENGEL:  Engel joins.

16           MS. AHMED:  So, Your Honor, were you advising -- were

17   you telling me to ask --

18           THE COURT:  Yes, please.

19   BY MS. AHMED:

20   *Q.*  Comparing Exhibit 460 to Exhibit 143, do you recognize the

21   content of Exhibit 460?  143 was what was previously shown to

22   the jury.

23   *A.*  Yes.

24   *Q.*  And what features of 460 are consistent with 143?

25   *A.*  The clothing the individual is wearing, the location -- the

—— 2:16-cr-00046-GMN-PAL ——

1  general location where he's at is very close to where the other

2  picture was taken, and the scene in the background, it looks

3  similar to the same terrain.

4  *Q.*  And are you familiar, both from the investigation and

5  personal knowledge, of the roadways that are depicted in Exhibit

6  460?

7  **A.**  Yes.

8  *Q.*  And are they consistent with what you observed in Exhibit

9  143?

10  **A.**  Yes.

11        MS. AHMED:  Your Honor, government moves to admit

12  Exhibit 460.

13        MR. LEVENTHAL:  Same objections.

14        MR. MARCHESE:  Same objection, Your Honor.  And also

15  the same objection as to the verbiage around the picture.

16        MS. AHMED:  And, Your Honor, we would propose to only

17  admit what's been pulled out, which is just the photograph.

18        THE COURT:  All right.

19        MR. TANASI:  Stewart joins, Your Honor.

20        MR. ENGEL:  Engel joins.

21        MR. PEREZ:  Lovelien joins.

22        MR. JACKSON:  Burleson joins.

23        MR. LEVENTHAL:  My objection is the whole thing.  I

24  want to be clear on the record that it's to the whole thing, not

25  just the verbiage, on behalf of Mr. Drexler.

 1          THE COURT:  All right.  And the same ruling.  It's

 2   admissible under 901(b)(4) with redactions; not without.  And,

 3   again, it's up to the jury to decide the weight to give to the

 4   photograph.

 5          MR. TANASI:  And, Your Honor, for the record, Stewart

 6   joins Mr. Drexler's objection as well.

 7          THE COURT:  Thank you.

 8          MR. TANASI:  Thank you.

 9          COURTROOM ADMINISTRATOR:  Your Honor, to be clear,

10   Exhibit 460 has been admitted?

11          THE COURT:  Yes, 460 is admitted, but with redactions

12   so that it's only the photograph and no written materials.

13          (Government's Exhibit 460 is admitted in redacted

14   form.)

15          MS. AHMED:  Your Honor, may we publish to the jury

16   what's currently on the screen.

17          THE COURT:  Yes.

18   BY MS. AHMED:

19   *Q.*  Agent Woolstenhulme, can you describe to the jury generally

20   what's depicted in Exhibit 460.

21   **A.**  An individual is crouched on the northbound I15 bridge near

22   Bunkerville, Nevada, looking over the concrete barrier generally

23   in the north/northeast direction.

24          MS. AHMED:  And, Your Honor, may we take this down and

25   publish to the witness what's been marked for identification as

1  Government's Exhibit 149?

2          THE COURT:  Yes.

3          MS. AHMED:  Just to witness, counsel, and the Court.

4  And can we zoom in just on the photograph.

5  BY MS. AHMED:

6  *Q.*  Agent Woolstenhulme, do you recognize what is depicted in

7  Exhibit 149?

8  *A.*  Yes, I do.

9  *Q.*  Is -- do you see -- is this an image that you yourself

10  obtained in the course of your investigation?

11  *A.*  I found it on the Washington Post website.

12  *Q.*  And did you yourself capture this image using a screen shot?

13  *A.*  Yes, I screen-shot captured it.

14  *Q.*  Looking at the individual in the foreground that I've

15  circled in red, is this individual -- is there anything about

16  this individual that you recognize as being consistent with what

17  was depicted in Exhibit 143 and Exhibit 460?

18  *A.*  Yes, the black hat, the color of the shirt, color of the

19  pants, you know, the rifle, laying on the bridge overlooking the

20  same wash as in the other photos.

21  *Q.*  And circling vehicles that are in the background of this

22  exhibit, 149, do you recognize whether or not they are

23  consistent with what you observed in Exhibit 143?

24  *A.*  Yes, those are BLM vehicles.

25  *Q.*  Circling an individual that appears on the far right of this

——— 2:16-cr-00046-GMN-PAL ———

1  photograph, do you recognize that individual as being depicted

2  in Exhibit 143?

3  *A.*  Yes.

4  *Q.*  And circling this roadway, do you also recognize this from

5  Exhibits 143 and 1 -- 460?

6  *A.*  Yes, that's the southbound I15 bridge.

7  *Q.*  Based on your investigation and all of these features that

8  were highlighted, was this taken on April 12th, 2014?

9  *A.*  Yes.

10         MS. AHMED:  Your Honor, the government moves to admit

11  Exhibit 149.

12         THE COURT:  Same objection?

13         MR. TANASI:  Same objection Stewart, Your Honor.

14         MR. MARCHESE:  Parker joins.

15         MR. LEVENTHAL:  Same objections.

16         MR. ENGEL:  Engel joins.

17         MR. PEREZ:  Lovelien joins.

18         MR. JACKSON:  Burleson joins.  I also join on the

19  grounds of relevancy to my client.

20         THE COURT:  All right.  So same ruling.  It's

21  admissible under 901(b)(4), distinctive characteristics,

22  appearance, contents, the substance, the patterns, and other

23  distinctive characteristics of the item taken, together with all

24  the circumstances.

25         MS. AHMED:  Your Honor --

─────2:16-cr-00046-GMN-PAL─────

1        THE COURT:  Again, just the redacted version; not with

2   the rest of the article.  Just the photo that's part of the

3   article.

4        MS. AHMED:  Understood, Your Honor.  Your Honor, may we

5   publish this pulled-out version of the exhibit to the jury?

6        THE COURT:  Yes.

7        (Government's Exhibit 149 is admitted in redacted

8   form.)

9   BY MS. AHMED:

10  *Q.*  Agent Woolstenhulme, can you explain to the jury again

11  what's generally depicted in Exhibit 149.

12  **A.**  It's a photograph that was displayed on the Washington Post

13  website.  An individual is laying on the northbound I15 bridge,

14  appears to be looking down the barrel of his rifle --

15        MR. LEVENTHAL:  Objection, speculation.

16        MS. AHMED:  Your Honor, he's describing just what he

17  observes.

18        THE COURT:  Yes, he's describing what he observes.

19        MR. JACKSON:  Your Honor, the picture speaks for

20  itself.  I don't think he needs to describe it.  That's not a

21  thing that an expert needs to describe.

22        MS. AHMED:  This is no different than any other witness

23  describing what's been depicted in an exhibit.

24        THE COURT:  Yeah, he can describe it.  Overruled.

25        THE WITNESS:  He appears to be looking down his rifle,

—— 2:16-cr-00046-GMN-PAL ——

1  which is laying between two concrete barriers and pointed in the

2  general north/northeast direction toward where the crowd is in

3  the southbound I15 bridge and the BLM vehicles are parked.

4  BY MS. AHMED:

5  Q.  Drawing your attention to what I've circled in red on the

6  far left of this image, can you describe to the jury what that

7  appears to be.

8  A.  It appears to be a person crouching.  You can see the knee

9  and some camouflage pants and some, looks like, a vest and some

10 things hanging from it.

11       MS. AHMED:  You can take that down.  Thank you.

12       Your Honor, may we -- well ...

13 BY MS. AHMED:

14 Q.  Agent Woolstenhulme, can I turn your attention to the

15 binders, what's been marked for identification as Government's

16 Exhibit 304.

17 A.  Okay.

18 Q.  Do you recognize what is Government's Exhibit 304?

19 A.  Yes.

20 Q.  Does it appear to be a CD or a DVD of some sort?

21 A.  Yeah, it appears to be a disc.

22 Q.  And prior to coming to court today, did you review the

23 contents of Exhibit 304?

24 A.  Yes, I did.

25 Q.  And do they fairly and accurately depict what you yourself

1    observed from the Internet?

2    *A.*   Yes.

3    *Q.*   Now, the -- with respect to Exhibit 304, is it a video?

4    *A.*   Yes, it's a video.

5    *Q.*   And on what date was that video made?

6    *A.*   On April 12th, 2014.

7    *Q.*   Now, is there anything depicted in the video that you

8    recognize from your investigation, in terms of terrain?

9    *A.*   Yes, it appears to be taken on the roadway, I believe it was

10   the northbound I15 bridge, near the bridge.

11   *Q.*   Does it depict any other roadways of Interstate 15 that you

12   recognize from April 12th, 2014?

13   *A.*   There's -- there's a dirt road that comes up out of a wash

14   and Ts into the interstate in the video.

15   *Q.*   Does the video include vehicles that you recognize as being

16   present in that area on April 12th, 2014?

17   *A.*   Yes, it includes numerous BLM vehicles, a local police

18   vehicle, National Park Service vehicles, other government

19   vehicles.

20   *Q.*   Does it include any media vehicles that you also recognize

21   as being present on April 12th, 2014, in that area?

22   *A.*   Yes, there's a white van with a satellite dish on top parked

23   near the intersection of the dirt road and the I15.

24   *Q.*   Does the video feature any audio that you recognize from

25   your investigation as taking place on April 12th, 2014?

2:16-cr-00046-GMN-PAL   Document 1828   Filed 04/06/17   Page 198 of 246

V. 1,1

─── 2:16-cr-00046-GMN-PAL ───

1   *A.*  Yes, the person taking the video curses at the BLM vehicles

2   as they're departing.

3   *Q.*  And are you familiar with that individual's voice, from the

4   investigation?

5   *A.*  Yes.

6   *Q.*  Now, in terms of this exhibit, can you describe where you

7   obtained it from, this video.

8   *A.*  I identified the Facebook page of Facebook.com/Todd

9   Engel982, I think.  It appeared to be the account -- the

10  Facebook account of Todd Engel.

11  *Q.*  And how did you know that the --

12          MR. LEVENTHAL:  I'm going to object.  Move to strike.

13  Speculation.

14          THE COURT:  All right.  That last part where it says,

15  Appeared to be the Facebook of Todd Engel, I don't think that

16  there's --

17          MS. AHMED:  Your Honor, I'll ask questions.

18          THE COURT:  I'll strike that part, but where he says

19  that he found it on a Facebook page that said Todd Engel, that

20  part is admissible.

21  BY MS. AHMED:

22  *Q.*  Did you observe anything else on that Facebook page in terms

23  of photographs that were depicted there?

24          MR. LEVENTHAL:  Well, I'm going to again object since

25  he doesn't know what Facebook page that he was on because he's

PATRICIA L. GANCI, RMR, CRR

1   speculating.

2          MR. TANASI:  Stewart joins, Your Honor.

3          MR. MARCHESE:  Parker joins.

4          MR. ENGEL:  Engel joins.

5          MS. AHMED:  He indicated he believes it was Todd

6   Engel 982.

7          THE COURT:  He can't say that he believes it was Todd

8   Engel unless there was a basis to believe that.  He can testify

9   that he found a Facebook page that said Todd Engel --

10         MS. AHMED:  I think he was describing --

11         THE COURT:  -- purporting to be a Todd Engel Facebook

12   page, but --

13   BY MS. AHMED:

14   Q.  Can you explain to the jury, was there a location that you

15   found this video on the Internet that you could see the

16   location, from your computer?

17         MR. LEVENTHAL:  I'm going to object.  Asked and

18   answered.

19         MS. AHMED:  Well, that was what he objected to.

20         THE COURT:  Right.  Yes, she didn't get to ask the

21   question.

22         Go ahead and ask the question.

23         THE WITNESS:  So there's a web address at the top.  Is

24   that what you're referring to?

25

1  BY MS. AHMED:

2  *Q.*  Yes.

3  *A.*  Okay.  So the uniform resource locator, you know,

4  www.Facebook.com/Todd.Engel.982, I think is what it was.  And it

5  brought me to a Facebook page that identified itself as -- the

6  operator of the account was Todd Engel.  And it had a photograph

7  of an individual, and that generally is a profile picture or --

8  on a Facebook page you would put a picture of yourself generally

9  in that position.

10  *Q.*  Did you -- from the profile picture -- well, did the

11  Facebook page also indicate whether there was a name associated

12  with the account you were looking at?

13  *A.*  Yes, there was a name there that said Todd Engel.

14  *Q.*  And did you observe whether there was a profile picture on

15  that account at the time that you saw this video?

16  *A.*  There was a profile page picture.

17  *Q.*  And did it depict an individual or something else?

18  *A.*  I believe it was an individual.

19          MR. LEVENTHAL:  I'm going to object.  Speculation.

20          MR. TANASI:  Stewart joins, Your Honor.

21          MR. MARCHESE:  Parker joins.

22          MR. PEREZ:  Lovelien joins.

23          MR. ENGEL:  Engel joins.

24          THE COURT:  You want to lay a foundation with how he

25  prepared for the search?

—————————— 2:16-cr-00046-GMN-PAL ——————————

1          MS. AHMED:  Your Honor, sure.  With the Court's

2    indulgence, Your Honor.

3          (Prosecution conferring.)

4          MS. AHMED:  Your Honor, turning back to Exhibit 304,

5    may we play this without sound for the witness, counsel, and the

6    Court, Exhibit 304.

7          The witness has described what's been featured in it so

8    that the Court can see it and counsel can see it as he's

9    describing the features that he recognizes, just with respect to

10   the exhibit itself.

11         THE COURT:  Right, but maybe I missed it.  Maybe you

12   said it and I just missed it.  Did he state that in preparation

13   for these searches that he reviewed various photos, including

14   of, and that's why he believes that it's the same person?

15         What is the basis for him saying that this is the photo

16   of Todd Engel being used on the profile?

17         MS. AHMED:  Well, I don't think we even got that far,

18   Your Honor, in terms of the profile picture.

19         THE COURT:  All right.  I know, but you needed to do

20   that first.  You need to explain what it is that he reviewed in

21   preparation for this search and why it was that he thought these

22   things in comparison matched and, therefore, saved them.

23         MS. AHMED:  Okay.  Just to clarify, Your Honor, it's

24   the government's intention, perhaps clumsily then, to have the

25   video -- regardless of whether he can link it to Mr. Engel's

————— 2:16-cr-00046-GMN-PAL —————

1   Facebook, that he can indicate the contents of it are

2   sufficiently similar to what he's observed from April 12th.  And

3   then whether or not he can establish that it was Todd Engel's

4   Facebook, we'll continue on with that.

5          MR. LEVENTHAL:  I'm sorry.  Did counsel say that he was

6   there on April 12th?  That he observed on April 12th?

7          MS. AHMED:  Consistent with other things that he's

8   observed regarding April 12th, based on his investigation.

9          MR. LEVENTHAL:  His investigation, Your Honor, is based

10  upon what he saw through social media, I guess.  He wasn't

11  there.  So for him to testify as to what's being played, it's

12  not relevant.

13         MS. AHMED:  Your Honor, that's just not the law.

14  Authenticity can be established via extrinsic evidence.  We've

15  had other special agents come in who talked about their

16  investigation and how they gathered materials from the Internet,

17  where they've observed things on the Internet that were

18  consistent with other things that they've seen from April 12th,

19  2014.

20         THE COURT:  Right.  That's the part that's missing, the

21  other things that he's seen and comparing to this.

22         MS. AHMED:  But, Your Honor -- right.  So separate from

23  the Facebook issue of where he got the video from, other than

24  the Internet generally, I think he can establish looking at the

25  video content that he has seen that's consistent with the

1   content in the video.

2          MR. LEVENTHAL:  Your Honor, it is consistent with the

3   law.  I'm just going to make a record.

4          THE COURT:  I think I -- well, go ahead.

5          MR. LEVENTHAL:  I'm going to make a record.  It is

6   consistent with the law, and that's why the government had to

7   bring in, so far, Mr. Ellis who authenticated some videos,

8   Mr. Lynch who authenticated some videos, as well as Mr. Gourgeon

9   who authenticated their videos.

10          Now, we have an FBI agent who does a search who's

11   trying to authenticate videos, and he doesn't know, again,

12   whether they've been Photoshopped, whether they've been used for

13   other purposes, and he can't testify because he wasn't there.

14          THE COURT:  Under 901(b)(4) that goes to the weight;

15   not to the admissibility.  The admissibility is if someone

16   testifies as to the distinctive characteristics and the like,

17   the appearance, content, substance, internal patterns, or other

18   distinctive characteristics of the item taken together with the

19   circumstances.

20          So in comparison with what?  I think you need to elicit

21   that first.  What is he comparing this to that causes him to

22   believe that there is a similarity of the distinctive

23   characteristics?

24          MR. JACKSON:  Your Honor, I'd just like to say one

25   thing, if I may.  I think under Daubert, I don't think he

—2:16-cr-00046-GMN-PAL—

 1  qualifies as an expert to be able --

 2          THE COURT:  He's not testifying as an expert.

 3          MR. JACKSON:  -- anything more than the jury can in

 4  terms of evaluating photos to make a comparison.  And I just say

 5  that for the record.  I'll submit it with that.

 6          THE COURT:  All right.  So that's noted.  He's not

 7  testifying as an expert.

 8          MS. AHMED:  He is not, Your Honor.

 9          THE COURT:  The government is not proffering him as an

10  expert.  This is a 901(b) Electronic Evidence Rule.

11          MS. AHMED:  Yes, Your Honor.

12  BY MS. AHMED:

13  *Q.*  Agent Woolstenhulme, can you explain, prior to obtaining

14  Exhibit 304, this video, what had you reviewed that indicated to

15  you that Exhibit 304 was taken on April 12th, 2014, from the

16  area of the BLM's impoundment site?

17  *A.*  I reviewed the airplane surveillance video from the FBI

18  surveillance plane, so I was generally familiar with the

19  movements of the crowd.  I reviewed newspaper articles that were

20  publicly available.  I conducted interviews of some of the BLM

21  agents who were present that day and their descriptions of what

22  occurred.

23  *Q.*  Specifically, did they describe leaving their impoundment

24  site?

25  *A.*  Yes.

 1            MR. JACKSON:  Objection, leading.  Also calls for

 2 hearsay.

 3            MR. LEVENTHAL:  Drexler joins.

 4            MR. MARCHESE:  Parker joins.

 5            MR. TANASI:  Stewart joins.

 6            MR. ENGEL:  Engel joins.

 7            MR. PEREZ:  Lovelien joins.

 8 BY MS. AHMED:

 9 Q.  What, if anything, did they say about their exit from the

10 impoundment site?

11            MR. JACKSON:  It still calls for hearsay.  I object.

12            THE COURT:  Sustained.

13            MS. AHMED:  Your Honor, it is foundational for an

14 exhibit.  It's not being offered for -- it's just for him to be

15 able to establish this is consistent with what they said, for

16 purposes of the foundation of this -- and authenticity of this

17 exhibit.

18            THE COURT:  All right.  Then ask him about the

19 distinctive characteristics.

20            MS. AHMED:  Your Honor, may I show the witness the

21 video so that he can describe how those -- what's depicted in

22 the video is consistent with other things that he saw that

23 day -- from that day.  Your Honor, may we play it without sound

24 for the witness, counsel, and the Court?

25            THE COURT:  Yes.

2:16-cr-00046-GMN-PAL

1          (Video playing.)

2          MS. AHMED:  Can we stop it here.

3  BY MS. AHMED:

4  *Q.*  Agent Woolstenhulme, is there anything that's on the screen

5  at this moment that is consistent with the aerial footage or

6  other materials that you observed with respect to events taking

7  place on April 12th, 2014?

8  *A.*  There's a news van.

9  *Q.*  Can you circle where that is.

10 *A.*  (Witness complies.)

11 *Q.*  Continue with respect to the news van.

12 *A.*  Okay.  It's a white van with a satellite dish on top, parked

13 at the intersection of a dirt road and I15.

14 *Q.*  Then clearing that.

15          Do you recognize anything else from the terrain of this

16 screen that allows you to compare it to something you've

17 previously seen with respect to April 12th, 2014?

18 *A.*  It's the wash where the BLM were gathering cattle.

19 *Q.*  Specific to the roadways, do you recognize anything?

20 *A.*  There's two lanes of traffic, the northbound and a

21 southbound I15.  And there's a -- I guess, the emergency

22 responders cut-across lane there that the BLM vehicles are

23 crossing to get over the southbound lanes and onto the

24 northbound lanes to go north on I15 toward Mesquite.

25          MS. AHMED:  Can we continue to play the video.

———————— 2:16-cr-00046-GMN-PAL ————————

1          (Video playing.)

2          MS. AHMED:  Stopping there.  Can you go back so that

3   you can see the other side.

4   BY MS. AHMED:

5   Q.  Is there anything that's depicted on the area that I've

6   circled, from your investigation that you've previously seen,

7   that you recognized in this video?

8   A.  Yes, that's the area where the, I guess, the -- I think it

9   was the State Police had blocked off, and so they wouldn't allow

10  nongovernmental vehicles beyond that point down the road into

11  the wash.

12          MR. LEVENTHAL:  I'm going to object, nonresponsive.

13  BY MS. AHMED:

14  Q.  Specifically with respect to the inner circle that I've

15  indicated on the screen, do you recognize what those are from

16  things you've previously seen regarding April 12th, 2014?

17  A.  There's two police vehicles parked there.

18          MS. AHMED:  Can we continue to play.

19          (Video playing.)

20          MS. AHMED:  Can you stop it there.  Can you move it

21  back so we can see that vehicle.

22  BY MS. AHMED:

23  Q.  Circling a vehicle that's on the roadway in the foreground

24  of this screen, do you recognize that from anything that you had

25  seen -- or from your investigation regarding the events of

——— 2:16-cr-00046-GMN-PAL ———

1    April 12th, 2014?

2    *A.*   Yes, that's a BLM official government vehicle.

3           MR. LEVENTHAL:  Objection, nonresponsive.  The question

4    was has he seen that from his prior investigation; not what is

5    it.  We can all see what it is.

6           MS. AHMED:  Your Honor, I can --

7           THE COURT:  He said, Yes, it's a --

8           MR. LEVENTHAL:  But --

9           THE WITNESS:  I said, Yes, I see it.  I've seen it.  I

10   know what it is.

11          MS. AHMED:  He was just going further in explaining.

12   BY MS. AHMED:

13   *Q.*   So you recognize this from your investigation?

14   *A.*   Yes.

15   *Q.*   Prior to obtaining this video?

16   *A.*   Yes.

17          MS. AHMED:  Can we continue to play.

18          (Video playing.)

19          MS. AHMED:  Can we pause it here for a moment.

20   BY MS. AHMED:

21   *Q.*   Agent Woolstenhulme, do you recognize anything about the

22   traffic that's depicted in this video as being consistent with

23   other things that you observed regarding April 12th, 2014, prior

24   to obtaining this video?

25   *A.*   The traffic on I15 northbound is stopped and -- to allow for

 1   the BLM vehicles and other federal vehicles that were down in

 2   the wash to get on the freeway and --

 3            MR. LEVENTHAL:  Objection, calls for speculation,

 4   Judge.

 5            MS. AHMED:  Your Honor, this is -- he's describing what

 6   he learned through his investigation and how this is consistent

 7   with what he learned.

 8            MR. LEVENTHAL:  How does he know what -- why the NHP or

 9   anybody was doing anything at the time if he's basing what he's

10   seeing on aerial views?

11            THE COURT:  He said he interviewed BLM agents.  You can

12   cross-examine him on the weight.

13   BY MS. AHMED:

14   *Q.*  You can continue your explanation.

15   *A.*  The BLM vehicles are pulling onto the northbound I15 freeway

16   and driving away.

17   *Q.*  And with respect to the traffic being stopped?  I think you

18   were interrupted.  If you can complete your answer as to that.

19   *A.*  Yeah, the traffic is stopped, I guess, up the road a little

20   bit further south on the northbound lane.  No traffic is moving.

21   *Q.*  And is that consistent with what you had learned prior to

22   obtaining this through your investigation?

23   *A.*  Yes.

24   *Q.*  And specifically through speaking with BLM officers?

25   *A.*  Yes.

1          MS. AHMED:  Can we continue to play it.

2          THE COURT:  Is there any part -- this is a long video.

3   Is there any part of this video that is not consistent with what

4   he has been -- what he had reviewed?

5          MS. AHMED:  Not -- no, Your Honor.

6          THE COURT:  You're tendering the entirety of the video?

7          MS. AHMED:  Yes, Your Honor.

8          THE COURT:  All right.  And so the objections are as to

9   hearsay, lack of foundation.  Anything else?

10         MR. ENGEL:  Relevancy.  I object to relevancy.

11         MR. JACKSON:  I join in that, Judge.

12         MR. LEVENTHAL:  Authenticity.

13         MR. ENGEL:  It's more probative than prejudicial.

14         MR. JACKSON:  And cumulative.

15         MR. ENGEL:  More prejudicial than probative.

16         MR. PEREZ:  Lovelien joins in all objections.

17         MR. TANASI:  Stewart joins, Your Honor.  And I'd add

18  just with authenticity.  We still don't have a time.

19         MR. MARCHESE:  Parker joins.

20         THE COURT:  We don't need to have a time, but it's

21  clear from what's being depicted the time could be determined by

22  other information, at least the chronology of what we're seeing.

23         MS. AHMED:  Your Honor --

24         THE COURT:  Not the exact minute and second.

25         MS. AHMED:  Your Honor, the government would move to

1   admit Exhibit 304.  I think authenticity has been established.

2   He's established several features of this video that are

3   consistent with his investigation.

4           As to the other objections, it's relevant to the

5   charges.  One of which is extortion and one of which is

6   conspiracy to cause officers to leave their location.  There's

7   clearly evidence of that obtained -- depicted in this video.

8   And they're certainly not more prejudicial than probative.  It

9   goes exactly to those elements of those offenses.

10          MR. TANASI:  Which, Your Honor, I would point out is

11  why the time is so important.

12          THE COURT:  All right.  Well, that goes to the weight.

13          The Court agrees that the admissibility foundation has

14  been laid.  It's not overly cumulative, and it's not hearsay.

15  And I think -- what was the other one?

16          MR. ENGEL:  How is it relevant, Your Honor?

17          THE COURT:  It's relevant to the charge of -- I'm

18  trying not to speak because I don't want -- I don't want the

19  jury to think that I'm making any particular finding that is up

20  to them to make factually.  But the basis of it does go to one

21  of the offenses and charges, the allegation as stated by the

22  government.  And the Court agrees that it's not overly

23  prejudicial under 403.

24          So I think I've addressed the relevancy, authenticity,

25  hearsay, and 403, and it's not cumulative.  So Exhibit 304 will

—— 2:16-cr-00046-GMN-PAL ——

1  be admitted.

2          (Government's Exhibit 304 is admitted.)

3          MR. TANASI:  Your Honor, if I may.  I'm sorry.  Just

4  for the record, as far as hearsay, what was the Court's ruling?

5  I think you said you've addressed it.  I just want to make sure

6  I understand how it ...

7          THE COURT:  Well, we haven't -- there's the audio.

8          MR. TANASI:  There is audio.  I'll represent to the

9  Court in my listening to it --

10          THE COURT:  He said the audio was of a voice of a

11  person that he recognized.  He found this on the Facebook page

12  of Todd Engel.

13          MS. AHMED:  Correct, Your Honor.  And, Your Honor,

14  there is an audio.  I was about to raise that with the Court

15  that there is audio, and there is comments that are made in this

16  video.  I don't know if the Court wants to view it outside the

17  presence of the jury.

18          THE COURT:  So it's admission or 801(d)(2)(E) for the

19  others.

20          All right.  Let's go ahead and take our afternoon

21  break, get a stretch.

22          I'd remind the jury that we are not to discuss this

23  case with anyone.  Do not read or listen to or view anything

24  that touches upon this case in any way.  Do not perform any

25  research or make any independent investigation.  And do not form

—2:16-cr-00046-GMN-PAL—

1    an opinion about the case until after you have heard all the

2    evidence, seen all the -- seen all the evidence, heard of all

3    the testimony, and been provided with the jury instructions of

4    law.  Then you'll hear the closing arguments, and then you will

5    begin your deliberation process.

6         It's 2:54.  Let's be back here by 3:10.  And we'll all

7    stand for the jury.

8         And after they exit, then, Special Agent Woolstenhulme,

9    you can also take your stretch break, use the bathroom, whatever

10   you need to.  If you'll just please be back here by 3:05.

11        Is that what I said, 3:05 or 3:10?

12        3:10.  I'm sorry.  Be back here by 3:10.

13        (Whereupon jury leaves the room at 2:55 p.m.)

14        THE COURT:  Off record.

15        (Recess taken at 2:55 p.m.)

16        (Resumed at 3:19 p.m.)

17        THE COURT:  Thank you.  You may be seated.

18        Aaron, please get the jury.

19        Ms. Ahmed, you wanted to play the audio outside the

20   presence of the jury?

21        MS. AHMED:  Your Honor, actually the government at this

22   time will reserve admission of this 304 and will -- having

23   established that the witness downloaded it, will seek admission

24   with another witness.

25        THE COURT:  All right.  So are you withdrawing 304?

───────────── 2:16-cr-00046-GMN-PAL ─────────────

1          MS. AHMED:  For admission, yes, Your Honor.

2          THE COURT:  Okay.

3          MS. AHMED:  Thank you.

4          THE COURT:  Go ahead and call the jury.

5          COURTROOM ADMINISTRATOR:  Yes, Your Honor.

6          (Whereupon jury enters the room at 3:23 p.m.)

7          THE COURT:  All right.  Everyone may be seated.  We're

8   joined by the jury, and we have Special Agent Woolstenhulme back

9   on the witness stand.

10          Thank you, sir.

11          And, Ms. Ahmed, you may continue with your direct

12   examination.

13          MS. AHMED:  Thank you, Your Honor.

14   BY MS. AHMED:

15   *Q.*  Agent Woolstenhulme, turning you back to Exhibit 304.  Where

16   did you observe this video on the Facebook account that you

17   described?

18   *A.*  In the Facebook account there's a section that's called

19   Albums.  You can click on that, and it will have photos or

20   videos.  I clicked on the -- I was actually on the timeline, I

21   believe.

22   *Q.*  Can you explain to the jury when you say, "on the timeline,"

23   what you mean.

24   *A.*  Okay.  So in Facebook every time you put a -- an update to

25   your account or a post, it shows up in a timeline.  So whatever

 1  you type or submit to your Facebook account shows up at the top

 2  of the feed, and then something new -- if you add something new,

 3  it gets pushed down and the newest thing is on top.  And all of

 4  that is stored, and you can search it and go back as far as your

 5  Facebook account has existed unless you change your privacy

 6  settings to make it private.

 7  Q.  So was the video that you observed that's contained in

 8  Exhibit 304, was it something that that account, the account

 9  with the name Todd Engel, was it sharing from somebody else or

10  was it something that they themselves had --

11         MR. LEVENTHAL:  Objection, calls for speculation.

12  BY MS. AHMED:

13  Q.  Based on your familiarity, based on your training and

14  experience with Facebook, could you tell whether it was

15  something that that account had posted to their timeline or

16  whether it was posted on that timeline through some other

17  fashion?

18         MR. LEVENTHAL:  Same objection.

19         THE COURT:  Overruled.  He can answer the question as

20  to whether he could tell.

21         MR. LEVENTHAL:  Then my objection is to foundation.

22         THE COURT:  He testified about his training and

23  experience.  Overruled.

24  BY MS. AHMED:

25  Q.  Could you tell -- initially looking at it, can you tell

1  whether that account was posting it or whether it was shared

2  from another account or it was posted on that timeline in some

3  other fashion?

4  *A.*  Yes, you can -- I could tell.

5  *Q.*  And was it posted by that account to its own -- to the

6  account --

7          MR. LEVENTHAL:  Objection, leading.

8          THE WITNESS:  It was --

9          MR. LEVENTHAL:  Objection, leading.

10         THE COURT:  Just a minute.  Don't answer the question.

11         Rephrase the question.  It's leading.

12  BY MS. AHMED:

13  *Q.*  So what did you observe with respect to the poster of that

14  video on that timeline?

15  *A.*  The video was posted by the user of the account.

16  *Q.*  Could you -- based on your training and experience with

17  Facebook, could you tell whether this was a video that was

18  obtained -- well, that the account holder was sharing a link --

19         MR. LEVENTHAL:  Objection, leading.

20         MS. AHMED:  Your Honor, I asked him whether he could

21  tell one or other options; not indicating to him a result -- the

22  answer.

23         THE COURT:  Well, I think you are indicating to him,

24  but ...

25         MS. AHMED:  Your Honor, I can rephrase.

1          THE COURT:  Yeah, rephrase it.

2    BY MS. AHMED:

3    *Q.*  What can you tell about this video that appeared on the Todd

4    Engel Facebook page in terms of where the content was coming

5    from, based on your training and experience with Facebook?

6    **A.**  In the timeline it said:  Todd Engel posted a video, or

7    shared a video, I don't remember the exact word used.  And then

8    it had the video in the timeline there.

9    *Q.*  Based on your training and experience with Facebook, could

10   you tell whether it was being shared from another source or that

11   was something that person had captured -- or that account was

12   uploading that video?

13          MR. TANASI:  Your Honor, I'm just going to object to

14   the line of questioning on foundation.  In talking about a

15   timeline and Facebook, I would say it assumes facts not in

16   evidence.  I don't know that we've seen anything from

17   Mr. Engel's timeline, Facebook, any of those foundational pieces

18   that he's now just testifying that he's seeing.

19          THE COURT:  Ms. Ahmed?

20          MS. AHMED:  Your Honor, he's testified, first of all,

21   to his training and experience with respect to Facebook and to

22   timelines generally.  He's speaking to what he himself observed

23   on that timeline and how he down -- where he got this video,

24   what he saw about this video.

25          THE COURT:  Objection overruled.  He can answer the

——— 2:16-cr-00046-GMN-PAL ———

1   questions.

2          THE WITNESS:  Could you restate the question?

3   BY MS. AHMED:

4   *Q.*  Was it uploaded by that user, as far as you could tell based

5   on your training and experience, or was it shared from another

6   source?

7   *A.*  It was uploaded by the user.

8   *Q.*  And can you explain what that means.  When something is

9   uploaded, can you explain that to the jury.

10  *A.*  In Facebook, to get something on your timeline, it has to

11  come from a source somewhere so you can take it from your

12  computer and share it to Facebook's server.  And then it is now

13  on Facebook and it's viewable to everybody else.  Or you can,

14  you know, copy a link to another video that's on YouTube.  Or if

15  one user wants to share their video or their picture with

16  another user, they can right click on it and there's a little

17  share icon and you can indicate which user you want to share

18  that content with.  And then it will show up on that person's

19  timeline as well.

20         And then the other person's timeline, it'll say, you

21  know, the original poster shared a video with, you know, the

22  user of the other account.

23  *Q.*  So based on your training and experience with Facebook, what

24  account was the originator of that video?

25  *A.*  The one identified as Todd.Engel.982.

—— 2:16-cr-00046-GMN-PAL ——

1          MS. AHMED:  Your Honor, the government will reserve

2    seeking admission of Exhibit 304 for another witness at the

3    time.

4          THE COURT:  All right.

5          MS. AHMED:  Your Honor, with the Court's indulgence.

6          THE COURT:  Yes.

7          (Prosecution conferring.)

8          MS. AHMED:  Nothing further, Your Honor.  We'll pass

9    the witness.

10         Thank you, Agent Woolstenhulme.

11         THE COURT:  Cross, Mr. Tanasi?

12         MR. TANASI:  Thank you, Your Honor.

13                      CROSS-EXAMINATION

14   BY MR. TANASI:

15   *Q.*  Good afternoon, sir.

16   **A.**  Good afternoon.

17   *Q.*  I'm Rich Tanasi.  I represent Steven Stewart.  Just got a

18   few questions for you on cross.  Okay?

19   **A.**  Okay.

20   *Q.*  All right.

21         MR. TANASI:  Bryan, if you could please bring up 143.

22   BY MR. TANASI:

23   *Q.*  Okay, sir.  Do you see it there in front of you?  And up

24   there?

25         Okay.  Fair to say you have no idea what time this

1   picture was taken, correct?

2   *A.*   I have an indication of when the picture was taken.

3   *Q.*   Fair to say you don't know exactly what time this picture

4   was taken, yes or no?

5   *A.*   I can identify the time correlated with the surveillance

6   video within a few minutes.

7   *Q.*   As you sit here right now, do you know the time that this

8   picture was taken, yes or no?

9   *A.*   I don't know it down to the second.

10  *Q.*   Thank you, sir.

11          In this picture the gentleman in the plaid shirt, he's

12  laying down, correct?

13  *A.*   Yes.

14  *Q.*   And to the right there's a gentleman who's, I think you've

15  described it as, crouching, correct?

16  *A.*   Yes.

17  *Q.*   Okay.

18          MR. TANASI:   Bryan, if we would please look at

19  Exhibit 149.

20  BY MR. TANASI:

21  *Q.*   Okay.   In this picture, sir, see the same gentleman in the

22  plaid shirt, correct?

23  *A.*   Yes.

24  *Q.*   Okay.   Fair to say you have no idea what time this picture

25  was taken, as you sit here right now today, correct?

—2:16-cr-00046-GMN-PAL—

1  *A.*  I don't know the exact second of the day that it was taken,

2  no.

3  *Q.*  Okay.  And in this picture to the right there is a lady with

4  kind of a shirt with a -- some pattern on it, correct?

5  *A.*  Uh-hmm.

6  *Q.*  Okay.  And that lady also is crouching, right?

7  *A.*  Yes.

8  *Q.*  Okay.

9       MR. TANASI:  Bryan, if we can look at 460, please.

10  BY MR. TANASI:

11  *Q.*  All right.  We see the same gentleman in the plaid shirt,

12  correct?

13  *A.*  Yes.

14  *Q.*  Fair to say, as you sit here right now, you have no idea

15  what time this picture was taken, correct?

16  *A.*  I can tell that it was taken before the previous photo, but

17  I don't know the exact second.

18  *Q.*  How can you tell that, sir?

19  *A.*  The location of the crowd down in the wash.  In the previous

20  exhibit they were up under the bridge.  Apparently, at the time

21  they were in negotiations with BLM.  I think Ammon Bundy was up

22  there talking with the BLM agent --

23  *Q.*  But, sir, you don't know what time that occurred, do you?

24  *A.*  This was one before the crowd had moved up, so this one was

25  before the other one.

1    *Q.*  Okay.  The crowd moved up and the crowd also moved back

2    during the day, too, right?

3    **A.**  Not in this pattern.

4    *Q.*  Not in what pattern, sir?

5    **A.**  The crowd is spread out in a line.  After the negotiations

6    ended, they didn't move back maintaining that same line.

7    *Q.*  So it's your testimony that crowd pattern gives you the

8    ability to identify exactly what time a picture is taken or at

9    least some chronological order of that picture.  Is that --

10   **A.**  It allows me to --

11   *Q.*  Just yes or no, sir.

12   **A.**  It allows me to determine the --

13   *Q.*  Sir, yes or no.

14        MS. AHMED:  Objection, Your Honor.  He's not allowing

15   the witness to answer the question.

16        THE COURT:  You need to let him answer the question.

17        THE WITNESS:  It allows me to determine, to some

18   degree, the chronology of the photographs.

19   BY MR. TANASI:

20   *Q.*  To some degree, but it's not 100 percent accurate.  Fair to

21   say?

22   **A.**  I don't know the exact second of the day as I sit here on

23   the stand, but it could be determined --

24   *Q.*  Okay.

25   **A.**  -- within a reasonable amount of time.

———— 2:16-cr-00046-GMN-PAL ————

1  *Q.*  Okay.  But, again, it's not the same as if this was time

2  stamped or you had an actual way to identify exactly what time

3  of day it was, correct?

4       MS. AHMED:  Objection, asked and answered.

5       THE COURT:  He can answer the question.

6       THE WITNESS:  Could you restate the question?

7  BY MR. TANASI:

8  *Q.*  Sure.  You're essentially speculating that you can tell what

9  time chronologically this occurred based on things that you see

10  in the picture, but you have no real idea exactly what time it

11  was because it's not time stamped, correct?

12  *A.*  This photograph is not time stamped.  But when we compare it

13  to other evidence or video or photographs that are time stamped,

14  we can identify to a fair degree of accuracy when the photo was

15  taken.

16  *Q.*  And did you do that for this picture?  Were you able to look

17  at these time stamps and come to this conclusion as to exactly

18  what time this picture was taken?

19  *A.*  I personally did not look at this photo to determine the

20  time stamp.  That was done by another agent.

21  *Q.*  Fair to say, then, you don't know exactly what time this

22  picture was taken, correct?

23  *A.*  I don't know the exact second that this photograph was

24  taken.

25       MR. TANASI:  Thank you, sir.

—— 2:16-cr-00046-GMN-PAL ——

1          I'll pass the witness.

2          THE COURT:  Mr. Marchese?

3          MR. MARCHESE:  Your Honor, I'll reserve.

4          MR. JACKSON:  I've got a few questions.

5          THE COURT:  All right.  Go ahead, Mr. Jackson.

6                    CROSS-EXAMINATION

7   BY MR. JACKSON:

8   Q.  Now, you've been working law enforcement for how long?

9   A.  Approximately nine years.

10  Q.  And you said you were an analyst, some type of analyst is

11  basically your job title or your job description?

12  A.  For -- from 2008 until 2012 I was an intelligence analyst.

13  Q.  All right.  And in doing that in this case, you performed a

14  Google search for various things.  Is that right?

15          MS. AHMED:  Objection.  Misstates the witness's

16  testimony.  He was not an analyst at the time of this

17  investigation.

18  BY MR. JACKSON:

19  Q.  Well, you did perform a Google search.  Isn't that what your

20  testimony was?

21          THE COURT:  Sustained.

22          I think the misunderstanding is, he was an analyst the

23  first four years of his nine years, but during the time of this

24  event he was not an analyst.  He was already a special agent.

25

—— 2:16-cr-00046-GMN-PAL ——

1  BY MR. JACKSON:

2  *Q.* You were a special agent when this happened.  Is that right?

3  *A.* That's correct.

4  *Q.* But -- and as a special agent, did you perform a Google

5  search?

6  *A.* Yes, I did.

7  *Q.* Okay.  And one of the things you were using is key words to

8  do the Google search.  Is that right?

9  *A.* Yes.

10  *Q.* And you had information about the case before you used those

11  key words.  Is that right?  You got information from the other

12  agents that were directly involved.  Is that right?

13  *A.* Yes, and from news reports and from -- you know, there

14  was -- it was all over the place.

15  *Q.* So you used secondary searches.  Is that right?  You got,

16  like, the news reports, would be the TV stations, the

17  Review-Journal, things like that, you used for your search?

18  *A.* Yes, they referenced Bunkerville and they referenced Cliven

19  Bundy and they referenced Mesquite.

20  *Q.* All right.  So you used key words.  Did you use the word

21  "militia" in any of your Google searches?

22  *A.* Yes, I did.

23  *Q.* Now, were you directed by any of the other agents to use the

24  word "militia" in doing your Google searches?

25  *A.* No, I was not.

—— 2:16-cr-00046-GMN-PAL ——

1   *Q.*  What?

2   **A.**  No, I was not.

3   *Q.*  So that was something that you independently discerned would

4   be relevant to do?

5   **A.**  Yes, I did.

6   *Q.*  Okay.  Did you spend a lot of your time or focus on Googling

7   the word "militia" or words related to militia activity in doing

8   your Google searches?

9   **A.**  In the news articles that were published about the event and

10  in the blog posts and other things that referenced, you know,

11  Cliven Bundy had a militia or Bundy's militia or the Bunkerville

12  militia.

13  *Q.*  No, the question was:  Did you spend a lot of time, yes or

14  no?

15  **A.**  Relative to --

16          MS. AHMED:  Objection, vague as to "a lot of time."

17  BY MR. JACKSON:

18  *Q.*  All right.  Did you spend more than five or ten hours of

19  focusing on the term "militia" in your Google search?

20  **A.**  I don't believe I focussed exclusively on militia for more

21  than ten hours.

22  *Q.*  Okay.  But maybe as much as ten hours.  Is that right?

23  **A.**  Perhaps over the course of a month.

24  *Q.*  It wasn't that important an issue to you.  Is that correct?

25          MS. AHMED:  Objection, argumentative.

————— 2:16-cr-00046-GMN-PAL —————

1          MR. JACKSON:  Well, I'm just trying to find out how

2    important it was to him.

3    BY MR. JACKSON:

4    *Q.*  Was it an important issue in the case to you?

5          MS. AHMED:  Objection, vague.

6          MR. JACKSON:  I don't think it's that vague.

7    BY MR. JACKSON:

8    *Q.*  Was it important enough to spend about ten hours of time

9    Googling it?

10   **A.**  I suppose.

11   *Q.*  Okay.  Now, you understand the Internet pretty well in your

12   work as a special agent.  Is that correct?

13   **A.**  Yeah, I --

14   *Q.*  That was a pretty important part of this case.  Is that

15   right?

16         MS. AHMED:  Objection, vague as to "important."

17   Irrelevant.

18         THE COURT:  Sustained.

19   BY MR. JACKSON:

20   *Q.*  Well, that was one of the things that was involved in this

21   case.  Is that not correct?

22         THE COURT:  I don't know what you're referring to when

23   you say "that."

24         MR. JACKSON:  All right.  It's a foundation question.

25

1  BY MR. JACKSON:

2  *Q.*  That was important, right, how the Internet worked?

3          MS. AHMED:  Objection, relevance.

4          MR. JACKSON:  Let me ask that as a foundational, and

5  I'll ask the next question.

6  BY MR. JACKSON:

7  *Q.*  That was important, right?

8          THE COURT:  What was important?

9          MS. AHMED:  Objection, vague.

10 BY MR. JACKSON:

11 *Q.*  The Internet postings, you've talked about them.  You've

12 talked about the fact that you got some evidence off of Internet

13 postings by different people involved in this case.  Isn't that

14 correct?

15 *A.*  Are you referencing Facebook or blogs --

16 *Q.*  Facebook, Internet.

17 *A.*  -- or news articles?

18 *Q.*  Yes.  Didn't you use the Internet in some way or get

19 evidence off of various Internet postings, things like that?

20 *A.*  I obtained information about this case from Facebook

21 profiles, from Twitter accounts, from news articles that were

22 posted on the Internet, from images that were available from a

23 Google search.

24 *Q.*  Do you know what the word "viral" means?

25 *A.*  Viral?

———————— 2:16-cr-00046-GMN-PAL ————————

 1  *Q.*  Viral.

 2          MS. AHMED:  Objection, relevance.

 3          MR. JACKSON:  Let me ask if he knows, yes or no.

 4          MS. AHMED:  Objection, relevance.

 5          MR. JACKSON:  I think it's relevant.  Let me ask him

 6  the question.

 7          MS. AHMED:  Objection, Your Honor.

 8          MR. JACKSON:  All right.  Let me rephrase it.

 9  BY MR. JACKSON:

10  *Q.*  Did the facts about the Bundy case or the Bunkerville case

11  go viral on the Internet?

12          MS. AHMED:  Objection, relevance.

13          THE COURT:  What's the relevance?

14          MR. JACKSON:  The relevance is that thousands or more

15  people were aware of this case and may have posted things about

16  it.  And he's talked about the research he did Googling it, and

17  I think it's -- I'm entitled to ask him the question whether or

18  not this case went viral, how many people were aware of it.

19  He's talked about getting it from multiple sources.  I just want

20  to ask if he knows what the word "viral" means and what the

21  concept of that is.

22          MS. AHMED:  Your Honor --

23          THE COURT:  Even if there were multiple sources aware

24  of it, how would that be relevant to the charges in this case?

25          MR. JACKSON:  It's relevant because it would affect --

────── 2:16-cr-00046-GMN-PAL ──────

1          THE COURT:  For the defenses.  It can be relevant to

2   the defenses, not limited to the relevance to the charges,

3   but --

4          MR. JACKSON:  It's not relevant?

5          THE COURT:  No, I said it can be either relevant to the

6   charges or the defenses or some other question that's at issue,

7   but I'm not seeing the relevance of how popular or unpopular or

8   how viral or not viral the event was.

9   BY MR. JACKSON:

10  Q.  There were many people that were aware of the -- what

11  happened at the Bundy Ranch.  Isn't that correct?

12         MS. AHMED:  Objection, vague, relevance.

13  BY MR. JACKSON:

14  Q.  All right.  You got information about this from many

15  sources.  Isn't that correct?

16  A.  From multiple sources, yes.

17  Q.  All right.

18         You stated you personally were not directly present on

19  April 12th of 2014, in the Bunkerville area.  Is that correct?

20  A.  That's correct.  I was not in Bunkerville nor at the wash on

21  April 12th.

22  Q.  Okay.  And you began your investigation of this case how

23  long after April 12th, 2014?

24  A.  I believe it was the following day.  I think that was

25  Sunday.

——————— 2:16-cr-00046-GMN-PAL ———————

1  *Q.*  How much time, if you know, did you spend going through

2  Facebook -- Facebooks of individuals involved in this case?

3         MS. AHMED:  Objection, relevance.

4         MR. JACKSON:  I just want to know how much time he

5  spent doing it.

6         MS. AHMED:  Objection, relevance.

7         MR. JACKSON:  I think it's relevant if he spent 30

8  minutes, three hours, 300 hours.  It's important for the jury to

9  know how much time he spent.

10        MS. AHMED:  Objection, relevance.

11        MR. JACKSON:  Why is it not relevant?

12        THE COURT:  Overruled.  I'm going to allow him to ask

13 the question.

14 BY MR. JACKSON:

15 *Q.*  Approximately how much time?  I mean, you might not know

16 precisely how many minutes and seconds you spent, but

17 approximately how much time you spent?

18 **A.**  The first day, Sunday, the 13th, I probably spent about

19 seven hours.  The next day probably similar.  I probably did

20 research between five and seven hours a day for two or three

21 weeks following the incident.

22 *Q.*  So that's a total of about 15 days times five, five to six

23 hours a day.  So maybe about 100 hours or more you spent

24 reviewing Facebook and other communications involved in this

25 case.  Would that be fair to say?

 1  *A.*  And then beyond the initial two or three weeks after the

 2  event, you know, I would continue to review information, but not

 3  for that extensive time each day.  Maybe one or two hours every

 4  other day, every day, you know, just as needed.

 5  *Q.*  So it would be substantially more than a 100 hours you've

 6  spent reviewing the information regarding Facebook accounts and

 7  whatever in this case.  Would that be fair to say?

 8  *A.*  If you include the time it took to capture the images, burn

 9  them onto a CD, submit them into evidence, you know, all of the

10  administrative process associated with it, yes.

11  *Q.*  And you've spent time in this case reviewing all of this

12  data with the United States Attorney's Office.  Is that correct?

13         MS. AHMED:  Objection, relevance.

14         MR. JACKSON:  Well, I'm just asking him if he did or

15  didn't, yes or no.

16         THE COURT:  Overruled.  He can answer the question.

17         THE WITNESS:  I reviewed some of it with the

18  U.S. Attorney's Office, but not everything.

19  BY MR. JACKSON:

20  *Q.*  How many times did you meet with them, if you remember?

21  *A.*  I met with them three or four times a couple of years ago,

22  you know, toward the beginning of the case.  I met with them

23  again, I believe it was last year, maybe once or twice.  And

24  then I met with them twice, you know, in this past week.

25  *Q.*  So you've met with them a total of maybe six or seven times,

—————2:16-cr-00046-GMN-PAL—————

1  and you've discussed the aspects of the case that you've

2  testified about here today.  Is that correct?

3  **A.**  Yes, that's correct.

4           MR. JACKSON:  I have no further questions.

5           THE COURT:  Mr. Marchese?

6           MR. MARCHESE:  Thank you, Your Honor.

7           Bryan, can we get up 143.

8                    CROSS-EXAMINATION

9  BY MR. MARCHESE:

10  *Q.*  All right.  Good afternoon, sir.  Do you see this particular

11  exhibit?

12  **A.**  Yes, I do.

13  *Q.*  And you recognized this on direct examination.  This is

14  something that you pulled off as a result of your search in the

15  course of this investigation.  Is that fair to say?

16  **A.**  Yes, that's fair.

17  *Q.*  Throughout the direct examination, you had some questions in

18  reference to this individual right here with the plaid shirt.

19  Do you remember those -- that line of questioning?

20  **A.**  Yeah.

21  *Q.*  Okay.  And part of that -- those lines of questions was

22  based on your investigation.  You saw similar pictures on the

23  Internet through the course of your investigation.  Does that

24  sound accurate?

25  **A.**  I found -- I saw pictures taken from the Internet.  I also

—2:16-cr-00046-GMN-PAL—

1  saw pictures taken from police dash cam videos.  I saw pictures

2  taken from our surveillance plane.  I saw, you know, newspaper

3  article, you know, front page of the Review-Journal.  It might

4  have been on there.

5  Q.  Okay.  But you didn't see any surveillance footage of this

6  individual, though, correct?

7  A.  The -- I saw the footage from the surveillance plane, and

8  sometimes it was in color.  Sometimes it was in black and white.

9  I don't recall specifically being able to determine the color of

10 his shirt from the surveillance plane video, but I could see,

11 you know, where the two individuals were from the surveillance

12 plane --

13 Q.  Okay.  So it's your testimony here today in court that from

14 the FBI surveillance video footage you could identify this

15 individual from the footage.  Is that a yes or a no?

16 A.  I could identify --

17 Q.  Is that a yes or a no?

18      MS. AHMED:  Your Honor, objection.  He's not allowing

19 the witness to answer.

20      MR. MARCHESE:  No, it's a yes or a no question.  I

21 would like a yes or no answer.

22      MS. AHMED:  Your Honor, clearly the witness is trying

23 to explain.

24      THE COURT:  He's already explained to you.  He said

25 there was numerous different things that he reviewed.  So it's

1    not a yes or no question.

2    BY MR. MARCHESE:

3    Q.  Yes or no, is it your testimony here today in court that you

4    can identify this individual from the FBI surveillance footage?

5    A.  I can identify that there were two individuals --

6           MR. MARCHESE:  Your Honor, I would ask you to instruct

7    the witness to answer yes or no questions with yes or no

8    answers.

9           MS. AHMED:  Objection, Your Honor.  He's not allowing

10   the witness to answer the question as posed, and the way that

11   the witness has --

12          THE COURT:  The way that it's posed is not necessarily

13   a yes or no question.

14   BY MR. MARCHESE:

15   Q.  So your testimony is that you can identify this individual

16   from the FBI surveillance footage?

17   A.  I can identify that there were two individuals in that

18   position.  I can't identify him specifically by facial

19   recognition from the FBI surveillance footage.  I can tell that

20   there was somebody in that position at approximately that time.

21   Q.  Okay.  And what time would that be?

22   A.  He was there for a while.  I don't know the exact minute and

23   second.

24   Q.  Okay.  Can you give me the time range?

25          If you don't know, that's fine.  I'm not here to make

-------------------2:16-cr-00046-GMN-PAL-------------------

1   you guess.

2   *A.*   Yeah, I don't know exactly off the top of my head --

3   *Q.*   All right.   That's fine.

4   *A.*   -- what time in the footage it was focussed on him versus

5   other places in the area.

6   *Q.*   Sure.   Speaking of that FBI surveillance footage, there

7   was -- did you view that footage -- did you actually see -- from

8   that footage did you see the BLM leaving the ICP compound,

9   through your investigation?

10  *A.*   I don't recall watching the full length of the surveillance

11  footage.   I don't believe I watched the last portion of the

12  footage, so I couldn't testify to that.

13  *Q.*   Okay.   Now, getting back to this individual that -- with the

14  plaid shirt.   You testified on direct examination -- or I think

15  it was actually cross-examination that you started your

16  investigation the Sunday after the alleged event, correct?

17  *A.*   That's correct.

18  *Q.*   Looks like you put in a full day's work, about a good seven

19  hours was your testimony, correct?

20  *A.*   Yeah, approximately.

21  *Q.*   Okay.   And in addition -- what did that seven hours consist

22  of?

23  *A.*   I was called and asked if I could assist in trying to review

24  social media to see if we could identify any information

25  associated with, you know, this event.

———————2:16-cr-00046-GMN-PAL———————

 1   Q.  Okay.  Would it be fair to say that during the course of

 2   your investigation that you did a lot of Internet searches,

 3   correct?

 4   A.  Yeah, that's correct.

 5   Q.  Okay.  Various forms of social media, correct?

 6   A.  Yes, that's correct.

 7   Q.  And during your Internet and social media searches, is it

 8   fair to say that there were numerous pictures that came up of

 9   this individual with the plaid shirt.  Is that fair to say?

10   A.  Yes, that's fair to say.

11   Q.  Very similar pictures to the one that you're actually seeing

12   depicted here today right now in court, maybe just from

13   different angles.  Is that accurate?

14   A.  Yes, that's accurate.

15   Q.  Okay.

16          MR. MARCHESE:  No further questions.

17          THE COURT:  Mr. Leventhal?

18                        CROSS-EXAMINATION

19   BY MR. LEVENTHAL:

20   Q.  Good afternoon, sir.

21   A.  Good afternoon.

22   Q.  My name is Todd Leventhal.  I represent Mr. Drexler.

23          MR. LEVENTHAL:  Bryan, if we would bring up Defense

24   Proposed 5046, which is Government's 214.

25

——————2:16-cr-00046-GMN-PAL——————

1   BY MR. LEVENTHAL:

2   *Q.* Can you take a look at your screen right there. Do you

3   recognize that as your screen?

4   ***A.*** The screen that I captured, yes.

5   *Q.* Yes. Okay.

6         So does that fairly and accurately represent your

7   computer screen?

8   ***A.*** Yes.

9   *Q.* Okay.

10         MR. LEVENTHAL: At this time offer up Defense

11   Proposed 5046.

12         MS. AHMED: No objection, Your Honor.

13         THE COURT: All right. What was the number again?

14         MR. LEVENTHAL: 5046.

15         THE COURT: 5046.

16         MR. LEVENTHAL: Yeah. May I publish?

17         THE COURT: Yes.

18         COURTROOM ADMINISTRATOR: And, Your Honor, 5046 is

19   admitted?

20         THE COURT: Yes, 5046 is admitted.

21         (Defense Exhibit 5046 is admitted.)

22         MR. LEVENTHAL: Okay. If we could blow that up a

23   little bit.

24   BY MR. LEVENTHAL:

25   *Q.* You indicated that you recognized this as your computer

———————— 2:16-cr-00046-GMN-PAL ————————

1  screen, correct?

2  **A.**  Yes, that's correct.

3          MR. LEVENTHAL:  You can go down, Bryan.

4  BY MR. LEVENTHAL:

5  *Q.*  Now, you have a number of boxes down here.  You see

6  Everything You Need, correct?

7  **A.**  Yes, that's correct.

8  *Q.*  And then to the right of that there's Roxio Creator Starter,

9  correct?

10 **A.**  Yes, that's correct.

11 *Q.*  Okay.  And then you've got -- hold on -- BLM Note Pad?

12 **A.**  Yes.

13 *Q.*  And you've got Camtasia Studios U, correct?

14 **A.**  Yes.

15 *Q.*  Okay.  Now, would you agree me that the Camtasia Studios U

16 is a program to edit pictures and videos?

17 **A.**  It can be used for that, yes.

18 *Q.*  Would you agree with me that it -- yeah, it's one of the

19 purposes, correct?

20 **A.**  Yes, it's one --

21 *Q.*  Okay.  And another purpose for Camtasia would be to enhance

22 a photo, correct?

23 **A.**  And to capture --

24 *Q.*  Yes or no?

25 **A.**  Yes, you can --

1  *Q.*  Okay.  And another reason you would use that is to split

2  clips if you wanted to, correct?

3  *A.*  You could.

4  *Q.*  Okay.  How about remove portions of the picture?  Can you

5  use that program that you have down here to remove portions of

6  the program -- or of the picture, yes or no?

7  *A.*  I'm not familiar with that capability.  I don't know.

8  *Q.*  Well, you have it down on your computer.  You're not

9  familiar with the program itself or ...

10  *A.*  I don't know every aspect of the program.

11  *Q.*  You don't.  Okay.  So you don't know whether or not you can

12  delete anything from the photo?

13  *A.*  I don't know.

14  *Q.*  Would you liken it to Photoshop?

15  *A.*  No, I wouldn't.  I'm not familiar with Photoshop either.

16  *Q.*  Okay.  But you have Camtasia Studios and you're not sure of

17  all of the functions in it?

18  *A.*  The function that I use it for is to record my computer

19  screen.

20  *Q.*  Okay.  How about -- let's go to the Roxio Creator.  That's

21  another program that you use?

22  *A.*  I tried to use it that day.

23  *Q.*  Okay.  And that's also to edit photographs, correct?

24  *A.*  It can be used that way.

25  *Q.*  Okay.  And you can add things to a photograph with that,

 1  correct?

 2  *A.*  Probably.  I'm not familiar enough with it.  I --

 3  *Q.*  So you don't know whether you can add things.  How about

 4  delete things from a photo?

 5          MS. AHMED:  Objection, Your Honor.  I would just ask

 6  that counsel allow --

 7          THE COURT:  You're not allowing the witness to answer

 8  the question fully.

 9  BY MR. LEVENTHAL:

10  *Q.*  Go ahead and answer.

11          Do you know whether or not you can add things to a

12  photo using either of those programs?

13  *A.*  I don't know the photo-editing capability of those programs.

14  I looked for programs that would record my computer screen.

15  *Q.*  Okay.  So you've never been actually trained in either Roxio

16  Creator or the Camtasia?

17          MS. AHMED:  Objection.  Misstates the witness's

18  testimony.

19  BY MR. LEVENTHAL:

20  *Q.*  Have you been trained in either the Roxio Creator Starter or

21  the Camtasia?

22  *A.*  I have not received any formal training in either of those

23  programs.

24  *Q.*  Okay.

25          MR. LEVENTHAL:  If we could bring up Government's 130,

——————— 2:16-cr-00046-GMN-PAL ———————

1   please.

2   BY MR. LEVENTHAL:

3   Q.  Okay.  You see this photo?

4   A.  Yes.

5   Q.  Okay.  The gentleman here looks to be in a laying down

6   position, correct?

7   A.  Yes.

8   Q.  Okay.

9           MR. LEVENTHAL:  If we could go to --

10  BY MR. LEVENTHAL:

11  Q.  And you see a blanket there, correct?

12  A.  Yes.

13  Q.  Okay.

14          MR. LEVENTHAL:  If we can go to 128.

15  BY MR. LEVENTHAL:

16  Q.  And where's the blanket?  Do you see a blanket there?

17          MS. AHMED:  Objection, Your Honor.  This is misleading.

18  This is argumentative.  This witness did not take these photos.

19          MR. LEVENTHAL:  He hasn't taken any of the photos.

20          MS. AHMED:  The implication that Mr. Leventhal is

21  implying with this witness is improper.  There's no foundation

22  for it at all.

23          MR. LEVENTHAL:  I'm not implying anything.  I'm saying

24  that there's a reason that we are objecting to authenticity.

25          THE COURT:  The question was:  Where is the red

——2:16-cr-00046-GMN-PAL——

1   blanket?

2          MR. LEVENTHAL:  That's it.

3          THE COURT:  That's not a proper question.

4          MR. LEVENTHAL:  Thank you.

5          THE COURT:  You can ask him:  Do you see a red blanket

6   in this photo?  That would be a proper question.

7   BY MR. LEVENTHAL:

8   *Q.*  Do you see a red blanket in this photo, sir?

9   **A.**  No, I do not.

10         MR. LEVENTHAL:  Nothing further.

11         THE COURT:  Thank you.

12         Mr. Perez?

13         MR. PEREZ:  No questions from Lovelien.

14         THE COURT:  All right.  Any redirect?

15         MS. AHMED:  Your Honor, briefly.  Thank you.

16                       REDIRECT EXAMINATION

17   BY MS. AHMED:

18   *Q.*  Agent Woolstenhulme, in the course of your investigation did

19   you edit any of the photographs or videos that you obtained from

20   the Internet?

21   **A.**  On a couple of videos I captured my screen shot and pasted

22   it into PowerPoint so that I could save it as a photo prior to

23   using Camtasia or any of these other programs I discovered.  I

24   would -- let me back up.

25         My initial method for capturing the images was to push

1  print screen or to use Microsoft snipping tool where you can

2  highlight a section of the screen and then it can be saved as a

3  JPEG.  The quickest way to save it as an image is to use a

4  snipping tool and then right click on it, and then I would paste

5  it into a PowerPoint slide.  And then I could right click on it

6  again and hit save as a photo, and then it would be saved as a

7  JPEG.

8  *Q.*  In terms of the -- your initial taking down or downloading

9  or capturing photos or videos, would you preserve what you saw

10 as you saw it?

11 **A.**  Yes, with the exception of I -- on a couple of photos that I

12 downloaded, I put a couple of arrows on the photo to indicate to

13 the lead case agent, you know, that this is something that might

14 be of interest to him.  And then I sent him a copy of that.

15 *Q.*  Did you -- in terms of the exhibits that we reviewed today

16 in court, did you edit any of the content of those?

17 **A.**  No.

18          MS. AHMED:  Court's indulgence.

19          THE COURT:  Yes.

20          (Prosecution conferring.)

21          MS. AHMED:  Nothing further, Your Honor.  Thank you.

22          THE COURT:  Any further cross?

23          MR. TANASI:  None from Stewart, Your Honor.

24          MR. LEVENTHAL:  Just briefly, Your Honor.

25

—————————— 2:16-cr-00046-GMN-PAL ——————————

1                    RECROSS-EXAMINATION

2   BY MR. LEVENTHAL:

3   *Q.*  You were asked a couple of questions on whether you edited,

4   correct?

5   *A.*  Yes.

6   *Q.*  You don't know if the person who took the photo edited, do

7   you?

8   *A.*  No, I do not know.

9            MR. LEVENTHAL:  Thank you.

10           THE COURT:  Anyone else?  Any for redirect?

11           MR. MARCHESE:  None from Parker.

12           MS. AHMED:  No redirect, Your Honor.

13           THE COURT:  All right.  Thank you very much,

14   Mr. Woolstenhulme, you're excused.  Please be careful on the way

15   down with the steps.

16

17

18

19

20

21

22

23

24

25

—2:16-cr-00046-GMN-PAL—

1                              --oOo--

2                   COURT REPORTER'S CERTIFICATE

3

4        I, PATRICIA L. GANCI, Official Court Reporter, United

5   States District Court, District of Nevada, Las Vegas, Nevada,

6   certify that the foregoing is a correct transcript from the

7   record of proceedings in the above-entitled matter.

8

9   Date:  March 29, 2017.

10                                   /s/ **Patricia L. Ganci**

11                                   Patricia L. Ganci, RMR, CRR

12                                   CCR #937

13

14

15

16

17

18

19

20

21

22

23

24

25

PATRICIA L. GANCI, RMR, CRR